**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| MASONITE CORPORATION, <u>et al.</u>,[1] | ) | Case No. 09-10844 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### *DISCLOSURE STATEMENT RELATING TO THE JOINT PLAN OF REORGANIZATION OF MASONITE CORPORATION, ET AL., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE*

**KIRKLAND & ELLIS LLP**
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701

Attorneys for the Masonite Debtors

---

[1] The Masonite Debtors, together with the last four digits of each Masonite Debtor's federal tax identification number, are: Masonite Corporation (8020); Premdor Finance LLC (4966); Eger Properties (6847); WMW, Inc. (3326); Woodlands Millwork I, Ltd. (5989); Masonite Primeboard, Inc. (5752); Masonite Corporation Foreign Holdings Ltd. (0667); Masonite Holding Company Limited (3243); Florida Made Door Co. (7960); Cutting Edge Tooling, Inc. (8818); Pintu Acquisition Company, Inc. (7932); Masonite Air LLC (N/A); Door Installation Specialist Corporation (2354); Masonite Holding Corporation (N/A); Masonite International Inc. (N/A); and Masonite International Corporation (7314). The Masonite Debtors' United States executive offices are located in Tampa, Florida and the Masonite Debtors' Canadian executive offices are located in Mississauga, Ontario. The service address for all Masonite Debtors is: One N. Dale Mabry Highway, Suite 950, Tampa, Florida 33609.

*TABLE OF CONTENTS*

Page

**Important Information About this Disclosure Statement** ............................................................................1

**Questions and Answers Regarding this Disclosure Statement and the Plan** ..............................................3

**Masonite's History and the Chapter 11 Cases** ........................................................................................7

**Treatment of Claims Against and Equity Interests in Masonite under the Plan** ...............................22

**Management of the Company** ..................................................................................................................26

**Composition of New Board of Directors** ...............................................................................................27

**Pension Plan and Other Benefits Plans** .................................................................................................27

**Capital Structure of the Reorganized Masonite Debtors upon Consummation** ..................................28

**Summary of Legal Proceedings** .............................................................................................................29

**Valuation Analysis** ................................................................................................................................31

**Liquidation Analysis** .............................................................................................................................35

**Projected Financial Information** ...........................................................................................................45

**Risk Factors** ..........................................................................................................................................49

**Confirmation of the Plan** ......................................................................................................................53

**Effect of Confirmation of the Plan** .......................................................................................................57

**Important Securities Laws Disclosure** ..................................................................................................61

**Nominee Voting Instructions** ................................................................................................................63

**Certain U.S. Federal Income Tax Consequences of the Plan** ...............................................................64

**Certain Canadian Federal Income Tax Considerations** ........................................................................75

**Recommendation of Masonite** ...............................................................................................................83

*EXHIBITS*

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Reorganized Masonite Debtors' Projections

EXHIBIT C      Disclosure Statement Order

**Important Information About this Disclosure Statement**

This Disclosure Statement provides information regarding the Joint Plan of Reorganization that Masonite Corporation and the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Masonite Debtors") are seeking to have confirmed by the Bankruptcy Court and approved by the Canadian Court in the related Canadian proceedings ("CCAA Proceedings").  Masonite believes that the Plan is in the best interests of all creditors. Masonite urges all creditors entitled to vote on the Plan to vote in favor of the Plan.

**References to the "Plan" and the "Plan of Reorganization" are to the Plan of Reorganization attached as Exhibit A hereto.  All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.**

**Unless the context requires otherwise, reference to "Masonite," "we," "our," and "us" are to Masonite  Holding Corporation and its subsidiaries.**

The Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including, without limitation, the Plan, which is annexed as Exhibit A hereto, and the section entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court or by the Canadian Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan, this Disclosure Statement and the Plan Supplement.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, Masonite is under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  Masonite believes that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning Masonite or the value of Masonite's property have been authorized by Masonite other than as set forth in this Disclosure Statement.  Any information, representations or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission ("SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

Masonite has sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement

has not been and will not be audited or reviewed by Masonite's independent auditors unless explicitly provided otherwise.

Some of the shares of the New Common Stock described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code and other applicable exemptions in foreign jurisdictions. Other shares of the New Common Stock may be issued pursuant to other applicable exemptions under the federal and foreign securities laws. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or registration under the Securities Act or similar foreign laws.

Masonite makes statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Masonite considers all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- Masonite's expected future financial position, liquidity, results of operations, profitability and cash flows;

- projected dividends;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated liability costs, including pension, retiree, tort and environmental costs and costs of environmental remediation;

- results of litigation;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing products and services;

- projected price increases;

- projected general market conditions;

- benefits from new technology; and

- effect of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of Masonite's future performance. Such statements represent Masonite's estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Masonite Debtors' actual performance or achievements to be materially different from those they may project and Masonite undertakes no obligation to update any such statement. These risks, uncertainties and factors include:

- Masonite's ability to confirm and consummate the Plan;

- Masonite's ability to reduce its overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases and CCAA Proceedings on Masonite's operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- lower prices for Masonite's products or a decline in Masonite's market share due to competition or price pressure by customers;

- Masonite's ability to implement cost reduction initiatives in a timely and effective manner;

- adverse tax changes;

- limited access to capital resources;

- multinational business risks;

- customer response to the Chapter 11 Cases and CCAA Proceedings;

- financial conditions of our customers;

- inability to have claims discharged/settled during the Chapter 11 Cases and CCAA Proceedings;

- continued decline in the general economic, business and market conditions where Masonite operates or sells its products;

- currency fluctuations;

- interest rate fluctuations;

- price increases or shortages of raw materials and energy;

- levels of residential repair, renovation and decrease in remodeling and construction activity;

- home financing availability;

- changes in domestic and foreign laws and regulations;

- trade balance;

- seasonality and weather conditions;

- disruptions in our operations due to hurricanes, earthquakes and other natural disasters;

- geopolitical instability;

- ability to renew Masonite's leases;

- intellectual property challenges; and

- labor costs and disputes.

## Questions and Answers Regarding this Disclosure Statement and the Plan

**Why is Masonite sending me this Disclosure Statement?**

Masonite is seeking to obtain Bankruptcy Court and Canadian Court approval for its Plan and the CBCA Plan. Prior to soliciting acceptances of the proposed Plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan? What will I receive from Masonite if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of Claim or Equity Interest you hold. The Classes of Claims and Equity Interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Equity Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|-------|------------------------------|--------|----------------|--------------------------|----------------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| Class 2 | Senior Secured Claims | Impaired | Entitled to Vote | 37.9% | 21.1% |
| Class 3 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| Class 4 | Senior Subordinated Notes Claims | Impaired | Entitled to Vote | 4.8% | 0% |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |

| Class | Claims and Equity Interests | Status | Voting Rights | Recovery Under the Plan | Recovery in a Liquidation |
|---|---|---|---|---|---|
| Class 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| Class 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% | 0% |
| Class 8 | Equity Interests in Masonite Holding Corporation | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% |

For more information about the treatment of Claims and Equity Interests see "Treatment of Claims Against and Equity Interests in Masonite under the Plan," which begins on page 22.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions (described in Article IX of the Plan) that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the Effective Date mean the date that all conditions to the Plan have been satisfied or waived and when the Plan is fully consummated. Distributions will only be made after Consummation of the Plan. See "Confirmation of the Plan," which begins on page 53, for a discussion of the conditions to Consummation.

**Where is the cash required to fund the Plan coming from?**

The Reorganized Masonite Debtors will fund distributions under the Plan with Cash on hand, including Cash from operations, and the Receivables Purchase Agreement.

**How is the Plan going to be implemented?**

The Restructuring Transactions will be effected in accordance with the Restructuring Transactions Memorandum. The New Common Stock will be issued by New Masonite Holdings.

**What is the CBCA Plan and how does it fit into the Plan?**

The CBCA Plan is a corporate plan of arrangement pursuant to Section 192 of the Canada Business Corporations Act, and is a necessary element of the Plan. The steps that are contemplated in the CBCA Plan are described more fully in the Restructuring Transactions Memorandum and are set out in the CBCA Plan, which is included in the Plan Supplement and is incorporated by reference into the Plan itself. By voting on the Plan, you will be deemed to be voting on the CBCA Plan, meaning that your vote to accept or reject the Plan will also be taken to be a vote to accept or reject the CBCA Plan.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

Creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including:

- the appropriate ballot and applicable voting instructions;

- a pre-addressed, postage pre-paid return envelope; and

- the Disclosure Statement with all exhibits, including the Plan and the CBCA Plan.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party upon written request to the Masonite Debtors' co-counsel at Kirkland & Ellis LLP, 153 East 53rd Street, New York, New York 10022, Attention: Christopher J. Marcus, or by downloading such exhibits and documents from the website of the Masonite Debtors' notice, claims, and balloting agent at www.kccllc.net/masonite or the Bankruptcy Court's website at *www.deb.uscourts.gov*.

**Will Masonite file reports with the SEC or Canadian securities regulators?**

Masonite does not expect to be filing reports with the SEC or Canadian securities regulators after the filing of the Chapter 11 Cases as it does not expect to be subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended, or the regulations promulgated thereunder, nor does it expect to be a reporting issuer in the United States or Canada after the filing of the Chapter 11 Cases.

**What rights will Masonite's new stockholders have?**

Each holder of New Common Stock issued under the Plan and the CBCA Plan will be entitled to one vote per share of New Common Stock on all matters subject to a vote of holders of common stock under applicable law and will be entitled to a pro rata share of any dividends that are declared by the board of directors of New Masonite Holdings. The New Common Stock shall be the sole class of voting stock of New Masonite Holdings.

Holders of the New Common Stock of New Masonite Holdings may be parties to the Shareholders' Agreement, if any, by and among New Masonite Holdings and certain holders of the New Common Stock. Such Shareholders' Agreement may include provisions with respect to voting, drag-along and tag-along rights, share transfers, and information rights. Any such agreements will be set forth in the Plan Supplement. In particular, the Shareholders' Agreement and other documents are expected to provide for public-type reporting to equityholders (other than competitors of New Masonite Holdings and its subsidiaries) who sign a confidentiality agreement and prohibit any transfer of New Common Stock if New Masonite Holdings reasonably determines that such transfer would, if effected, result in the New Masonite Holdings having more than 290 holders of record (as such concept is understood for purposes of Section 12(g) of the Securities Exchange Act of 1934, as amended and any relevant rules promulgated thereunder). On the Effective Date, New Masonite Holdings will authorize and issue a number of shares of New Common Stock sufficient to satisfy its obligations under the Plan and the CBCA Plan.

**Where will New Masonite Holdings be organized?**

New Masonite Holdings will be organized either (i) in Canada under the Canada Business Corporations Act and, in accordance with the CBCA Plan, will change its name to "Masonite Worldwide Holdings Inc." and then make an application to continue under the Business Corporations Act (British Columbia), or (ii) in the United States under the Delaware General Corporation Law. The decision will depend in part upon further discussion with certain of our creditors. Final resolution on this point is expected to be disclosed in the Plan Supplement.

**How will the New Common Stock and Warrants be distributed? Will holders be entitled to stock certificates?**

The New Common Stock delivered to holders of Senior Secured Claims is expected to be delivered to The Bank of Nova Scotia, as Senior Secured Agent. The Bank of Nova Scotia will then distribute the New Common Stock it received to the holders of Senior Secured Claims to accounts designated by them at The Depository Trust Company.

The New Common Stock and Warrants delivered to holders of Senior Subordinated Notes Claims are expected to be delivered to The Bank of New York, as indenture trustee, for distribution to holders of Senior Subordinated Notes Claims to the accounts in which such holders hold their Senior Subordinated Notes Claims.

It is not expected that holders will be entitled to stock or warrant certificates. The Depository Trust Company or its nominee will initially be considered the sole owner or holder of the New Common Stock and Warrants issued upon the Effective Date. Holders of Senior Secured Claims that receive New Common Stock and

holders of Senior Subordinated Notes Claims that receive New Common Stock and Warrants will be owners of beneficial interests in such New Common Stock and Warrants, as the case may be, and will not receive or be entitled to receive physical delivery of such securities.

**What is the deadline to vote on the Plan?**

5:00 p.m., prevailing Eastern time, on May 18, 2009.

**How do I vote for or against the Plan?**

The Masonite Debtors are distributing this Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, to the Holders of Claims entitled to vote on the Plan. If you are a Holder of Claims in the following Classes, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided: 2 and 4.

Masonite has engaged Epiq Systems, Inc. (Financial Balloting Group), to serve as the voting agent, to answer questions, provide additional copies of all materials, and oversee the voting process. The voting agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is 5:00 p.m., prevailing Eastern time, on May 18, 2009.

| BALLOTS |
|---|
| Ballots and master ballots must be actually received by the voting agent by the voting deadline of 5:00 p.m., prevailing Eastern time, on May 18, 2009 at the following address: |
| Masonite Corporation Balloting<br>c/o Financial Balloting Group LLC<br>757 Third Ave. 3rd Floor<br>New York, NY 10017 |
| If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a master ballot before the voting deadline. |
| If you have any questions on the procedure for voting on the Plan, please call the voting agent at the following telephone number: |
| (866) 734-9393 |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed and received by 5:00 p.m., prevailing Eastern time, on May 18, 2009.

Any ballot that is properly executed by the Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each Holder of a Claim may cast only one ballot for each Claim held. By signing and returning a ballot, each Holder of a Claim in Classes 2 and 4 will certify to the Bankruptcy Court and Masonite that no other ballots with respect to such Claim have been cast or, if any other ballots have been cast with respect to such Class of Claims, such earlier ballots are superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot. For information regarding voting by nominees, see "Nominee Voting Instructions," which begins on page 63.

**When is the Confirmation Hearing expected to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for May 29, 2009 at 9:30 a.m., prevailing Eastern time. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Approval of the Canadian Court will also be sought.

**Masonite's History and the Chapter 11 Cases**

*Historical Overview*

Masonite's history dates back to 1925 when William H. Mason founded Masonite Corporation. Masonite is one of the largest manufacturers of doors in the world, with a significant market share in both interior and entry door products. During the years 2006, 2007 and 2008, Masonite sold approximately 55 million, 45 million and 36 million doors per year, respectively, to more than 3,500 customers in over 70 countries, including the United States, Canada, the United Kingdom, Chile, Mexico, France and other countries around the world. Masonite sells its extensive range of interior and entry doors under well-recognized brand names, including Masonite® and Premdor®.

Throughout its 85-year history, Masonite has focused on leading-edge innovation, manufacturing excellence, and superior customer service. Masonite is committed to delivering product and service innovations that will enhance beauty, functionality and architectural design for its customers around the world. As a result, builders, remodelers, architects and homeowners rely on Masonite products to create homes of distinction.

The chart in "Masonite's Prepetition Organizational Structure," which begins on page 11, sets forth the current simplified structure of the Masonite entities. Masonite Holding Corporation, the parent company of Masonite International Inc., was incorporated under the Canada Business Corporations Act on January 4, 2005. Masonite International Inc., the parent company of Masonite Corporation and Masonite International Corporation, was incorporated under the Canada Business Corporations Act on February 2, 2005. Masonite Corporation is a Delaware corporation incorporated on September 1, 1925. Masonite International Corporation and Specialty Buildings Products Ltd. amalgamated on May 30, 2005 to form Masonite International Corporation under the Business Corporations Act (Ontario).

Masonite's United States executive offices are located at One North Dale Mabry Highway, Suite 950, Tampa, Florida 33609 and Masonite's Canadian executive offices are located at 1820 Matheson Blvd Unit B4, Mississauga, Ontario, Canada L4W 0B3. Masonite's web site is *www.masonite.com*.

In 1955, one of Masonite's predecessor companies, Premdor Inc., commenced its Canadian operations in Toronto, Ontario, as the purchasing division of a retail lumberyard. Masonite began manufacturing doors in Canada in 1961 with a full line of flush doors. Masonite expanded its business through the introduction of wood doors, such as louvre, stile and rail, molded interior doors, plastic laminates, fire doors and pre-hung units, and eventually introduced architectural doors, steel and fiberglass exterior doors and entry door systems. Masonite also expanded geographically, establishing and acquiring door manufacturers in Canada, the United States, the United Kingdom, Chile, Mexico, France and in Central and Eastern Europe. In addition, Masonite made numerous acquisitions of door component manufacturers, as well as logistical and fabrication centers.

On August 31, 2001, Premdor Inc. acquired Masonite Corporation, a leading manufacturer of composite molded door facings, from International Paper Company for approximately $427.3 million, forming the newly vertically integrated enterprise under the ownership of Masonite International Inc.. In 2004, Masonite acquired the residential entry door business of The Stanley Works for $164 million, a manufacturer and pre-hanger of steel and

fiberglass residential entry doors sold primarily for use in residential repair, renovation and remodeling in the United States.

On April 6, 2005, an entity controlled by affiliates of Kohlberg Kravis Roberts & Co. L.P. ("KKR") acquired Masonite. The aggregate value of the acquisition including the assumption of indebtness, premiums, fees and expenses was approximately $2.7 billion, including $551.5 million of new equity provided by KKR and $24.3 million of equity invested by certain members of management at closing. In connection with the acquisition, Masonite entered into the Senior Secured Credit Agreement (consisting of a six year $350 million revolving credit facility, an eight year $1,175 million term loan facility) and a $770 million senior subordinated loan facility, the proceeds of which were used to partially fund the acquisition. The senior subordinated loan facility was subsequently converted into the Senior Subordinated Notes. In May 2005, Masonite purchased the remaining ownership of less than wholly owned investments located in Israel, Turkey and Ukraine for cash consideration of $8.4 million. In July 2005, Masonite entered into a joint venture in Malaysia with a cash contribution of $2.8 million. Also, in October 2005, Masonite acquired an 80% interest in a manufacturing company located in Hungary for total consideration of $8.5 million. In December 2005, Masonite completed the acquisition of a door component manufacturing company in the United States for cash consideration of $6.6 million. During 2005, Masonite also acquired the remaining ownership of two less than wholly owned subsidiaries for total consideration of $45.3 million. These acquisitions included purchasing the remaining interest in a manufacturing facility with operations in Canada and the United States for cash consideration of $36.4 million in May 2005, and the purchase of the remaining ownership of a manufacturing enterprise with operations in Canada for total consideration of $8.9 million in October 2005. Furthermore, in 2005, Masonite sold its former manufacturing site located in the Republic of Korea, which had been closed in late 2004, for cash proceeds of approximately $7.4 million. Also, in 2005, several of the US companies were merged into Masonite Corporation and several Canadian entities were amalgamated with the amalgamated entity being Masonite International Corporation.

Masonite made no acquisitions in 2006. In 2007, Masonite purchased the remaining 20% of its door manufacturing facility located in Hungary for cash consideration of $3.3 million. In the first quarter of 2008, Masonite purchased the remaining 25% ownership interests of Masonite's operations located in the Czech Republic and Poland for a consideration of approximately $18.6 million. In the second quarter of 2008, the holder of 25% of Sacopan Inc. exercised its put right requiring Masonite, pursuant to the terms of the applicable shareholders' agreement, to purchase such ownership interest for a consideration of approximately $16.8 million. Also in 2008, Masonite entered into a joint venture with TechnoLines L.P., an innovator in laser etching technology.

For a description of Masonite's divestitures, please see "Business Facilities," which begins on page 11 and "Masonite's Operational Restructuring," which begins on page 18.

### *Masonite's Business Operations*

Masonite employs approximately 8,500 people worldwide, including approximately 4,450 people in the United States and Canada. Masonite is a vertically integrated producer, manufacturing key components of doors, including composite molded and veneer door facings, decorative and non-decorative insulated glass door inserts, door slabs and other door components. Masonite believes that its high level of vertical integration provides it with competitive advantages over most other door manufacturers and enhances its ability to develop new and proprietary products.

Masonite operates 65 manufacturing, warehouse, and office facilities in 18 countries. Masonite conducts the bulk of its North American operations through Masonite International Corporation and Masonite Corporation, respectively. With limited exceptions, Masonite conducts its operations in countries other than the United States and Canada through subsidiaries of Masonite International Corporation.

Masonite's sales are derived from the two primary sources of door demand: the construction of new homes and residential repair, renovation and remodeling of existing homes. Masonite sells its products through multiple distribution channels, including: (a) directly to large retail home center customers; (b) "one-step" distributors that sell directly to homebuilders and contractors; and (c) "two-step" wholesale distributors that resell to other dealers or distributors. For its North American and certain European retail home center customers, Masonite also provides

value-added fabrication and logistical services, including pre-hanging interior and entry doors and delivering pre-hung doors directly to customers' stores.

Geographically, Masonite segments its sales based on the North American market versus the rest of the world markets. In 2008, Masonite's worldwide sales revenue totaled $1.82 billion. Masonite's sales of interior and exterior door products accounted for approximately 71% and 29% of 2008 sales revenue, respectively. In 2008, Masonite's United States and Canadian operations generated approximately $1.18 billion in revenue (65% of Masonite's total 2008 sales revenue) and Masonite's European and rest of world operations generated approximately $640 million in revenue (35% of Masonite's total 2008 sales revenue). Masonite's adjusted EBITDA ("Adjusted EBITDA") for 2008 was $162.4 million. As of December 31, 2008, the book value of Masonite's assets totaled approximately $1.6 billion and its liabilities totaled $2.7 billion.

### *Masonite's Products*

Masonite sells interior and exterior doors, with interior products accounting for approximately two-thirds of Masonite's total annual sales revenue over the past five years; and exterior products accounting for the majority of the balance of Masonite's revenue during these periods. Masonite offers an extensive range of interior and exterior doors, which are available in a wide variety of sizes, styles and types. Substantially all interior doors are made with wood and related materials such as hardboard (including composite molded and flat door facings). Exterior doors are made primarily of steel or fiberglass, as the demand for wood based exterior doors has declined over the last decade.

The following is a description of the principal types of doors and other products that Masonite manufactures and sells worldwide:

| | |
|---|---|
| *Molded Flush* | Doors made by sandwiching a wood or medium density fiberboard frame and a hollow or solid core between two molded hardboard facings. These doors are used for closets, bedrooms, bathrooms and hallways. |
| *Flush* | Doors made by sandwiching a wood or medium density fiberboard frame and a hollow or solid core between two facings made of plywood or hardboard (flat or embossed). These doors are used for closets, bedrooms, bathrooms and hallways. |
| *Stile and Rail* | Doors made from solid wood with vertical stiles, horizontal rails and wood panels, which have been cut, milled and assembled from lumber such as clear pine, knotty pine, oak and mahogany. Where glass panels are inserted between stiles and rails, the resulting door when used for interior purposes is referred to as a French door. For interior purposes these doors are primarily used for hallways, room dividers, closets and bathrooms. For exterior purposes these doors are used as entry doors and decorative glass inserts (lites) are often inserted into these doors. |
| *Louvre* | Doors with sloping horizontal slats that admit light and air. These doors are used for hallways, closets, and cabinets and as interior and exterior decorative shutters. |
| *Bifold* | Hinged folding doors (typically molded flush, flush or louvre doors) used in closets or as room dividers. |
| *Pre-hung* | Interior and exterior doors sold together with door frames as units. |

| | |
|---|---|
| *Plastic Laminate* | Flush doors with a plastic veneer facing, generally for commercial use. |
| *Architectural* | Doors custom-designed to architectural specifications generally for commercial uses such as in office buildings, hotels, schools and hospitals. |
| *Steel* | Exterior doors made by assembling two interlocking steel facings (paneled or flat) or attaching two steel facings to a wood or steel frame and injecting the core with polyurethane insulation. |
| *Fiberglass* | Exterior doors made by assembling two fiberglass facings to a wood frame or composite material and injecting the core with polyurethane insulation. |
| *Entry Systems* | Exterior doors sold pre-assembled in a door frame, with or without lites and transoms. |
| *Molded Door Facings* | Thin sheets of molded hardboard produced by grinding or defibrating wood chips, adding resin and other ingredients, creating a thick fibrous mat composed of dry wood fibers and pressing the mat between two steel dies to form a molded sheet, the surface of which may be smooth or textured with a wood grain pattern. |
| *Door Framing Material* | Commonly referred to as cut stock. Wood or medium density fiberboard components that constitute the frame on which interior and exterior door facings are attached. |
| *Door Lites* | Decorative and non-decorative insulated glass inserts primarily used in exterior doors. |
| *Door Core* | A molded fiber mat or particle board used in the construction of solid core doors. |

### Sales and Marketing

In the United States and Canada, Masonite primarily sells doors through its own dedicated commissioned sales force organized by geographical regions. In addition to driving revenues, the sales force is also responsible for providing customer service in the field, enabling Masonite to respond rapidly to its customers and to end user needs. Masonite has become a leader in merchandising and advertising through point of sale displays, in-store merchandising and training programs, trade advertisements, regional flyer programs and do-it-yourself videos for doors distributed through the home center channel. To assist home center sales personnel with product knowledge and sales strategies Masonite provides consumer brochures, including a planning guide and do-it-yourself products to assist the consumer in the purchase and installation of doors, as well as other training programs. In addition, Masonite promotes its products at numerous events, including trade shows in North America, Europe, Asia and the Middle East.

In 2008, Masonite redesigned and launched its award winning website *www.masonite.com.* Masonite's new website allows customers to more easily browse and choose from a wide selection of doors. The site contains an interactive door configurator, which enables customers to design an entry door system specifically for their home, as well as a 'where-to-buy' feature that provides consumers with a wide selection of dealers and retail outlets that carry Masonite products along with detailed maps and directions to these locations.

*Intellectual Property*

Masonite has approximately 921 registered and pending trademarks in 116 countries and regions. In North America, Masonite's doors and door components are marketed primarily under the Masonite® brand. Other North American brands include: Premdor®, Barrington®, Oakcraft®, Sta-Tru® HD, ArTek®, Premvu®, Royal Mahogany®, Cavalier™, Fast-Frame®, Safe'N Sound®, Premcor®, Crown™, Miami Louver Doors®, Palazzo Series®, Bellagio®, Capri®, Cheyenne®, Belleville®, Riverside™, Timbergrain®, Heritage®, Specialty® and Mohawk®. In Europe, doors are marketed also under the Premdor®, Ekem™, Fonmarty™, Magri™, Monnerie™, Batimetal™ and Crosby™ brands, among others. In Central and South America, doors are also marketed under the HDF® brand. Masonite considers the use of trademarks and trade names to be important in the development of product awareness, and for differentiating its products from those of its competitors.

Many of Masonite's products contain patented features or were manufactured using patented processes owned by Masonite. In addition, Masonite protects the appearance of its doors and various components with design patents. Masonite owns patents on ink jet printing of door facings and on creating dies to manufacture realistic looking molded door facings. Masonite has approximately 850 patents and patent applications in 41 countries and regions. Masonite believes its patents provide Masonite with an advantage over its competitors and are a valuable benefit to its customers.

Masonite's Coates Technical Center in West Chicago, Illinois is recognized as being an industry leader in the development of innovative wood fiber products and manufacturing processes. With the world-class facilities and equipment at the Coates Technical Center, Masonite is able to develop new products and techniques in-house and to solve manufacturing problems.

Masonite has sued Jeld-Wen, Inc. for infringement of its patented isocyanate technology for manufacturing door facings. That litigation is pending in the United States District Court for the District of Delaware (Case No. 1:09-cv-138-GMS).

*Business Facilities*

Masonite operates 65 manufacturing, warehouse and office facilities worldwide. As more fully described in "Masonite's Operational Restructuring," which begins on page 18, since 2005, Masonite has completed the closure or consolidation of 23 facilities worldwide, has announced the closure of three additional facilities for 2009, and will continue to evaluate its business operations as necessary. Masonite believes that its post-restructuring leased and owned facilities are adequate for Masonite's present operations. Masonite believes that it generally has sufficient capacity to satisfy the demand for its products in the foreseeable future, and there are no environmental issues materially constraining the utilization of its facilities.

***Masonite's Prepetition Organizational Structure***

The following chart generally depicts Masonite's prepetition organizational structure:

<u>Figure 1 – Masonite Organizational Structure</u>



***Masonite's Prepetition Capital Structure***

As of the Petition Date, Masonite's total consolidated funded debt was approximately $2.2 billion, consisting of $1,470.2 million in Senior Secured Claims, including open but undrawn letters of credit, $769.9 million in Senior Subordinated Notes Claims, and $6.3 million of other funded debt.[2]

---

[2] Certain Masonite entities that are neither Masonite Debtors nor CCAA Applicants are parties to certain third-party funded debt agreements. The amount of such debt is approximately $6.3 million.

Figure 2 – Masonite Capital Structure (000,000's)



*The Prepetition Senior Secured Credit Agreement*

Masonite Corporation, as the United States borrower, Masonite International Corporation, as the Canadian Borrower, and certain of their affiliates, as guarantors, The Bank of Nova Scotia, as Senior Secured Agent, and the Holders of Senior Secured Claims party thereto are parties to that certain Senior Secured Credit Agreement, dated as of April 6, 2005. The Senior Secured Credit Agreement provides for a $350 million revolving credit facility (of which $335.2 million remains outstanding) and a $1.175 billion term loan (of which $1.135 billion remains outstanding). The Senior Secured Claims mature on April 6, 2013. Each of the Masonite Debtors and the CCAA Applicants (other than Masonite Corporation, Masonite International Corporation, Masonite Corporation Foreign Holdings LTD, Masonite Holding Company Ltd. and Masonite Holding Corporation) guarantee the Senior Secured Claims. In addition, the Non-Debtor Guarantors guarantee the Senior Secured Claims.

Masonite Corporation, as the United States borrower, certain Masonite subsidiaries, as subsidiary guarantors, and The Bank of Nova Scotia, as collateral agent for the Holders of Senior Secured Claims (the "U.S. Security Agreement Collateral Agent") are parties to that certain U.S. Security Agreement (the "U.S. Security Agreement"), dated as of April 6, 2005. Under the U.S. Security Agreement, the Masonite Debtors, and the Non-Debtor Guarantors provided the Security Agreement Collateral Agent with a security interest in substantially all of their assets.

Masonite International Corporation, as the Canadian borrower, Masonite International Inc., certain subsidiaries of Masonite International Corporation, as subsidiary guarantors, and The Bank of Nova Scotia as administrative agent for the Holders of the Senior Secured Claims (the "Canadian Security Agreement Collateral Agent") are parties to that certain Canadian Security Agreement (the "Canadian Security Agreement") dated as of April 6, 2005. Under the Canadian Security Agreement, certain of the Masonite Debtors, certain of the CCAA Applicants and certain of the Non-Debtor Guarantors provided the Canadian Security Agreement Collateral Agent with a security interest in substantially all of their assets.

*The Prepetition Senior Subordinated Notes*

Masonite International Corporation, as issuer, Masonite International Inc., as parent, Masonite Corporation and the other guarantors party thereto, as guarantors, and The Bank of New York, as indenture trustee, are parties to that certain Canadian Senior Subordinated Notes Indenture, dated as of October 6, 2006. Under the Canadian Senior Subordinated Notes Indenture, Masonite International Corporation issued a total of approximately $357.9 million in Canadian Senior Subordinated Notes.

Masonite Corporation, as issuer, Masonite International Inc., as parent, Masonite International Corporation and the other guarantors party thereto, as guarantors, and The Bank of New York, as indenture trustee, are parties to that certain United States Senior Subordinated Notes Indenture, dated as of October 6, 2006. Under the United States Senior Subordinated Notes Indenture, Masonite Corporation issued a total of approximately $412.0 million in United States Senior Subordinated Notes.

Each of the Masonite Debtors, the CCAA Applicants, and the Non-Debtor Guarantors (except Masonite Corporation Foreign Holdings LTD and Masonite Holding Company Limited) guarantee the Senior Subordinated Notes.

*Common Stock*

As of the Petition Date, Masonite Holding Corporation had 112,058,002 common shares issued and outstanding and no preferred shares issued or outstanding.

### Events that Led to the Chapter 11 Cases and the CCAA Proceedings

Commencing in 2006, Masonite experienced an unprecedented and unanticipated downturn in the U.S. housing and construction market. This downturn subsequently spread to other international markets where Masonite operates. These market downturns in addition to several other negative global macroeconomic factors resulted in a significant decline in demand for doors and door components. The effect of this decline in demand materially impacted Masonite's sales and led to a deterioration in Masonite's financial performance. Moreover, in 2007, Masonite lost a significant percentage of its largest customer's business.

Masonite embarked on a comprehensive operational restructuring to right-size its manufacturing capabilities and workforce. Commencing in 2006, Masonite's restructuring efforts included a bottoms-up analysis of its entire enterprise. Masonite consolidated its manufacturing facilities to maximize efficiencies and eliminated unused capacity. As a result of these efforts, Masonite has been able to adapt its business model to weather the current economic storm and believes it is well-positioned to take advantage of any recovery in the housing and construction markets.

Despite the operational improvements that Masonite has achieved over the last three years, however, Masonite recognizes that it will not be able to sustain its current debt service obligations over the long term. As a result of declining sales, Masonite's ability to service its $2.2 billion indebtedness became strained and ultimately, on June 30, 2008, caused Masonite to trip certain debt covenants contained in its Senior Secured Credit Agreement which led to a later default in payment obligations under its Senior Subordinated Notes Indentures. Thus, Masonite has since the second quarter of 2008 been working with representatives of the Holders of Senior Secured Claims (including the Senior Secured Agent) and the Informal Noteholder Committee to reach an agreement on the terms of a consensual out-of-court or prearranged restructuring. Masonite has executed a restructuring and lock-up agreement (the "Restructuring and Lock-Up Agreement") with Holders of 75.75% of the Senior Secured Claims (including the Senior Secured Agent) and Holders of 83% of the Senior Subordinated Notes Claims. The Masonite Debtors have commenced the Chapter 11 Cases and the CCAA Proceedings to effectuate the transactions contemplated in the Restructuring and Lock-Up Agreement — the final step in Masonite's overall restructuring efforts.

*The Downturn in United States and International Housing and Construction Markets and the Loss of Business*

Various macroeconomic factors, including general economic conditions, interest rates, levels of unemployment, consumer confidence, and the availability of credit influence the demand for doors. Historically, the new home construction sector has been cyclical. During 2006, however, a major housing downturn began in the United States. Indeed, "housing starts" (i.e., the number of residential building construction projects that have begun during a particular time period) fell almost 13% from 2.07 million in 2005 to 1.8 million in 2006. In addition, sales in connection with repair, renovation, and remodeling weakened in the United States in 2006 compared with 2005.

Figure 3 – U.S. Housing Start History (1910 – 2009F) (000's)



The housing market downturn in the United States intensified during 2007, with housing starts in 2007 falling almost 25% from the 2006 rate to 1.4 million, and continued during 2008, with housing starts in 2008 falling over 33% from the 2007 rate to approximately 904,000.  Based on forecasts from leading third-party sources like the National Association of Home Builders ("NAHB"), the extent of the downturn in U.S. housing starts could not have been foreseen or predicted.

Figure 4 – Unpredictability of the Extent of the Downturn in U.S. Housing Starts

Further declines are predicted for 2009.  Moreover, while it is unclear whether the housing market will begin to recover in 2009 given the uncertainties in forecasting housing starts, it is safe to say that housing starts are unlikely to reach 2007 levels for several years.

Figure 5 – 2009 Housing Starts Forecasts



**Number of Months from Peak to Trough - Seasonally Adjusted Starts**

Legend: 1972-1975, 1978-1981, 1986-1991, 2006-??

(-64%) 02/75
(-62%) 11/81
(-60%) 01/91
(-79%) 01/09

| Start Date | Floor Date | Total % Decline | Starts Vol at Trough | Total # of Months in Decline | Average Month Over Month rate of decline at the 37 month of cycle | % Decline from 1st to 37 Month | Hypothetical |
|---|---|---|---|---|---|---|---|
| Jan-72 | Feb-75 | -64% | 904 | 38 | -2.2% | -58.6% | 65% Decline = 802K starts |
| Apr-78 | Nov-81 | -62% | 837 | 44 | -0.8% | -38.1% | |
| Jan-86 | Jan-91 | -60% | 798 | 61 | -0.4% | -17.8% | |
| Jan-06 | ??? | | | 37 - To Date | -4.0% | -79.7% | Jan 2009 = 466K |

Recently, the housing market downturn has spread from the United States into the other markets in which Masonite does business, particularly in the United Kingdom, where housing starts in 2008 fell to the lowest levels since World War II, and are expected not to return to 2007 levels until 2012.

Figure 6 – International Housing Starts (2007 – 2009F) (000's)

Legend: France, UK, Poland, Czech, Hungary, Israel

2007: 435, 216, 95, 44, 31, 22
2008: 415, 145, 95, 38, 33, 26
2009 Plan: 373, 136, 90, 30, 31, 25
2009 Fcst: 330, 102, 90, 30, 31, 21

The negative effect of the housing market downturn is compounded by recent turmoil in the general economy, mortgage market and overall credit markets, which has caused increasing levels of unemployment, a severe decline in home prices, a dramatic tightening of consumer credit and decreased consumer confidence.

In addition to these adverse market conditions, Masonite's largest customer notified Masonite in the first quarter of 2007 that it intended to move substantially all of its business with Masonite in the northeastern United States to one of Masonite's competitors in 2007. Masonite's sales in the affected region accounted for approximately $250 to $300 million of Masonite's annual sales revenues which represented approximately 11% of Masonite's then total sales revenues.

*Masonite's Financial Performance Deteriorates.*

The confluence of adverse market conditions and the significant loss of business discussed above negatively affected Masonite's financial position in 2008. Worldwide sales revenue declined to $1,816 million in 2008 from $2,174 million in 2007 – a drop of 16.5%. Sales revenue within Masonite's North American segment decreased to $1,180 million in 2008 from $1,523 million in 2007 – a drop of 22.5%.

Figure 7 – Unaudited Year-to-Year Quarterly Sales Revenue (2006 – 2008) (000,000's)[3]



Moreover, as demonstrated in Figure 7 below, Masonite's worldwide Adjusted EBITDA (calculated pursuant to the Senior Secured Credit Agreement) also declined dramatically from 2006 through 2008 largely as a result of decreases in sales revenues in the United States, its largest market. Indeed, Masonite's worldwide Adjusted EBITDA decreased to $162.4 million in 2008 from $319 million in 2007 – a drop of almost 50% in a one-year period.

Figure 8 – Unaudited Quarter-by-Quarter Adjusted EBITDA
by Geographic Segment (Q1 2006 – Q4 2008) (000,000's)[4]



---

[3]   Based upon unaudited Q3 and Q4 2008 financials.

[4]   Based upon unaudited Q3 and Q4 2008 financials.

17

*Masonite Defaults Under the Senior Secured Credit Agreement*

Ultimately, decreased demand and corresponding sales declines caused Masonite to trip two financial covenants under the Senior Secured Credit Agreement as of June 30, 2008. First, Masonite's debt to Adjusted EBITDA ratio of 8.5x exceeded the maximum permitted ratio of 7.00x under section 10.9 of the Senior Secured Credit Agreement. Second, Masonite's Adjusted EBITDA to interest expense ratio of 1.51x fell below the minimum permitted ratio of 1.65x under section 10.10 of the Senior Secured Credit Agreement.

As a result of these covenant defaults, the Holders of Senior Secured Claims were entitled to seek immediate repayment of $1,475.7 million of the Senior Secured Credit Agreement obligations. Moreover, if the Holders of Senior Secured Claims sought repayment, the Holders of the Senior Subordinated Notes may have been permitted to demand immediate repayment of the entire $769.9 million in Senior Subordinated Notes. Accordingly, Masonite engaged the Senior Secured Agent in discussions for a waiver of the financial covenant defaults and an amendment to the covenants in the Senior Secured Credit Agreement that would enable Masonite to meet the covenants going forward given the depressed state of the housing market.

### Masonite's Out-of-Court Restructuring Initiatives

*Masonite's Operational Restructuring*

Starting in 2005, Masonite embarked on a comprehensive operational restructuring to right-size its manufacturing capabilities and work force. These efforts included a bottoms-up analysis of Masonite's entire enterprise and, ultimately, resulted in the implementation of a number of operational and strategic initiatives aimed toward maximizing supply chain and production efficiencies and eliminating unused capacities to increase cash flow and reduce costs.

As part of this process, and as a result of Masonite's "Lean Sigma" initiatives, Masonite has closed or consolidated 23 facilities worldwide since 2005 and has announced the closure of three additional facilities for 2009. Masonite completed one of these actions in 2005, five in 2006, eight in 2007, and nine in 2008. These actions included closures or consolidations of facilities in Canada, the United States, the United Kingdom and Costa Rica.

Masonite also has taken significant steps to right-size its workforce given the slowdown in the new construction and repair, remodeling and renovation markets in North America, its largest market. In particular, Masonite undertook four company-wide salaried staff reduction in force actions: the first implemented in Q4 2006, the second implemented in Q4 2007, the third implemented in Q1 2008, and the most recent implemented in Q3 2008. These actions, coupled with the plant consolidations noted above and ongoing flexing of staffing in response to demand, have resulted in Masonite reducing its total headcount from over 15,000 in Q3 2006 to less than 8,500 in Q1 2009. A large portion of these reductions have been in the overhead, selling and administrative functions where worldwide headcount has been reduced from approximately 3,800 to approximately 2,600. In North America where the impact of the declining housing market has been experienced most significantly, headcount has declined from approximately 10,000 in Q3 2006 to under 5,000 in Q1 2009. Masonite will continue to vigorously manage costs and flex its workforce in response to changes in market demands.

*The Lender Forbearance Agreement*

Throughout July and August 2008, Masonite continued negotiating with the Senior Secured Agent for a waiver of the financial covenant defaults and an amendment to the covenants in the Senior Secured Credit Agreement that would enable Masonite to meet the covenants going forward given the depressed state of the housing market. To provide the parties with additional time to continue negotiations and avert a chapter 11 filing, Masonite entered into a forbearance agreement with the Senior Secured Agent and the Holders of Senior Secured Claims on September 16, 2008 (the "Lender Forbearance Agreement"). Under the terms of the Lender Forbearance Agreement, the Holders of Senior Secured Claims agreed to forbear from exercising remedies related to the existing financial covenant defaults and, provisionally, non-compliance with financial covenants as of September 30, 2008, through November 13, 2008. In exchange for entering the Lender Forbearance Agreement, the Masonite Debtors agreed to pay each Holder of Senior Secured Claims who executed the Lender Forbearance Agreement a pro rata

share of a forbearance fee equal to 0.25% of the outstanding indebtedness under the Senior Secured Credit Agreement.

*The Payment Blockage*

Also on September 16, 2008, the Senior Secured Agent provided notice pursuant to the terms of the Senior Subordinated Notes Indentures of a payment blockage period with respect to the Senior Subordinated Notes. The blockage notice prohibited Masonite for a period of up to 179 days from making interest or principal payments on account of the Senior Subordinated Notes. Thereafter, in addition to negotiating with the Senior Secured Agent and the Holders of Senior Secured Claims, Masonite convened discussions regarding restructuring alternatives with the Informal Noteholder Committee.

Pursuant to the payment blockage notice, Masonite did not make the $42 million interest payment on the Senior Subordinated Notes that was due on October 15, 2008. Failure to make the October 15, 2008 interest payment within 30 days of the due date would constitute an event of default under the Senior Subordinated Notes Indentures, permitting holders of at least 30% in principal amount of Senior Subordinated Notes to declare the full amount of the Senior Subordinated Notes due and payable. Nevertheless, Masonite continued to negotiate with the Holders of Senior Secured Claims and the Informal Noteholder Committee in an effort to avoid a chapter 11 filing or a CCAA filing.

*The Noteholder Forbearance Agreement*

In connection with the parties' ongoing negotiations with respect to potential out-of-court restructuring alternatives, on November 17, 2008, Masonite Corporation, as issuer of the United States Senior Subordinated Notes, Masonite International Corporation, as issuer of the Canadian Senior Subordinated Notes, certain subsidiaries of Masonite and Holders of a majority in principal amount of the Senior Subordinated Notes entered into a forbearance agreement (the "Noteholder Forbearance Agreement"), pursuant to which certain Holders of the Senior Subordinated Notes agreed to, among other things, forbear, and direct the indenture trustee under the Senior Subordinated Notes Indentures to forbear, from exercising the default related rights and remedies available under the Senior Subordinated Notes Indentures and/or applicable law with respect to Masonite's failure to make the October 15th interest payment, through December 31, 2008 (subject to certain conditions).

*First Amendment to the Lender Forbearance Agreement and the Noteholder Forbearance Agreement*

Masonite and the Holders of Senior Secured Claims were unable to conclude their negotiations prior to the expiration of the Lender Forbearance Agreement. Thus, on November 17, 2008, the Holders of Senior Secured Claims agreed to extend the Lender Forbearance Agreement through December 19, 2008, so that the parties could continue negotiating and Masonite could develop a revised 2009 business plan in response to the rapidly deteriorating market conditions. The Holders of Senior Secured Claims also agreed to extend the Lender Forbearance Agreement through January 15, 2009, provided that Masonite delivered a draft business plan to the Holders of Senior Secured Claims on or before December 19, 2008. In exchange for extending the Lender Forbearance Agreement, Masonite agreed to a 2% increase in the interest rate under the Senior Secured Credit Agreement, which increase is payable in the form of additional indebtedness.

Masonite also was actively engaged in parallel discussions with the Informal Noteholder Committee in an effort to agree on the terms of a restructuring of the Senior Subordinated Notes. In the interest of continuing these negotiations, the Holders of more than 50% in principal amount of the Senior Subordinated Notes agreed on December 30, 2008, to extend the Noteholder Forbearance Agreement through January 31, 2009 (subject to certain conditions).

*Second Amendment to the Lender Forbearance Agreement*

Throughout December 2008, Masonite continued to develop its business plan to reflect a more appropriate capital structure capable of supporting Masonite's long-term business objectives. In addition, in accordance with the terms of the amended Lender Forbearance Agreement, Masonite delivered a draft of its revised 2009 business plan

to the Holders of Senior Secured Claims (and the representatives of the Informal Noteholder Committee) on December 19, 2008. After the parties reviewed and discussed the plan, Masonite provided the Holders of Senior Secured Claims (and the representatives of the Informal Noteholder Committee) with a final 2009 business plan on January 15, 2009. To allow adequate time for the parties to review and discuss the final business plan and continue their efforts toward consensually restructuring Masonite's capital structure, the Holders of Senior Secured Claims agreed on January 15, 2009, to further extend the amended Lender Forbearance Agreement through January 30, 2009 (subject to certain conditions).

*Third Amendment to the Lender Forbearance Agreement and the Second Amendment to the Noteholder Forbearance Agreement*

Masonite continued negotiating with both the Holders of Senior Secured Claims and the Informal Noteholder Committee throughout January 2009 and into February 2009, in an effort to resolve its capital structure issues outside the bankruptcy forum. To this end, the Holders of more than 50% in principal amount of the Senior Subordinated Notes agreed to further extend the amended Noteholder Forbearance Agreement through February 13, 2009, and Masonite and the Holders of Senior Secured Claims agreed to further extend the amended Lender Forbearance Agreement through February 9, 2009.

*Restructuring and Lock-Up Agreement*

On March 2, 2009, Masonite announced that it had successfully negotiated a Restructuring and Lock-Up Agreement. The Restructuring and Lock-Up Agreement was entered into as of March 11, 2009 with Holders of 75.75% of the Senior Secured Claims (including the Senior Secured Agent in its capacity as a lender) and Holders of 83% of the Senior Subordinated Notes Claims on the terms of a restructuring, which thus ensures that the Plan has sufficient support to satisfy the confirmation requirements under section 1129 of the Bankruptcy Code. The Restructuring and Lock-Up Agreement requires Masonite to file the CCAA Proceedings in Canada and the Chapter 11 Cases in the United States. Pursuant to the terms of the Restructuring and Lock-Up Agreement, such Holders of Senior Secured Claims and such Holders of Senior Subordinated Notes Claims have agreed to vote to accept the Plan, subject to certain conditions. The Restructuring and Lock-Up Agreement also prohibits such Holders of Senior Secured Claims and such Holders of Senior Subordinated Notes from enforcing remedies under the Senior Secured Credit Agreement and the Senior Subordinated Notes Indentures, respectively. In addition, as part of the Restructuring and Lock-Up Agreement, Masonite negotiated forbearance agreements with such Holders of Senior Secured Claims and such Holders of Senior Subordinated Notes Claims that prohibit such Holders of Senior Secured Claims and such Holders of Senior Subordinated Notes Claims from enforcing remedies under the Senior Secured Credit Agreement and the Senior Subordinated Notes Indentures, respectively, against the Non-Debtor Guarantors.

*Initial Motions of the Chapter 11 Cases and Certain Related Relief*

In order to minimize disruption to Masonite's operations and effectuate the terms of the Restructuring and Lock-Up Agreement and the proposed Plan, Masonite has sought certain relief, including, but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Chapter 11 Cases.

*Motion for Authority to Use Cash Collateral*

On March 17, 2009, the Bankruptcy Court entered an order authorizing the Masonite Debtors to use cash collateral pursuant to sections 361 and 363 of the Bankruptcy Code on an interim basis pending the final hearing on this motion, and approving the forms of adequate protection provided to the Masonite Debtors' prepetition secured lenders. Pursuant to this order, the Masonite Debtors are authorized to use cash collateral for working capital and general corporate purposes, including, without limitation, (a) operating their businesses in an orderly manner, (b) maintaining business relationships with vendors, suppliers and customers, (c) paying employees and (d) satisfying other operational needs—all of which are necessary to preserve and maintain the Masonite Debtors' going-concern value and, ultimately, effectuate a successful reorganization. On April 14, 2009, the Bankruptcy Court entered a final order authorizing use of cash collateral and approving the forms of adequate protection provided to the Masonite Debtors' prepetition secured lenders.

*Motion to Pay Employee Wages and Associated Compensation*

On March 17, 2009, the Masonite Debtors obtained interim approval authorizing them (a) to pay certain prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical, pension and similar benefits and (b) to continue their workers' compensation program. The order also authorizes the Masonite Debtors to remit any outstanding payroll taxes or deduction to the appropriate third-party or taxing authority. Finally, the order modified the automatic stay, allowing all workers' compensation claims, both pre- and post-petition to proceed in the appropriate judicial or administrative forum. On April 14, 2009, the Bankruptcy Court entered a final order granting such relief.

*Motion to Pay Prepetition Claims of General Unsecured Creditors*

On March 17, 2009, the Bankruptcy Court entered an interim order authorizing the Masonite Debtors to pay up to $30 million in prepetition amounts owed to unsecured creditors, consistent with the terms of such obligations existing on the Petition Date. On April 14, 2009, the Bankruptcy Court entered a final order authorizing the Masonite Debtors to pay up to $56 million in prepetition amounts owed to unsecured creditors in the ordinary course of business.

*Motion to Pay Taxes and Fees*

On March 17, 2009, the Masonite Debtors obtained approval authorizing, but not directing them, to pay certain taxes and fees that in the ordinary course of business accrued or arose before the Petition Date.

*Motion to Prohibit Utilities from Terminating Service*

On March 17, 2009, the Bankruptcy Court entered an interim order (a) setting a final hearing to approve, among other things, the Masonite Debtors' proposed adequate assurance of payment for future service to the utility providers and procedures governing any requests for additional or different adequate assurance and (b) prohibiting the utility providers from altering, refusing or discontinuing utility services on account of any unpaid prepetition charges, or discriminating against the Masonite Debtors, or requiring payment of a deposit or receipt or any other security for continued service as a result of the Masonite Debtors' bankruptcy filing or any outstanding prepetition invoices without further Bankruptcy Court order. On April 14, 2009, the Bankruptcy Court entered a final order granting such relief.

*Other Related Relief*

In addition, the Masonite Debtors filed the following motions, which were granted after a hearing in the Bankruptcy Court, obtaining: (a) an order directing the joint administration of the sixteen Chapter 11 Cases under a single docket, Case Number 09-10844 (PJW); and (b) orders (i) authorizing the Masonite Debtors to honor customer programs and practices; (ii) authorizing the Masonite Debtors to continue to use their centralized cash management system, bank accounts and perform intercompany transactions; (iii) establishing procedures for interim compensation and reimbursement of expenses of retained professionals in the Chapter 11 Cases; (iv) establishing procedures for retention and compensation of professionals utilized in the ordinary course of Masonite's business; (v) authorizing the Masonite Debtors to continue prepetition insurance policies and program and to maintain premium financing agreements for insurance coverage entered into prepetition; (vi) approving this Disclosure Statement and the solicitation and voting procedures; (vii) establishing certain dates and deadlines; (viii) authorizing the Masonite Debtors to assume the Receivables Purchase Agreement, enter into amendments to the Receivables Purchase Agreement and to continue to perform under such agreements; and (ix) implementing a cross-border protocol to coordinate the Chapter 11 Cases and the CCAA Proceedings.

*The CCAA Proceedings*

Masonite Holding Corporation, Masonite International Inc., Masonite International Corporation, Crown Door Corporation, Castlegate Entry Systems Inc., 3061275 Nova Scotia Company and Rochman Universal

Doors Inc. applied for and obtained relief under the Companies' Creditors Arrangement Act (Canada) ("CCAA") by initial order of the Canadian Court dated March 16, 2009.

## Treatment of Claims Against and Equity Interests in Masonite under the Plan

### Asserted and Scheduled Claims

All Claims and Equity Interests against Masonite, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this section. The Claims are categorized into Classes based upon the similarity or dissimilarity of Claims (with similarly situated Claims in the same Class) as prescribed by the Bankruptcy Code.

Distributions under the Plan will be made only to Holders of Allowed Claims. As more fully described in Articles VI and VII of the Plan, Holders of Disputed Claims will receive no distributions unless and until their Claims become Allowed.

Pursuant to the terms of the Plan, except for Claims that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code or (b) specifically identified as being reinstated, all Claims that arose prior to the confirmation of the Plan will be discharged.

### Administrative Claims

#### General Administrative Claims

Except as specified in this section, unless otherwise agreed to by the Holder of a General Administrative Claim and the Masonite Debtors or the Reorganized Masonite Debtors, as applicable, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date, (b) if the General Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable, or (c) if the Allowed General Administrative Claims are based on liabilities incurred by the Masonite Debtors in the ordinary course of their business during the postpetition period, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claims, without any further action by the Holders of such Allowed General Administrative Claims.

#### Professional Compensation

##### Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Holdback Amount and Professional Fee Claims incurred during the period from Petition Date through the Confirmation Date, must be filed with the Bankruptcy Court and served on the Reorganized Masonite Debtors no later than 45 days after the Confirmation Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

##### Payment of Interim Amounts

Subject to the Holdback Amount, on the Effective Date, the Masonite Debtors or Reorganized Masonite Debtors, as applicable, shall pay all amounts owing to Professionals for all outstanding amounts payable relating to prior periods through the Confirmation Date. To receive payment, on or before Effective Date, each Professional shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order.

*Post-Confirmation Date Fees and Expenses*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Masonite Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Masonite Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Masonite Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### Class 1 - Priority Non-Tax Claims

- *Classification*:  Class 1 consists of all Priority Non-Tax Claims.

- *Treatment*:  Except to the extent that a Holder of an Allowed Priority-Non Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash.

- *Voting*:  Class 1 is Unimpaired by the Plan.  Each Holder of a Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

### Class 2 - Senior Secured Claims

- *Classification*:  Class 2 consists of all Senior Secured Claims.

- *Allowance*:  The Senior Secured Claims are Allowed in full and, for the avoidance of doubt, shall not be subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

- *Treatment*:  Except to the extent that a Holder of an Allowed Senior Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Senior Secured Claim, each Holder of such Allowed Senior Secured Claim shall receive at the Holders' option:

  (1)      New Term Loans in a face amount up to such Holder's Pro Rata share of $200,000,000 based on the amount of the Allowed Senior Secured Claims that such Holder elects to apply to the New Term Loan.  The aggregate principal amount of the New Term Loan shall be reduced by the Pro Rata share of each such Holder that does not elect to receive New Term Loans;

  (2)      to the extent such Holder elects to receive New PIK Loans, $1 in amount of New PIK Loan for each $2 of New Common Stock such Holder would have received at Plan Equity Value, <u>provided</u>, <u>however</u>, that if the Holders of Allowed Senior Secured Claims

elect to apply for an amount of New PIK Loan that exceeds the Maximum New PIK Loan Amount, the amount of New PIK Loans issued to an individual Holder electing to apply for the New PIK Loan shall be reduced ratably so that the aggregate amount of the New PIK Loan does not exceed the Maximum New PIK Loan Amount; and/or

(3) such Holder's Pro Rata share (as adjusted as a result of such Holder's election for the New Term Loan and/or New PIK Loan) of 97.5% of the New Common Stock issued on the Effective Date (subject to dilution by the New Warrants issued to the Holders of Senior Subordinated Notes and New Common Stock reserved under the Management Equity Incentive Plan).

Each Holder of an Allowed Senior Secured Claim shall be entitled to exchange its Claims for its Pro Rata share of the New Term Loan and its Pro Rata share of 97.5% of the New Common Stock. To the extent a Holder of a Senior Secured Claim elects not to apply its Claims to its full Pro Rata share of the New Term Loan, such Holder shall receive an additional amount of New Common Stock (at Plan Equity Value) equal to the difference between its Pro Rata share of the New Term Loan amount and the actual amount of the New Term Loan, if any, such Holder elects to receive. To the extent such Holder elects to apply its Claims to the New PIK Loan, the amount of New Common Stock that such Holder receives shall be reduced by $2 for every $1 of New PIK Loan it receives. In no event shall the Holders of Senior Subordinated Notes receive more than 2.5% of the New Common Stock (subject to dilution by the New Warrants issued to the Holders of Senior Subordinated Notes and New Common Stock reserved under the Management Equity Incentive Plan) on account of their Claims in respect of the Senior Subordinated Notes. To the extent that any Holder of Senior Secured Claims elect not to receive their full Pro Rata share of the New Term Loan, the New Common Stock received by such Holder of Senior Secured Claims shall be reduced, on a Pro Rata basis among such Holders, by 2.5% of the increase in the Reorganized Masonite Debtors' equity value attributable to such elections

- *Voting:* Class 2 is Impaired by the Plan. Holders of Senior Secured Claims are entitled to vote to accept or reject the Plan.

### Class 3 - Other Secured Claims

- *Classification*: Class 3 consists of all Other Secured Claims.

- *Treatment*: Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Other Secured Claim, each Allowed Other Secured Claim shall be Reinstated or otherwise rendered Unimpaired for the benefit of the Holders thereof.

- *Voting*: Class 3 is Unimpaired by the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

### Class 4 - Senior Subordinated Notes Claims

- *Classification*: Class 4 consists of all Senior Subordinated Notes Claims.

- *Allowance:* The Senior Subordinated Notes Claims are Allowed in full and, for the avoidance of doubt, shall not be subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

- *Treatment*:  Except to the extent that a Holder of an Allowed Senior Subordinated Notes Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Senior Subordinated Notes Claim, each Holder of such Allowed Senior Subordinated Notes Claim shall receive its Pro Rata share of:

    (1)     2.5% of the New Common Stock issued on the Effective Date (subject to dilution by amounts reserved pursuant to the Management Equity Incentive Plan); and

    (2)     100% of the New Warrants issued on the Effective Date.

- *Voting*:  Class 4 is Impaired by the Plan.  Holders of Senior Subordinated Notes Claims are entitled to vote to accept or reject the Plan.

### Class 5 - General Unsecured Claims

- *Classification*:  Class 5 consists of all General Unsecured Claims.

- *Treatment*:  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid prior to the Effective Date, each Allowed General Unsecured Claim shall be Unimpaired in accordance with section 1124 of the Bankruptcy Code.  Each Holder of an Allowed General Unsecured Claim that is not due and payable on or before the Effective Date will receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim (including, to the extent required under applicable non-bankruptcy law, interest accrued on account of such Allowed Claim following the Petition Date through the date that such Allowed Claim is paid at the Federal Judgment Rate) on the latest of (a) the Effective Date and (b) as otherwise agreed to by the Masonite Debtors and the Holder of such Claim; provided, however, that the Masonite Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business.  The Masonite Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

- *Voting*:  Class 5 is Unimpaired by the Plan.  Each Holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

### Class 6 - Intercompany Claims

- *Classification*:  Class 6 consists of all Intercompany Claims.

- *Treatment*:  To preserve the Masonite Debtors' corporate structure, Intercompany Claims may be Reinstated as of the Effective Date or, at the Masonite Debtors' or the Reorganized Masonite Debtors' option, be cancelled, and no distribution shall be made on account of such Claims.

- *Voting*:  Class 6 is Unimpaired by the Plan. Each Holder of an Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

### Class 7 - Intercompany Interests

- *Classification*:  Class 7 consists of all Intercompany Interests.

- *Treatment*:  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Intercompany Interest, Intercompany Interests shall be Reinstated for the benefit of the Holders thereof.

- *Voting*:  Class 7 is Unimpaired by the Plan.  Each Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

### Class 8 - Equity Interests in Masonite Holding Corporation

- *Classification*:  Class 8 consists of all Equity Interests in Masonite Holding Corporation.

- *Treatment*:  On the Effective Date, all Equity Interests in Masonite Holding Corporation shall be cancelled without any distribution.

- *Voting*:  Class 8 is Impaired by the Plan.  Each Holder of an Equity Interest in Masonite Holding Corporation is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Equity Interests in Masonite Holding Corporation are not entitled to vote to accept or reject the Plan.

### Class 9 - Section 510(b) Claims

- *Classification*:  Class 9 consists of all Section 510(b) Claims.

- *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be cancelled without any distribution.

- *Voting*:  Class 9 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

### Management of the Company

Biographical information for Mr. Frederick Lynch, Mr. Anthony D. DiLucente, Mr. Lawrence P. Repar, Mr. Glen Coulter and Mr. Matthew M. Clark is set forth below:

Mr. Lynch has served as President since August 2006 and as Chief Executive Officer since June 2007. Mr. Lynch has also been a member of Masonite's board of directors since November 2008. Prior to joining Masonite, Mr. Lynch served in a variety of senior positions at Alpharma, Inc. including as President, Generic Pharmaceuticals from June 2003 until December 2005.  Prior to joining Alpharma, Inc., Mr. Lynch served in a variety of senior positions over the course of 18 years at AlliedSignal and its successor, Honeywell International, including Vice President and General Manager of Specialty Chemicals, from 1999 to March 2003 and General Manager, High Purity Chemicals, from 1997 to 1999.

Mr. DiLucente has served as Chief Financial Officer since November 2007.  Prior to joining Masonite, Mr. DiLucente was Vice President-Finance for Johns Manville from December 2005 through October 2007.  Prior to joining Johns Manville, Mr. DiLucente served in a variety of financial leadership and general management positions with AlliedSignal and its successor, Honeywell International for 11 years, most recently as Vice President and Chief Financial Officer of Honeywell Nylon, Inc. from 2003 to 2005, and General Manager of Specialty Films from 2001 to 2003.  Before AlliedSignal, he spent 11 years with DuPont in a variety of financial roles.

Mr. Repar was appointed as Executive Vice President and Group Chief Operating Officer of Masonite International on April 6, 2005.  He served in a similar position for Masonite predecessor companies since 2001, and he has held a variety of senior positions with us since 1994.  Mr. Repar formerly worked as an equity financial

analyst and director of institutional sales and trading for Sanwa McCarthy Securities Limited in Toronto for 3 years prior to joining Masonite in 1994.

Mr. Coulter was appointed as Executive Vice President Operations of Masonite International as of January 2008. He joined Masonite November 27, 2006 as Senior Vice President Operations for the Door Group and as Senior Vice President of Continuous Improvement. Mr. Coulter has 25 years of extensive manufacturing experience in companies including Dow Chemical, AlliedSignal and W. R. Grace.

Mr. Clark was appointed Senior Vice President Legal, General Counsel and Corporate Secretary in June, 2007. He began his career as a litigation attorney with Paul Hastings, Janofsky & Walker. Mr. Clark has over 27 years of in-house corporate legal experience, working for TRW, Hitachi, Raytheon and General Electric.

### Composition of New Board of Directors

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Masonite Debtors will disclose in advance of the Plan Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Masonite Debtors and New Masonite Holdings. To the extent any such director or officer of the Reorganized Masonite Debtors or New Masonite Holdings is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.

### Pension Plan and Other Benefits Plans

Pursuant to the Plan, the Pension Plan will be continued in accordance with its terms, and the Masonite Debtors or the Reorganized Masonite Debtors, as applicable, will satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, be liable for the payment of premiums to the Pension Benefit Guaranty Corporation ("PBGC") in accordance with Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461 (2006), subject to any and all applicable rights and defenses of the Masonite Debtors, and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code of 1986, as amended (the "Tax Code"). Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, the Pension Plan will be continued and administered in accordance with ERISA and the Tax Code.

In addition, all employment, retirement, indemnification, and other agreements or arrangements in place as of the Effective Date with the Masonite Debtors' officers, directors, or employees, who will continue in such capacities or similar capacities after the Effective Date, or retirement income plans or welfare benefit plans for such persons, or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees identified as key leaders, top level managers or sales leaders, or indemnification arrangements with directors of non-Masonite Debtors subsidiaries, will remain in place after the Effective Date, and the Reorganized Masonite Debtors will continue to honor such agreements, arrangements, programs, and plans; provided, however, that the foregoing shall not apply to any stock-based compensation or incentive plan, agreement, or arrangement existing as of the Petition Date.

Furthermore, the New Board of New Masonite Holdings will implement the Management Equity Incentive Plan, which will consist of restricted stock units, stock options, and/or stock appreciation rights in an amount up to 10% of the New Common Stock, some portion of which will be allocated to management by the New Board of New Masonite Holdings within 30 days of the Effective Date. The terms of the Management Equity Incentive Plan will be set forth in the Plan Supplement and be subject to the approval of the New Board of New Masonite Holdings. Masonite engaged Mercer (a leading consulting company on compensation practices of reorganizations) to develop a model for individual emergence equity awards based on both traditional bankruptcy practices and Masonite's total direct compensation position relative to market. Mercer's report regarding its assessment of Masonite's proposed management incentive program dated February 27, 2009 was based on Masonite's original proposal to grant incentives to select employees in an amount up to 15% of the New Common Stock. Pursuant to the report, Mercer concludes, among other things, that (i) due to Masonite's plan using only stock options rather than a more typical mix of options and full value shares, (ii) the original proposal recommended grant incentives to select employees in the amount of up to 15% of the New Common Stock, (iii) while Masonite's current total direct compensation is 15%

below market in aggregate (for the top ten executives), it will be at median with inclusion of the new option grant (assuming the grant is annualized over five years), (iv) to bring compensation closer to market levels, Masonite has proposed an equity pool to be used to provide long-term incentives to senior executives and other key employees, and (v) considering Masonite's proposal includes 85% of the total available pool being awarded upon emergence from bankruptcy, the size of Masonite's pool is more inclusive than some practices for companies emerging from bankruptcy. In conjunction with the New Board, Masonite plans to continue working with Mercer and other compensation professionals to refine and develop an ongoing and competitive full compensation program.

## Capital Structure of the Reorganized Masonite Debtors upon Consummation

### *The New Term Loan*

On the Effective Date, the Reorganized Masonite Debtors will enter into the New Term Loan. Confirmation will be deemed approval of the New Term Loan. The New Term Loan will consist of a first lien secured term credit facility in the maximum amount of $200 million. The New Term Loan will be secured by first priority liens upon and security interests on substantially all of the assets of the Reorganized Masonite Debtors, which liens, to the extent provided in the New Term Loan, may be the liens currently securing the Senior Secured Credit Agreement. The New Term Loan will have a maturity date of December 31, 2013. Cash interest under the New Term Loan will be payable quarterly at LIBOR plus 700 basis points (with a LIBOR floor of 3.00%) or Prime Rate plus 600 basis points (with a Prime Rate floor of 5.00% ), and amortization of the New Term Loan will be effected on a quarterly repayment schedule of 0.25% of the principal amount. The New Term Loan will not have any affirmative or negative covenants other than covenants requiring payment of principal and interest under the New Term Loan and limiting the Reorganized Masonite Debtors' ability to (a) incur liens that are pari passu with or senior to the liens securing the New Term Loan (with customary carveouts and baskets, and a basket for first-priority liens on accounts receivable and inventory to secure up to $150 million of obligations in respect of receivables securitizations (the liens in respect of which shall be solely on accounts receivable) or revolving credit facilities and an additional $25 million of obligations in respect of letter of credit facilities or debt to cash collateralize letters of credit), with new liens subject to an intercreditor agreement on terms set forth in the New Term Loan or on other customary terms reasonably acceptable to the agent under the New Term Loan; and (b) engage in consolidations, mergers or sales of all or substantially all of its assets. The New Term Loan will have customary events of default. A form of the New Term Loan will be included in the Plan Supplement.

### *The New PIK Loan*

On the Effective Date, the Reorganized Masonite Debtors will enter into the New PIK Loan. Confirmation will be deemed approval of the New PIK Loan. The New PIK Loan will consist of a second lien secured term facility in an amount up to $100 million plus $200 million less the amount of New Term Loan actually issued). The New PIK Loan will be secured by second priority liens upon and security interests on substantially all of the assets of the Reorganized Masonite Debtors which liens, to the extent provided in the New PIK Loan, may be the liens securing the Senior Secured Credit Agreement. The New PIK Loan will have a maturity date of December 31, 2015. The interest rate under the New PIK Loan will be 8.00%. The New PIK Loan will not have any affirmative or negative covenants other than covenants requiring payment of principal and interest under the loan and limiting the Reorganized Masonite Debtors' ability to engage in certain consolidations, mergers or sales of all or substantially all of its assets. The New PIK Loan will have customary events of default. A form of the New PIK Loan will be included in the Plan Supplement.

### *Intercompany Account Settlement*

The Masonite Debtors and the Reorganized Masonite Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Masonite Debtors to satisfy their obligations under the Plan and the CBCA Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Masonite Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

### Issuance of New Common Stock

The Confirmation shall be deemed to authorize the issuance of the New Common Stock, including options, or other equity awards, if any, reserved for the Management Equity Incentive Plan, by New Masonite Holdings, without the need for any further corporate action or without any further action by the Holders of Claims or Equity Interests. A form of the constituting documents of New Masonite Holdings, providing for the number of authorized shares, the rights and preferences of the New Common Stock, will be included in the Plan Supplement. At least that number of shares of New Common Stock sufficient to satisfy New Masonite Holdings' obligations under the Plan will be authorized under the constituting documents of New Masonite Holdings. On the Effective Date, such New Common Stock will be issued and distributed as follows: (a) 97.5% of the shares of New Common Stock will be issued to the Holders of Claims in Class 2; and (b) 2.5% of the shares of New Common Stock will be issued to the Holders of Claims in Class 4. For purposes of distribution, the New Common Stock will be deemed to have the value assigned to it based upon, among other things, the New Masonite Total Enterprise Value, regardless of the date of distribution. Distributions of New Common Stock will only be made through broker accounts via electronic issuance of the shares and New Masonite Holdings will not issue separate stock certificates. Furthermore, the New Board of New Masonite Holdings will implement the Management Equity Incentive Plan which will consist of restricted stock units, stock options, and/or stock appreciation rights in an amount up to 10% of the New Common Stock, some portion of which will be allocated to management by the New Board of New Masonite Holdings within 30 days of the Effective Date.

### Issuance of New Warrants

On the Effective Date, the Reorganized Masonite Debtors will issue the New Warrants to the Holders of Claims in Class 4, pursuant to the terms of the New Warrant Agreement. A form of the New Warrant Agreement will be included in the Plan Supplement.

## Summary of Legal Proceedings[5]

### Masonite's Legal Proceedings

Because of the size and nature of Masonite's businesses, Masonite is party to numerous legal proceedings. Most of these legal proceedings have arisen in the ordinary course of Masonite's business and involve Claims for money damages. Whether these Claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the Claims and the debt arising therefrom. Generally, if the debt underlying such Claims was incurred by one of the Masonite Debtors prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the Claim is liquidated and resolved before or after the Effective Date. Claims arising from conduct occurring after the Effective Date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by Masonite in the ordinary course of its business after emergence.

### Legal Proceedings in the Bankruptcy Court

*Avoidance Actions*

A number of transactions occurred prior to the Petition Date that may give rise to claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action

---

[5] This summary is not intended as an exhaustive description of all pending legal matters or proceedings in which Masonite or any of its affiliates are involved. Certain legal proceedings may be subject to appeal in or outside the Bankruptcy Court. Nothing in this discussion is deemed to be an admission by Masonite or any of its affiliates of any liability or wrongdoing.

under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law (collectively, the "Avoidance Actions").

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on March 16, 2011, i.e., two years after the Petition Date.

*Preference Actions*

Under sections 547 and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code where the transfer had not been made. Transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing of a petition under chapter 11 of the Bankruptcy Code (the "Preference Period"). Under section 547 of the Bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought. Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not, among other things, make an otherwise unavoidable transfer to or for the benefit of the creditor. A debtor may not recover a payment to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor. Further, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor. The debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference and is presumed to be insolvent during the Preference Period. The creditor has the initial burden of proof as to the aforementioned defenses.

*Fraudulent Transfer and Conveyance Actions*

Generally, a conveyance or transfer is fraudulent if: (i) it was made with the actual intent to hinder, delay or defraud a creditor (i.e., an intentional fraudulent conveyance); or (ii) reasonably equivalent value was not received by the transferee in exchange for the transfer and the debtor was insolvent as a result of the transfer, was rendered insolvent as a result of the transfer or was left with insufficient capitalization as a result of the transfer (i.e., a constructive fraudulent conveyance). Two primary sources of fraudulent conveyance law exist in a chapter 11 case.

### Section 548 of the Bankruptcy Code

The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code, under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred on or within one year before the date that a bankruptcy case is filed.

### Section 544 of the Bankruptcy Code

The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code—the so-called "strong-arm provision"—under which the debtor in possession (or creditors with Bankruptcy Court permission) may have the rights of a creditor under state law to avoid transfers as fraudulent. State fraudulent conveyance laws generally have statutes of limitations longer than one year and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case. If such statute of limitations has not expired, the debtor in possession (or creditors with Bankruptcy Court permission) may bring the fraudulent conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the state statute of limitations period expires prior to the expiration of such time.

## Valuation Analysis

### *Estimated Reorganization Value*

The Masonite Debtors have been advised by their investment banker, Perella Weinberg Partners LP ("Perella Weinberg"), with respect to the estimated hypothetical reorganization value of the Reorganized Masonite Debtors. Perella Weinberg estimated the New Masonite Total Enterprise Value of the Reorganized Masonite Debtors to be approximately $500 million. The New Masonite Total Enterprise Value consists of the theoretical enterprise value of the Reorganized Masonite Debtors through the application of various relative and intrinsic valuation methodologies. Perella Weinberg has estimated the New Masonite Total Enterprise Value as of June 8, 2009.

The imputed reorganization equity value (the "Equity Value") of the Reorganized Masonite Debtors, which takes into account estimated debt balances under the Plan as of the assumed Effective Date. The Plan allows holders of the Senior Secured Claims the option to elect to receive debt and equity securities in exchange for their Senior Secured Claims. Accordingly, until holders elect the type of consideration they desire, the exact amount of debt balances is unknown. For purposes of calculating Equity Value for this Disclosure Statement the debt balances were based on the assumption that the combined principal amount of the New Term Loan and the New PIK Loan will be approximately $300 million (the "Combined Amount"). If the Combined Amount is determined to be a different amount, then the Equity Value will be adjusted accordingly. Utilizing the New Masonite Total Enterprise Value of $500 million, deducting $300 million of debt balances and adding estimated cash on the Effective Date (prior to borrowings under new facilities, if any) of $66 million provides an imputed Equity Value of $266 million.

The foregoing estimate of the New Masonite Total Enterprise Value, and the resulting estimate of Equity Value of the Reorganized Masonite Debtors, as the case may be, are based on a number of assumptions, including but not limited to, a successful reorganization of the Masonite Debtors' business, the implementation and realization of the Reorganized Masonite Debtors' business plans, the achievement of the forecasts reflected in management's projections, and the Plan becoming effective on the assumed Effective Date.

In preparing its estimate of the New Masonite Total Enterprise Value, Perella Weinberg did, among other things, the following: (a) reviewed certain historical financial information of the Masonite Debtors for recent years and interim periods, (b) reviewed certain internal financial and operating data of the Masonite Debtors and financial projections relating to their business and prospects, (c) met with certain members of the senior management of the Masonite Debtors to discuss the Masonite Debtors' operations and future prospects, (d) reviewed publicly available financial data and considered the market values of public companies that Perella Weinberg deemed generally comparable to those of the Masonite Debtors as a whole or a significant part of their operations, (e) considered certain economic and industry information relevant to the Masonite Debtors' operations, and (f) reviewed such other information and conducted such other analyses as Perella Weinberg deemed appropriate.

Although Perella Weinberg conducted a review and analysis of the Masonite Debtors' businesses, operating assets and liabilities and business plans, Perella Weinberg assumed and relied on the accuracy and completeness of all (a) financial and other information furnished to it by the Masonite Debtors and by other firms retained by the Masonite Debtors and (b) publicly available information. Perella Weinberg did not independently verify any financial projections prepared by management of the Masonite Debtors in connection with its estimate of the New Masonite Total Enterprise Value. Perella Weinberg has assumed that such projections have been prepared reasonably, in good faith and on a basis reflecting the currently available estimates and judgments of the Masonite Debtors as to the future operating and financial performance of the Masonite Debtors. Such projections assume that the Masonite Debtors will operate the businesses reflected in the financial forecast and that such businesses will perform as expected in the financial forecast. To the extent that the Masonite Debtors operate at higher or lower capacity utilizations or have higher or lower raw material margins (i.e., margins in excess of the raw material purchase costs) during the period contemplated in the projections and to the extent that all or a portion of the businesses perform at levels inconsistent with those expected by management in the financial forecast, such adjustments may have a material impact on the projections and the valuations as presented herein.

Hypothetical valuation estimates reflect computations of the estimated New Masonite Total Enterprise Value and Equity Value of the Reorganized Masonite Debtors through the application of various valuation techniques, including, among others, the following: (a) a comparable company analysis, in which Perella Weinberg analyzed the enterprise values of public companies that Perella Weinberg deemed generally comparable to all or parts of the operating businesses of the Masonite Debtors as a multiple of certain financial measures, including, but not limited to, earnings before interest, taxes, depreciation and amortization ("EBITDA") and then applied multiples derived from such analysis, among other statistics, to the projected EBITDA of the Reorganized Masonite Debtors; and (b) a discounted cash flow analysis, in which Perella Weinberg, using a weighted average cost of capital, computed the present value of free cash flows and the terminal value of the Reorganized Masonite Debtors. EBITDA has been adjusted for certain non-cash and non-operating charges representing a total of approximately $1 million in 2010.An estimate of the New Masonite Total Enterprise Value and Equity Value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Perella Weinberg made judgments as to the relative significance of each analysis in determining the New Masonite Total Enterprise Value range. Perella Weinberg did not consider any one analysis or factor to the exclusion of any other analysis or factor. Perella Weinberg's hypothetical valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the New Masonite Total Enterprise Value. With respect to the analysis of comparable companies, no company utilized as a comparison is identical to the Reorganized Masonite Debtors. Accordingly, an analysis of publicly traded comparable companies is not mathematical; rather, it involves complex considerations and judgments concerning the differences in financial and operating characteristics of the companies relative to the Reorganized Masonite Debtors.

The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of the New Masonite Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, none of the Masonite Debtors, Perella Weinberg or any other person assumes responsibility for their accuracy. Depending on the results of the Masonite Debtors' operations or changes in the financial markets, Perella Weinberg's valuation estimates as of the Effective Date may differ from those disclosed herein.

### *Valuation Methodology*

*Discounted Cash Flow Analysis*

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of the Reorganized Masonite Debtors' unlevered after-tax free cash flows based on the projections plus an estimate for the value of the firm beyond the period contemplated in the projections known as the terminal value. The terminal value is derived by applying a multiple ("Terminal Multiple") to the Reorganized Masonite Debtors' projected EBITDA in the final year of the period contemplated in the projections, discounted back to the assumed date of emergence by the Discount Rate.

In selecting a Discount Rate for Masonite, Perella Weinberg utilized input received from potential Masonite financing sources, analyzed yields on the debt securities of publicly traded comparable companies and estimated required equity returns based on current market conditions. In selecting the Terminal Multiple, Perella Weinberg considered the significant EBITDA growth projected to occur during the period contemplated in the projections and, accordingly, used a multiple range below the median comparable company analysis described above.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Masonite Debtors, which in turn affect its cost of capital and Terminal Multiples. Perella Weinberg calculated its DCF valuation on a range of Discount Rates and terminal value EBITDA multiples as indicated below:

| Discounted Cash Flow Analysis Assumptions | |
| --- | --- |
| Discount Rate | Terminal Multiple |
| 23.0% - 27.0% | 4.5x - 5.5x |

In applying the above methodology, Perella Weinberg utilized management's detailed projections for the period beginning June 30, 2009, and ending December 31, 2013, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Masonite Debtors are assumed to be full taxpayers at the applicable regional corporate income tax rates (the effective tax rate is assumed to be 35%). These cash flows, along with the terminal value, are discounted back to the assumed Effective Date using the range of Discount Rates described above to arrive at a range of enterprise values. Perella Weinberg did not apply DCF analyses to the value of deferred tax assets, including future NOL carryforwards. Perella Weinberg assumes that the Masonite Debtors' existing NOL carryforwards are partially used to offset income resulting from the cancellation of debt in the Restructuring Transactions and will otherwise be significantly restricted. Further tax diligence after the determination of the final capital structure will be required to confirm the underlying tax assumptions used in this valuation.

### a) Comparable Company Analysis

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company and minority interest less the market value of unconsolidated investments. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly EBITDA. In addition, among other things, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Reorganized Masonite Debtors' actual and projected operational performance. Perella Weinberg focused primarily on EBITDA multiples of the selected comparable companies to determine the New Masonite Total Enterprise Value.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Masonite Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Perella Weinberg selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Reorganized Masonite Debtors in one or more of the factors described above: American Woodmark Corp., Masco Corp., Mohawk Industries, Inc., Owens Corning, Sherwin-Williams Co., and Trex Co. Inc.

Perella Weinberg calculated market multiples for the Peer Group based on 2010 estimated EBITDA by dividing the enterprise value of each comparable company as of March 12, 2009, by the projected 2010 EBITDA as estimated by equity research analysts. In determining the applicable EBITDA multiple ranges, Perella Weinberg considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue and EBITDA results, EBITDA margins, financial distress impacting trading values, size, growth

and similarity in business lines. Based on this analysis, Perella Weinberg's selected EBITDA multiple ranges for 2010 EBITDA are set forth in the table below.

| | Enterprise Value/EBITDA Multiple | | | |
|---|---|---|---|---|
| | Selected Multiple Range | | Peer Multiple Range | |
| | Low | High | Low | High |
| 2010E | 7.0x | 8.0x | 5.3x | 8.0x |

Perella Weinberg then applied the range of multiples described above to the Reorganized Masonite Debtors' 2010E income from operations before depreciation and amortization, impairment charges, stock compensation expense, and other operating expenses, such as special charges and loss on sale or retirement of assets ("Adjusted EBITDA") to determine a range of New Masonite Total Enterprise Values.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE MASONITE DEBTORS OR THE REORGANIZED MASONITE DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE ESTIMATED CALCULATION OF NEW MASONITE TOTAL ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE MASONITE DEBTORS' BUSINESS PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE MASONITE DEBTORS' CONTROL.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT THE ESTIMATED NEW MASONITE TOTAL ENTERPRISE VALUE AND DO NOT NECESSARILY REFLECT A VALUE THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED EQUITY VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATION IS ASSUMED TO REVISE THIS CALCULATION OF REORGANIZED MASONITE DEBTORS' VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR. THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY PERELLA WEINBERG. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, PERELLA WEINBERG AND THE REORGANIZED MASONITE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY PERELLA WEINBERG ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO ELECT THEIR TREATMENT UNDER THE PLAN MAY NOT RELY UPON THE VALUATION ANALYSIS IN MAKING SUCH ELECTION.

**Liquidation Analysis**

**Best Interests Test**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (i) accept the plan of reorganization or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain under the plan of reorganization if the applicable debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. This is referred to as the "best interests" test.

To demonstrate compliance with the "best interests" test, the Masonite Debtors estimated a range of proceeds that would be generated from a hypothetical chapter 7 liquidation (the "<u>Liquidation Analysis</u>"). The Masonite Debtors assumed a liquidation date of June 8, 2009 (the "<u>Liquidation Date</u>"). The Effective Date is expected to be the same as the Liquidation Date. Therefore, no material difference in outcome is anticipated between the Effective Date and the Liquidation Date.

The Masonite Debtors first determined the dollar amount that would be generated from a hypothetical chapter 7 liquidation of their assets where a chapter 7 trustee would be appointed and charged with reducing to cash any and all of the assets. In this hypothetical liquidation scenario, the trustee would be required to either (i) sell the assets owned by the Masonite Debtors and their non-Masonite Debtor affiliates as going-concerns or (ii) shut down the Masonite Debtors' businesses and sell the individual assets of the Masonite Debtors and their non-Masonite Debtor affiliates.[6] The gross amount of cash available from liquidation would be the sum of the proceeds from the disposition of the Masonite Debtors' assets and cash held by the Masonite Debtors (and their non-Masonite Debtor affiliates' assets) at the time of the commencement of the hypothetical chapter 7 cases. The Masonite Debtors then reduced the total amount by the amount of any claims secured by such assets, the costs and expense of liquidation, and additional administrative expenses and priority claims that may result from the termination of the Masonite Debtors' businesses and the use of chapter 7 for purposes of the hypothetical liquidation. Any net cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the Masonite Debtors compared this hypothetical liquidation value to the value and returns provided for under the Plan.

**THE MASONITE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE MASONITE DEBTORS' ASSETS. UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE MASONITE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE MASONITE DEBTORS OR A CHAPTER 7 TRUSTEE. IN ADDITION, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE MASONITE DEBTORS' ASSETS WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED WERE THE MASONITE DEBTORS TO UNDERGO AN ACTUAL LIQUIDATION. THE ACTUAL AMOUNT OF CLAIMS AGAINST THE MASONITE DEBTORS' ESTATES COULD VARY SIGNIFICANTLY FROM THE ESTIMATE SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED DURING THE PENDENCY OF THE MASONITE DEBTORS' HYPOTHETICAL CHAPTER 7 CASES. ACCORDINGLY, THE ACTUAL LIQUIDATION VALUE OF THE MASONITE DEBTORS IS SPECULATIVE IN NATURE AND COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.**

---

[6]    In such a chapter 7 scenario, there is a risk that the trustee would be unable to liquidate the assets as a going-concern.

The Masonite Debtors' management assumed that (i) the Masonite Debtors would have access to cash collateral over the course of the hypothetical chapter 7 liquidation, (ii) all operating divisions would be liquidated, and (iii) the Masonite Debtors would be able to complete an expedited liquidation. The Masonite Debtors did not include estimates for additional claims that may arise as part of any conversion to a chapter 7 liquidation, including potential rejection damages claims associated with the rejection of executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, potential claims associated with the rejection of various management employment contracts, and potential claims that would arise in connection with the Worker Adjustment and Retraining Notification Act. In addition, the Masonite Debtors have not performed a comprehensive analysis of potential avoidance actions and, therefore, the Liquidation Analysis does not account for the proceeds, if any, of such avoidance actions. A general summary of the other assumptions used by the Masonite Debtors in preparing this Liquidation Analysis follows below, while more specific assumptions are discussed in the "Notes to the Liquidation Analysis", which begins on page 38.

In estimating the gross amount of proceeds available under a hypothetical chapter 7 liquidation, the Masonite Debtors estimated the cash proceeds that might be realized from the liquidation of the Masonite Debtors' assets based upon the book value of assets as of the January 25, 2009 closing balance sheet, or more recent financial information, where available. These values have not been subject to any review, compilation, or audit by any independent accounting firm. Subject to the qualifications, assumptions, and schedules herein, the Masonite Debtors estimated the range of gross proceeds, net of wind-down costs, trustee fees, and professional fees will not be adequate to make full payment on Secured Claims under either the high end or low end of the range. The assumptions and schedules supporting these results are set forth herein.

As a result of the Liquidation Analysis, Holders of General Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Senior Subordinated Notes Claims, and General Unsecured Claims will recover more value as a result of the Confirmation of the proposed Plan than through a hypothetical chapter 7 liquidation.

### *Findings of Liquidation Analysis*

The Masonite Debtors developed the Liquidation Analysis using Masonite's consolidated (including non-Masonite Debtor affiliates) balance sheets as of the end of January 2009. The Liquidation Analysis represents the Masonite Debtors' current estimates for asset recovery, assuming a Chapter 7 liquidation commencing on or about March 16, 2009. The Masonite Debtors believe there would have been no material changes to asset values between the date of the balance sheet used in the analysis and the date of the hypothetical chapter 7 liquidation (i.e., June 8, 2009). And while the Masonite Debtors would expect certain additional Claims to be incurred during this 90-day period (which have not been reflected herein), the ultimate inclusion of such additional Claims is not expected to change materially the result of the Liquidation Analysis.

Alvarez & Marsal North America, LLC, the Masonite Debtors' financial advisors, assisted the Masonite Debtors in completing the Liquidation Analysis. The advisors received information on asset recovery from various operating personnel who have relevant market knowledge to determine potential recoveries. The Masonite Debtors do not provide any assurance to such recoveries but have given their best estimates in this scenario.

The Masonite Debtors assume an expedited but orderly wind-down of the businesses to maximize recovery values. While the Masonite Debtors assume that the majority of the wind-down would be done in approximately 90 days, the complete liquidation would be expected to take 12 months.

The table below summarizes the recovery estimates for proceeds that would be available for distribution in the Masonite Debtors' hypothetical chapter 7 bankruptcy liquidation.

*Masonite*

**Liquidation Analysis**

(in millions of US dollars unless otherwise noted)

| | Jan 25, 2009 Book Value (Unaudited) | Potential Recovery | | | | | |
|---|---|---|---|---|---|---|---|
| | | Low | | Medium | | High | |
| | | ($) | (%) | ($) | (%) | ($) | (%) |
| Cash | 154.16 | 154.16 | 100.00% | 154.16 | 100.00% | 154.16 | 100.00% |
| Accounts Receivable | 179.40 | 98.84 | 55.09% | 117.90 | 65.72% | 135.73 | 75.66% |
| Inventory | 231.48 | 60.57 | 26.17% | 73.41 | 31.71% | 87.42 | 37.76% |
| Prepaids | 23.78 | - | 0.00% | - | 0.00% | - | 0.00% |
| Current Assets for Sale | 1.59 | 0.70 | 44.00% | 0.70 | 44.00% | 0.70 | 44.00% |
| Buildings & Leaseholds | 159.71 | 31.94 | 20.00% | 47.91 | 30.00% | 63.88 | 40.00% |
| Machinery & Equipment | 494.84 | 2.36 | 0.48% | 27.61 | 5.58% | 52.85 | 10.68% |
| Land | 35.37 | 20.68 | 57.74% | 24.44 | 68.24% | 28.20 | 78.74% |
| Intangibles | 145.88 | 6.00 | 4.11% | 6.25 | 4.28% | 6.50 | 4.46% |
| Current & Long term future tax asset | 47.84 | - | 0.00% | - | 0.00% | - | 0.00% |
| Long-term receivables | 0.32 | - | 0.00% | - | 0.00% | - | 0.00% |
| **Gross Liquidation Proceeds** | | **375.26** | | **452.38** | | **529.44** | |
| | | | | | | | |
| **Less: Wind Down Costs** | | | | | | | |
| Wind Down Costs | | (119.83) | | (124.68) | | (129.60) | |
| Trustee Fees | | (4.41) | | (5.95) | | (7.49) | |
| Professional Fees (Trustee Advisors) | | (9.60) | | (9.60) | | (9.60) | |
| **Total Liquidating Costs** | | **(133.83)** | | **(140.23)** | | **(146.69)** | |
| | | | | | | | |
| **Proceeds Available for Distribution & Waterfall** | | **241.42** | | **312.14** | | **382.75** | |

| | | Potential Distribution | | | | | |
|---|---|---|---|---|---|---|---|
| US & Canadian Revolver | 337.33 | | | | | | |
| US & Canadian Term Loans | 1,129.37 | | | | | | |
| SWAP Termination Costs | 15.88 | | | | | | |
| Accrued Interest | 0.00 | | | | | | |
| **Total Secured Lender Claims** | **1,482.58** | **241.42** | **16.3%** | **312.14** | **21.1%** | **382.75** | **25.8%** |
| | | | | | | | |
| **Other Secured Claims** | **17.00** | **0.00** | **0.0%** | **0.00** | **0.0%** | **0.00** | **0.0%** |
| **Priority Tax Claims** | **1.90** | **0.00** | **0.0%** | **0.00** | **0.0%** | **0.00** | **0.0%** |
| **Priority Non Tax Claims** | **16.25** | **0.00** | **0.0%** | **0.00** | **0.0%** | **0.00** | **0.0%** |
| **Senior Subordinated Notes** | **769.86** | **0.00** | **0.0%** | **0.00** | **0.0%** | **0.00** | **0.0%** |
| **General Unsecured Claims** | **113.40** | **0.00** | **0.0%** | **0.00** | **0.0%** | **0.00** | **0.0%** |
| **Equity** | **0.00** | **0.00** | **0.0%** | **0.00** | **0.0%** | **0.00** | **0.0%** |

***Notes to the Liquidation Analysis***

*Cash*

   Cash and cash equivalents consist of all cash and liquid investments with maturities of three months or less, in banks or operating accounts. The Masonite Debtors assumed no cash assets are restricted. The book cash balance is based upon the January 25, 2009 closing balance sheet is net of certain foreign bank loan balances that will be paid prior to repatriation of any cash funds or letter of credit cash collateralizations that may occur as a result of a bankruptcy filing. The Masonite Debtors assume under all scenarios, the balance will remain the same at the liquidation date and all cash will be recovered.

| *Masonite* | | |
|---|---|---|
| **Cash** | | |
| (in millions of US dollars unless otherwise noted) | | |
| | **Notes** | **Jan 25, 2009 Book Value** |
| **Cash - per January Closing Balance Sheet** | (a) | 176.60 |
| - Payoff of remaining Chile Loan Balance (March '09) | (b) | (5.00) |
| - Payoff of Czech Loans (February '09) | (c) | (5.56) |
| - Cash Collateralization of LCs | (d) | (11.88) |
| **Cash for Distribution** | | 154.16 |

Notes:

(a) Cash represents amounts as listed on the January Closing balance sheet and represents all cash items held in global Masonite bank accounts. Cash position may be significantly different at commencement of liquidation.

(b) In Chile, Masonite paid off a $5MM loan on Jan 2,2009 and a $2.5MM loan on Jan 19, 2009. These payoffs are reflected in the beginning cash balance. There is $5 million remaining on an external loan in Chile which matures end of March. The cash balance is adjusted to reflect the payoff of this loan.

(c) On Feb 6, 2009, Masonite paid external debt in CZ in full. The cash balance is adjusted to reflect the payment.

(d) Outstanding Letters of Credit of approximately $11.88MM will need to be cash collateralized because the requirements met by the current LCs are expected to continue.

*Accounts Receivable*

Accounts receivable primarily include North American and rest of world ("Rest of World") trade accounts receivable.  The Masonite Debtors assume they will be able to collect the outstanding accounts receivable using their resources.  The estimated realizable proceeds from accounts receivable are based on management's assessment of the ability of the Masonite Debtors to collect on their accounts, taking into consideration the location, quality, and age of the accounts.  The Rest of World accounts receivable are assumed to have slightly lower recoveries.  The Masonite Debtors further assume intercompany accounts receivable will not be settled.   Finally, customer programs are taken into consideration by reducing the collective amount by the customer program accrued account balance.  The Masonite Debtors' management assumes there is no residual accounts receivable resulting from any securitization agreements.  The results indicate the book value of accounts receivable will be collected at a weighted average recovery rate of 55.1% to 75.7%, with a mid-range of 65.7%

**Masonite**

**Accounts Receivable**

(in millions of US dollars unless otherwise noted)

| | Notes | Jan 25, 2009 Book Value (Unaudited) | Potential Recovery | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Low | | Medium | | High | |
| | | | ($) | (%) | ($) | (%) | ($) | (%) |
| **Trade AR - North American Entities** | (a) | | | | | | | |
| Current | | 89.09 | 71.27 | 80.0% | 80.18 | 90.0% | 87.30 | 98.0% |
| 1 to 29 days past due | | 12.70 | 8.26 | 65.0% | 9.53 | 75.0% | 10.80 | 85.0% |
| 30 to 59 days past due | | 2.76 | 1.52 | 55.0% | 1.79 | 65.0% | 2.07 | 75.0% |
| 60 to 89 days past due | | 2.24 | 0.34 | 15.0% | 0.56 | 25.0% | 0.79 | 35.0% |
| 90 to 119 days past due | | 1.09 | - | 0.0% | 0.05 | 5.0% | 0.16 | 15.0% |
| Over 120 days past due | | 0.30 | - | 0.0% | - | 0.0% | 0.03 | 10.0% |
| | | 108.18 | 81.38 | 75.2% | 92.11 | 85.1% | 101.15 | 93.5% |
| | | | | | | | | |
| **Trade AR - Rest of World Entities** | (b) | | | | | | | |
| Current | | 73.97 | 40.68 | 55.0% | 48.08 | 65.0% | 55.48 | 75.0% |
| 1 to 29 days past due | | 6.29 | 3.14 | 50.0% | 3.77 | 60.0% | 4.40 | 70.0% |
| 30 to 59 days past due | | 1.51 | 0.60 | 40.0% | 0.75 | 50.0% | 0.90 | 60.0% |
| 60 to 89 days past due | | 1.50 | 0.52 | 35.0% | 0.67 | 45.0% | 0.82 | 55.0% |
| 90 to 119 days past due | | 1.81 | - | 0.0% | - | 0.0% | 0.18 | 10.0% |
| Over 120 days past due | | 2.88 | - | 0.0% | - | 0.0% | 0.29 | 10.0% |
| | | 87.95 | 44.95 | 51.1% | 53.28 | 60.6% | 62.07 | 70.6% |
| **Total Trade AR** | | 196.13 | 126.33 | 64.4% | 145.39 | 74.1% | 163.22 | 83.2% |
| **Other receivables**  (net of doubtful accounts) | (c) | 10.77 | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total AR** | | 206.89 | 126.33 | 61.1% | 145.39 | 70.3% | 163.22 | 78.9% |
| **MINUS: Customer Rebate Accrual**  (included in AR) | (d) | (27.49) | (27.49) | | (27.49) | | (27.49) | |
| **Total Recoverable AR** | (e) | 179.40 | 98.84 | 55.1% | 117.90 | 65.7% | 135.73 | 75.7% |

Notes:
(a) North American trade accounts receivable relect a higher recovery value as they are more than 80% current and mostly large retail home centers.
(b) Rest of World trade accounts receivable recovery rate is calculated at a lower rate due to collection difficulties in foreign jurisdictions with differing legal environments and practices.
(c) Other receivables consist of vendor refunds for vendor incentives.  The Masonite Debtors assume vendors will not pay any incentives to Masonite.
(d) The Company records gross accounts receivable on the balance sheets.  The Masonite Debtors assume customers will offset payments owed with customer liabilities (rebates etc).  Any final AR liquidation proceeds are reduced by the accrued rebate amount.
(e) The Masonite Debtors assume no intercompany accounts receivable will be settled.

*Inventory*

The Masonite Debtors assume the liquidation of inventory assets will occur through the sale of specific products to competitors, vendors, and on the secondary market. Inventory is separated into the different types of raw materials (i.e., skins, glue, paint etc) and separated into the respective stages of production. Recovery values were estimated based on the insight and experience of the Masonite Debtors' management. Estimated recoveries vary based on the specific stage of production. Overall, inventory is assumed to be liquidated at a recovery rate of 26.2% to 37.8% of the total book value, with a mid-range of 31.7%.

**Masonite**
**Inventory**
(in millions of US dollars unless otherwise noted)

| | | Jan 25, 2009 Book Value (Unaudited) | Potential Recovery | | | | | |
| | Notes | | Low ($) | (%) | Medium ($) | (%) | High ($) | (%) |
|---|---|---|---|---|---|---|---|---|
| Door skins | (a) | 35.26 | 7.05 | 20.0% | 8.82 | 25.0% | 10.58 | 30.0% |
| Stiles & rails | (b) | 7.57 | 0.00 | 0.0% | 0.38 | 5.0% | 0.76 | 10.0% |
| Raw lumber | (c) | 4.88 | 0.98 | 20.0% | 1.22 | 25.0% | 1.46 | 30.0% |
| Core | (d) | 4.24 | 1.06 | 25.0% | 1.27 | 30.0% | 1.48 | 35.0% |
| Paint | (e) | 1.24 | 0.43 | 35.0% | 0.50 | 40.0% | 0.56 | 45.0% |
| Door Lites & Other | (f) | 8.86 | 2.21 | 25.0% | 2.66 | 30.0% | 3.54 | 40.0% |
| Inventory - other | | 2.68 | 0.94 | 35.0% | 1.07 | 40.0% | 1.34 | 50.0% |
| Embossing steel | | 3.46 | 0.69 | 20.0% | 1.04 | 30.0% | 1.38 | 40.0% |
| Coil steel | (g) | 1.32 | 0.59 | 45.0% | 0.66 | 50.0% | 0.79 | 60.0% |
| FGLS skin | (h) | 9.55 | 1.91 | 20.0% | 2.39 | 25.0% | 2.87 | 30.0% |
| Glue | (i) | 1.74 | 0.17 | 10.0% | 0.26 | 15.0% | 0.35 | 20.0% |
| Hardware | (j) | 2.67 | 0.94 | 35.0% | 1.07 | 40.0% | 1.34 | 50.0% |
| Packaging | (k) | 0.55 | 0.00 | 0.0% | 0.00 | 0.0% | 0.03 | 5.0% |
| Exterior Wood | (l) | 2.73 | 1.37 | 50.0% | 1.50 | 55.0% | 1.78 | 65.0% |
| Interior Wood | (m) | 2.89 | 0.72 | 25.0% | 1.01 | 35.0% | 1.30 | 45.0% |
| Logs | (n) | 1.38 | 0.83 | 60.0% | 0.96 | 70.0% | 1.10 | 80.0% |
| Vinyl | (o) | 0.00 | 0.00 | 0.0% | 0.00 | 5.0% | 0.00 | 10.0% |
| Steel frame | (p) | 0.00 | 0.00 | 20.0% | 0.00 | 30.0% | 0.00 | 40.0% |
| Other | (q) | 48.81 | 9.76 | 20.0% | 14.64 | 30.0% | 19.53 | 40.0% |
| Raw Materials, net | | 139.84 | 29.66 | 21.2% | 39.45 | 28.2% | 50.18 | 35.9% |
| Work-in-Process, net | (r) | 23.34 | 0.00 | 0.0% | 0.47 | 2.0% | 1.17 | 5.0% |
| Finished Goods, net | (s) | 51.53 | 30.92 | 60.0% | 33.49 | 65.0% | 36.07 | 70.0% |
| Other, net | (t) | 16.78 | 0.00 | 0.0% | 0.00 | 0.0% | 0.00 | 0.0% |
| **Total Inventory, net** | | 231.48 | 60.57 | 26.2% | 73.41 | 31.7% | 87.42 | 37.8% |

Notes:
(a) There are many door skin suppliers in the market. Several suppliers are currently reducing capacity.
(b) Stiles and rails are cut to specific sizes for specific applications for Masonite products and have little use to other manufacturers. May be sold for scrap lumber.
(c) There are different classifications of raw lumber.
(d) Door cores are wooden filler materials used to fill the center of solid doors. The cores may be pre-routed or blank. Pre-routed cores have little use outside of the Masonite's manufacturing process.
(e) Includes finishing paints and primers which can be used in other applications.
(f) Door lites are pre-cut glass door windows, some of which are industry standard and may be used by other manufacturers.
(g) Embossed steel includes stamped, embossed, or textured door skins which can be recovered as scrap steel values.
(h) Coil steel can be used for multiple applications.
(i) There are many FGLS skin suppliers in the market. Several suppliers are currently reducing capacity.
(j) Glue is specific to the door manufacturing process and exhibits a limited shelf life and specific storage requirements.
(k) Hardware includes hinges, bifolds, security plates etc. and the items may have use outside of the door manufacturing industry.
(l) Includes various packaging related materials. The market for packaging goods is currently saturated.
(m) Exterior wood is used to manufacture door frames.
(n) Interior wood includes stiles, rails, logs etc.
(o) Includes raw wooden logs which tend to retain value over time.
(p) Vinyl is prepared specifically for use in Masonite products and has very little market value.
(q) Steel frame includes stamped, embossed, or textured door skins which can be recovered as scrap steel values.
(r) Assumes production of goods will be discontinued and Inventory classified as Work-In-Process will remain unfinished with little realizable value. Work-In-Process includes some steel materials that may be recoverable at scrap value.
(s) Finished goods are values at Masonite's cost. Assumes reasonable recovery.
(t) Other, Net mostly "Storeroom Materials". Storeroom Materials are spare manufacturing equipment parts specific to Masonite's manufacturing equipment. As these parts are very specific, they have no liquidation value.

*Prepaid Expenses*

Prepaid expenses consist of deposits held by various suppliers for items such as insurance. The Masonite Debtors assume vendors will offset these deposits against their receivables from Masonite. In addition, any prepaid insurance will not be refunded as workers compensation insurance and similar claims will continue to accrue during the post-petition period.

*Current Assets For Sale*

Current assets for sale represent a single property that is currently under contract and expected to close on or around March 31, 2009.  The book value of the property per the January 25, 2009 closing balance sheet was approximately $1.59 million.  Although the closing price may be as high as $1.75 million, this amount does not include any transaction related costs or the current mortgage payoff amount.  The Masonite Debtors' management also assumes the balance will remain constant and the net proceeds will approximate 44% of the current book value.  These proceeds will not be subject to trustee fees or other liquidation related cost, but all of these proceeds are expected to be remitted directly to the Holders of Senior Secured Claims.

*Buildings & Leaseholds*

The buildings and leaseholds category includes owned structures and improvements to facilities.  The recovery percentages consider the location of the buildings and the current status of the commercial and industrial real estate market, as well as the time frame allotted for the liquidation.  The Masonite Debtors assume buildings and facilities can be liquidated, in an orderly manner, for a weighted average recovery between 20.0% and 40.0% of the net book values (net of accumulated depreciation for the appropriate components), with a mid-range of 30.0%.

**Masonite**
**Buildings, Leaseholds, & Land**
(in millions of US dollars unless otherwise noted)

| | Notes | Jan 25, 2009 Net Book Value (Unaudited) | Recovery - based on Net Book Value | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | | Medium | | High | |
| | | | ($) | (%) | ($) | (%) | ($) | (%) |
| **Buildings & Leaseholds** | (a) | | | | | | | |
| SACOPAN INC. | (b) | 0.14 | 0.03 | 20.0% | 0.04 | 30.0% | 0.06 | 40.0% |
| MASONITE INTERNATIONAL CORPORATION | | 16.02 | 3.20 | 20.0% | 4.80 | 30.0% | 6.41 | 40.0% |
| MASONITE CORPORATION | | 63.39 | 12.68 | 20.0% | 19.02 | 30.0% | 25.36 | 40.0% |
| ECHELON LASER SYSTEMS LP | (c) | - | - | 20.0% | - | 30.0% | - | 40.0% |
| DOMINANCE INDUSTRIES, INC. (@ 45%) | (d) | 1.92 | 0.38 | 20.0% | 0.58 | 30.0% | 0.77 | 40.0% |
| PREMDOR S.A.S. | | 18.37 | 3.67 | 20.0% | 5.51 | 30.0% | 7.35 | 40.0% |
| PREMDOR UK HOLDINGS LIMITED | | 18.90 | 3.78 | 20.0% | 5.67 | 30.0% | 7.56 | 40.0% |
| MASONITE IRELAND CONSOLIDATED | | 14.43 | 2.89 | 20.0% | 4.33 | 30.0% | 5.77 | 40.0% |
| KRONOSPAN DOOR HOLDING SARL | | 0.07 | 0.01 | 20.0% | 0.02 | 30.0% | 0.03 | 40.0% |
| MASONITE MAGYARORSZAG | | 0.66 | 0.13 | 20.0% | 0.20 | 30.0% | 0.27 | 40.0% |
| EUROPA DOOR LTD | | 1.87 | 0.37 | 20.0% | 0.56 | 30.0% | 0.75 | 40.0% |
| UKRAINE CONSOLIDATED | | 1.42 | 0.28 | 20.0% | 0.43 | 30.0% | 0.57 | 40.0% |
| ISRAEL CONSOLIDATED | | 0.05 | 0.01 | 20.0% | 0.01 | 30.0% | 0.02 | 40.0% |
| MASONITE EUROPE SHARED SERVICES LIMITED | | - | - | 20.0% | - | 30.0% | - | 40.0% |
| MASONITE (AFRICA) LIMITED | (e) | (0.47) | (0.09) | 20.0% | (0.14) | 30.0% | (0.19) | 40.0% |
| PREMDOR INTERNATIONAL INC. | | - | - | 20.0% | - | 30.0% | - | 40.0% |
| MASONITE (HUNGARY) SZOLGALTOTO | | - | - | 20.0% | - | 30.0% | - | 40.0% |
| PREMDOR FINANCE LLC | | - | - | 20.0% | - | 30.0% | - | 40.0% |
| MASONITE MEXICO S.A. de S.V. | | 2.11 | 0.42 | 20.0% | 0.63 | 30.0% | 0.84 | 40.0% |
| MASONITE CHILE HOLDINGS S.A. | | 8.84 | 1.77 | 20.0% | 2.65 | 30.0% | 3.54 | 40.0% |
| MASONITE COSTA RICA S.A. | | 1.76 | 0.35 | 20.0% | 0.53 | 30.0% | 0.70 | 40.0% |
| TECNOFOREST DEL NORTE S.A. | | 0.25 | 0.05 | 20.0% | 0.07 | 30.0% | 0.10 | 40.0% |
| MASONITE (SHANGHAI) TRADING COMPANY | | - | - | 20.0% | - | 30.0% | - | 40.0% |
| MAGNA FOREMOST SDN BHD | (f) | 0.72 | 0.14 | 20.0% | 0.22 | 30.0% | 0.29 | 40.0% |
| BS Consolidation Adjustments | | 9.28 | 1.86 | 20.0% | 2.78 | 30.0% | 3.71 | 40.0% |
| | | **159.71** | **31.94** | **20.0%** | **47.91** | **30.0%** | **63.88** | **40.0%** |

Notes:
(a) The Masonite Debtors assume the balance sheet book values are representative of the current market values and base their assumption on the fact that many the buildings and much of the real property have been the subject of appraisals over the last four to five years.  The book values were adjusted to reflect the m recent appraisals.  The facilities mostly include large manufacturing facilities in rural areas where the Debtors know and assume it to be difficult to locate buyer expecially given current industry and macroeconomic conditions.
(b) Book value adjusted to reflect 75% interest in JV.
(c) Book value adjusted to reflect 50% interest in JV.
(d) Book value adjusted to reflect 45% interest in JV.
(e) Book value adjusted to reflect 80% interest in JV.
(f) Book value adjusted to reflect 50% interest in JV.

*Machinery & Equipment*

Machinery and equipment includes production machinery, tooling, fixtures, fittings, transportation equipment, automobiles, office equipment, computer equipment etc. The Masonite Debtors assume liquidation of machinery and equipment takes place in an orderly manner in order to maximize recovery. The Masonite Debtors also assume machinery and equipment can be liquidated for a recovery between 0.5% and 10.7% of the net book values, with a mid-range of 5.6%. Plant closing costs are included in the section entitled "Wind-Down Costs", which begins on page 44.

**Masonite**
**Machinery & Equipment**
(in millions of US dollars unless otherwise noted)

| | Notes | Jan 25, 2009 Book Value (Unaudited) | Potential Recovery | | | | | |
| | | | Low | | Medium | | High | |
| | | | ($) | (%) | ($) | (%) | ($) | (%) |
| **Net of Accumulated Depreciation** | | | | | | | | |
| Tooling | (a) | 9.13 | 0.00 | 0.0% | 0.46 | 5.0% | 0.91 | 10.0% |
| Mach & equip | (a) | 470.13 | 0.00 | 0.0% | 23.51 | 5.0% | 47.01 | 10.0% |
| Mach & equip, appraisal increment | (a) | (12.96) | 0.00 | 0.0% | (0.65) | 5.0% | (1.30) | 10.0% |
| Fixtures & fittings | (b) | 3.03 | 0.00 | 0.0% | 0.15 | 5.0% | 0.30 | 10.0% |
| Distribution equipment | (c) | 0.48 | 0.10 | 20.0% | 0.14 | 30.0% | 0.19 | 40.0% |
| Delivery equipment | (c) | 0.11 | 0.02 | 20.0% | 0.03 | 30.0% | 0.04 | 40.0% |
| Automobiles | (c) | 1.04 | 0.21 | 20.0% | 0.31 | 30.0% | 0.41 | 40.0% |
| Automobiles, appraisal increment | (c) | 0.01 | 0.00 | 20.0% | 0.00 | 30.0% | 0.00 | 40.0% |
| Office equipment | (d) | 10.57 | 0.53 | 5.0% | 1.06 | 10.0% | 1.59 | 15.0% |
| Office equipment, appraisal increment | (d) | 0.01 | 0.00 | 5.0% | 0.00 | 10.0% | 0.00 | 15.0% |
| Computer equipment | (d) | 4.87 | 0.24 | 5.0% | 0.49 | 10.0% | 0.73 | 15.0% |
| Current year, additions | (e) | 8.43 | 1.26 | 15.0% | 2.11 | 25.0% | 2.95 | 35.0% |
| **Machinery & Equipment, net** | | **494.84** | **2.36** | **0.5%** | **27.61** | **5.6%** | **52.85** | **10.7%** |

Notes:
(a) The Masonite Debtors assume there is currently little to no interest in door manufacturing equipment due to current economic conditions. Additionally, Management notes that the current oversupply of door manufacturing equipment and industry wide capacity reductions.
(b) Assumes Fixtures & fittings generate no to little value as it is part of current configuration of plant, office and warehouse buildings.
(c) Distribution and delivery equipment have multiple uses across industries. Assumes higher recovery than other machinery and equipment.
(d) Aging and oversupply of vastly available standardized office and computer equipment. Assumes relatively low recovery yields.
(e) Includes current year machinery and equipment purchases. Assumes slightly higher recovery percentages.

*Land*

Land includes real property.  Some properties included in the book values were appraised during or around 2005.  The recovery percentages consider the location of the property and the current status of the commercial and industrial real estate market, as well as the time frame allotted for any liquidation scenario.  The Masonite Debtors' management assumes the property can be liquidated, in an orderly manner, for a weighted average recovery between 57.7% and 78.7% of the net book values (net of accumulated depreciation), with a mid-range of 68.2%.

*Masonite*
**Buildings, Leaseholds, & Land**
(in millions of US dollars unless otherwise noted)

| | Notes | Jan 25, 2009 Net Book Value (Unaudited) | Recovery - based on Net Book Value | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | | Medium | | High | |
| | | | ($) | (%) | ($) | (%) | ($) | (%) |
| *Land* | (a) | | | | | | | |
| SACOPAN INC. | (b) | - | - | 55.0% | - | 65.0% | - | 75.0% |
| MASONITE INTERNATIONAL CORPORATION | | 2.25 | 1.24 | 55.0% | 1.46 | 65.0% | 1.69 | 75.0% |
| MASONITE CORPORATION | | 17.20 | 9.46 | 55.0% | 11.18 | 65.0% | 12.90 | 75.0% |
| ECHELON LASER SYSTEMS LP | (c) | - | - | 55.0% | - | 65.0% | - | 75.0% |
| DOMINANCE INDUSTRIES, INC. (@ 45%) | (d) | - | - | 55.0% | - | 65.0% | - | 75.0% |
| PREMDOR S.A.S. | | 3.66 | 2.02 | 55.0% | 2.38 | 65.0% | 2.75 | 75.0% |
| PREMDOR UK HOLDINGS LIMITED | | 8.00 | 4.40 | 55.0% | 5.20 | 65.0% | 6.00 | 75.0% |
| MASONITE IRELAND CONSOLIDATED | | 1.49 | 0.82 | 55.0% | 0.97 | 65.0% | 1.12 | 75.0% |
| KRONOSPAN DOOR HOLDING SARL | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| MASONITE MAGYARORSZAG Kft. | | 0.91 | 0.50 | 55.0% | 0.59 | 65.0% | 0.68 | 75.0% |
| EUROPA DOOR LTD | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| UKRAINE CONSOLIDATED | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| ISRAEL CONSOLIDATED | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| MASONITE EUROPE SHARED SERVICES LIMITED | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| MASONITE (AFRICA) LIMITED | (e) | (1.79) | - | 0.0% | - | 0.0% | - | 0.0% |
| PREMDOR INTERNATIONAL INC. | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| MASONITE (HUNGARY) SZOLGALTOTO RESZVENYTARSASAG | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| PREMDOR FINANCE LLC | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| MASONITE MEXICO S.A. de S.V. | | 2.16 | 1.19 | 55.0% | 1.40 | 65.0% | 1.62 | 75.0% |
| MASONITE CHILE HOLDINGS S.A. | | 0.61 | 0.33 | 55.0% | 0.39 | 65.0% | 0.46 | 75.0% |
| MASONITE COSTA RICA S.A. | | 0.53 | 0.29 | 55.0% | 0.35 | 65.0% | 0.40 | 75.0% |
| TECNOFOREST DEL NORTE S.A. | | 10.13 | 5.57 | 55.0% | 6.59 | 65.0% | 7.60 | 75.0% |
| MASONITE (SHANGHAI) TRADING COMPANY LIMITED | | - | - | 55.0% | - | 65.0% | - | 75.0% |
| MAGNA FOREMOST SDN BHD | (f) | - | - | 55.0% | - | 65.0% | - | 75.0% |
| BS Consolidation Adjustments | | (9.35) | (5.14) | 55.0% | (6.08) | 65.0% | (7.02) | 75.0% |
| | | 35.81 | 20.68 | 57.7% | 24.44 | 68.2% | 28.20 | 78.7% |

Notes:
(a)  The Masonite Debtors assume the balance sheet book values are representative of the current market values and base their assumption on the fact that many of the buildings and much of the real property have been the subject of appraisals over the last four to five years.  The book values were adjusted to reflect the more recent appraisals.  The facilities mostly include large manufacturing facilities in rural areas where the Debtors know and assume it to be difficult to locate buyers, expecially given current industry and macroeconomic conditions.
(b)  Book value adjusted to reflect 75% interest in JV.
(c)  Book value adjusted to reflect 50% interest in JV.
(d)  Book value adjusted to reflect 45% interest in JV.
(e)  Book value adjusted to reflect 80% interest in JV.
(f)  Book value adjusted to reflect 50% interest in JV.

*Intangible Assets*

    Intangible assets include customer lists, patents and trademarks etc.   The estimated brand value is based on discounts applied to recent valuations performed by Cole & Partners, which were prepared for the purpose of asset impairment.  Patents are also estimated to have a minimum realizable value while all other intangibles are assumed to have zero value.  The Masonite Debtors assume its brand and patents could be liquidated for a recovery between 4.1% and 4.5%, with a mid-range of 4.3%.

**Masonite**
**Intangibles**
(in millions of US dollars unless otherwise noted)

| | Notes | Jan 25, 2009 Net Book Value (Unaudited) | Potential Recovery | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Low | | Medium | | High | |
| | | | ($) | (%) | ($) | (%) | ($) | (%) |
| Customer lists | | 0.00 | 0.00 | 0.0% | 0.00 | 0.0% | 0.00 | 0.0% |
| Patents | (a) | 47.78 | 1.98 | 4.1% | 2.06 | 4.3% | 2.15 | 4.5% |
| Order backlog | | 0.00 | 0.00 | 0.0% | 0.00 | 0.0% | 0.00 | 0.0% |
| Trademarks and tradenames | (a) | 98.10 | 4.02 | 4.1% | 4.19 | 4.3% | 4.36 | 4.4% |
| **Total Intangibles, net** | | **145.88** | **6.00** | **4.1%** | **6.25** | **4.3%** | **6.50** | **4.5%** |

**Valuation of Patents:**
Value as % of 2009 Revenue:    0.33%

**Valuation of Trademarks and tradenames:**
Value as % of 2009 Revenue:    0.67%

| | Low | Medium | High |
| --- | --- | --- | --- |
| 2009 Revenue Estimates | 1,200.00 | 1,250.00 | 1,300.00 |
| Value of Patents | 3.96 | 4.13 | 4.29 |
| Value of Trademarks | 8.04 | 8.38 | 8.71 |

| **Discount - imposed by potential buyer:** | | | |
| --- | --- | --- | --- |
| Net of Discount | 50% | 50% | 50% |
| Value of Patents | 1.98 | 2.06 | 2.15 |
| Value of Trademarks | 4.02 | 4.19 | 4.36 |

Notes:
(a) Patents, Trademarks and tradenames valuation methodology based on recent brand name and patent appraisals by Cole & Partners.  While the Cole & Partners data was used as a basis for this assumption, it is impossible to accurately predict the value a potential buyer would be willing to pay as it would largely be based on incremental sales driven by the brand name and patents.

*Current & Long Term Future Tax Asset*

    The Masonite Debtors assume their tax assets have zero value.

*Long-Term Receivables*

    The Masonite Debtors' management assumes that there is no recovery of long-term receivables.

*Wind-Down Costs*

    Wind-down costs consist of the estimated operating costs necessary to effectuate the chapter 7 liquidation of the Masonite Debtors' estate.  Professional fees represent the cost of the trustee and professionals required to support a chapter 7 trustee, as well as auctioneers, brokers and other liquidation professionals engaged to liquidate the assets of the Masonite Debtors.

    The Masonite Debtors assume that plants cease operations but employees are required to support the liquidation which would include finance and treasury support, warehouse personnel and other overhead personnel needed to ensure the liquidation is completed in an orderly manner.  The Masonite Debtors' management assumes three months of salary is required.  Salary estimates are based on recent financial statements.  Other costs include utilities, logistics and security.  Wind-down costs before trustee and trustee legal and financial advisor fees are

estimated to be approximately $125.4 to $135.2 million, with a mid-range of $130.3 million. Trustee and trustee professional fees are estimated to be approximately $14.9 to $18.0 million, with a mid-range of $16.5 million.

*Claims*

As of the January 25, 2009 closing balance sheet, the Masonite Debtors had approximately $1,482.6 million in Senior Secured Claims, which total included the United States and Canadian revolving lines of credit, the United States and Canadian term loans, interest rate swap termination costs, open but undrawn letters of credit, and accrued interest. The draws on the letters of credit are reflected in the cash balance. The Liquidation Analysis indicates that Holders of Senior Secured Claims would receive a recovery of 16.3% to 25.8% in the hypothetical chapter 7 liquidation, with a mid-range of 21.1%. While the Liquidation Analysis indicates that some Holders of Senior Secured Claims would receive a partial recovery, it also demonstrates that Holders of all other Claims and Equity Interests would receive no recovery in the hypothetical chapter 7 liquidation.

Other Secured Claims include amounts owed to shippers, warehousemen, and materialmen. The Masonite Debtors estimate that Other Secured Claims total approximately $17.0 million. The Liquidation Analysis demonstrates that Holders of Other Secured Claims would receive no recovery in the hypothetical chapter 7 liquidation.

The Masonite Debtors estimate that Priority Tax Claims total approximately $1.9 million and is based on the accrued Priority Tax Claims detailed in the January 25, 2009 closing balance sheet. The Liquidation Analysis demonstrates that Holders of Priority Tax Claims would receive no recovery in the hypothetical chapter 7 liquidation.

Priority Non-Tax Claims include Claims that are entitled to priority under the Bankruptcy Code, including Claims of vendors for the value of any goods received by the Masonite Debtors in the ordinary course of business within 20 days before the Petition Date. The Masonite Debtors estimate that Priority Non-Tax Claims total approximately $16.3 million. The Liquidation Analysis demonstrates that Holders of Priority Non-Tax Claims would receive no recovery in hypothetical chapter 7 liquidation. The Senior Subordinated Notes Claims include all Claims arising under the Senior Subordinated Notes Indentures. The Masonite Debtors estimate that the Senior Subordinated Notes Claims total approximately $769.9 million. The Liquidation Analysis demonstrates that Holders of Senior Subordinated Notes Claims would receive no recovery in a hypothetical chapter 7 liquidation.

General Unsecured Claims include all general unsecured, non-priority Claims (other than the Senior Subordinated Notes Claims) arising prior to the Petition Date. The Masonite Debtors estimate that General Unsecured Claims total approximately $113.4 million. The Liquidation Analysis demonstrates that Holders of General Unsecured Claims would receive no recovery in the hypothetical chapter 7 liquidation.

**Projected Financial Information**

Attached as Exhibit B are the unaudited pro forma financial statements (the "Projections"), which include the following: (A) a projected income statement (the "Income Statement") for January 1, 2009 through December 31, 2013; (B) a projected cash flow statement (the "Cash Flow Statement") for January 1, 2009 through December 31, 2013; (C) and a balance sheet (the "Balance Sheet") for year end 2009 through 2013. The Projections are based on the Masonite Debtors' business plan and the forecasted consolidated financial results of the Masonite Debtors and their non-debtor affiliates.

THE MASONITE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE MASONITE DEBTORS' MANAGEMENT DID NOT PREPARE THE PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC. THE MASONITE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, (A) DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH

RESPECT TO THE PROJECTIONS, (B) ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND (C) DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE MASONITE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED IN THIS DISCLOSURE STATEMENT.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE MASONITE DEBTORS, INCLUDING THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, COMMODITY PRICE FLUCTUATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN THE SECTION ENTITLED "RISK FACTORS" OF THIS DISCLOSURE STATEMENT, WHICH BEGINS ON PAGE 49) AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE MASONITE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE MASONITE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED MASONITE DEBTORS' CONTROL. THE MASONITE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED MASONITE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE MASONITE DEBTORS PREPARED THE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE MASONITE DEBTORS AND REORGANIZED MASONITE DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THIS DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AND EQUITY INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

### *Income Statement and Cash Flow Statement*

*Market and Operational Drivers*

"Net Sales" in the Income Statement is based on the anticipated revenue of the Masonite Debtors' business units using an approach established by the Masonite Debtors to forecast the Masonite Debtors' sales revenues and costs across their business units. In particular, the Income Statement accounts for the conditions in the new home construction market and levels of repair, renovation and remodeling ("RRR") activity in the North American market (Canada, the United States and Mexico) and other economic factors such as gross domestic product growth in other worldwide locations. Forecasted new home construction trends are obtained from various third party sources including, but not limited to, NAHB and the Canada Mortgage and Housing Corporation ("CMHC"). Forecasted levels of RRR activity are based on studies from the Harvard Joint Centre for Housing Studies. Economic activity levels in non-North American business units are based on third party forecasts such as EuroConstruct. The Masonite Debtors also considered the impact of changes in forecasted exchange rates as provided by Consensus Economics Inc. on each business unit by determining the exposure of sales revenue in each business unit to the various foreign currencies in which Masonite sells its products.

"Total Cost of Goods Sold" and "Sales, General, Administrative, and Other" in the Income Statement are based on a financial model that considers the fixed and variable nature of each of the cost elements that make up these categories including cost of materials, factory overheads, direct labor and distribution costs. For each of the cost elements, the Masonite Debtors considered the impacts of inflation, cost savings actions to be implemented and changes in exchange rates.

The Income Statement for 2009 was established based on the Masonite Debtors' 2009 budget, which was established on a plant-by-plant and account-by-account basis by Masonite operations, finance and sales management and approved by senior management. Key budget items include materials, utilities, wage costs, leases, freight and distribution costs. The budget was updated in early 2009 to reflect actual results to date through January and a re-forecast of volume levels based on the evolution of market conditions between the time of preparation of the budget and early 2009. For the years after 2009, expenses were adjusted on a business unit basis for volume, inflation, translation and cost reduction activities.

While Masonite holds a 100% interest in most of its major subsidiaries, it holds less than a 100% interest in certain operations. The accounting treatment for such minority ownership interest varies on the ownership structure of the subsidiary. For purposes of the Projections, the Magna Foremost subsidiary in Malaysia (50% owned by Masonite), the Masonite Africa subsidiary (79% owned by Masonite), and Sacopan Inc. (75% owned by Masonite) were assumed to be consolidated and minority interest adjustments were made. In the case of Foremost Crest (50% owned by Masonite) and Dominance Industries Inc (45% owned by Masonite) proportionate consolidation was applied. The treatment of these less than wholly owned subsidiaries in the Projections is consistent with the treatment applied in the historical financial statements prepared under Canadian GAAP.

*Sales, General, Administrative*

In addition to market and plant specific factors, the Income Statement reflects other items, such as corporate overhead, which comprises a large portion of the expense included in "Sales, General, Administrative, and Other" category, to determine Net Income. Major components of the Masonite Debtors' corporate overhead consist of salaries, benefits, bonuses, outside services, office space, equipment, office expense, insurance and other miscellaneous expenses. The Masonite Debtors' corporate overhead budget for year 2009 was prepared on a "bottom-up" basis, with each functional area submitting budgets for the upcoming fiscal year. Each department forecasted year 2009 expenditures by analyzing expected personnel requirements, salaries, and anticipated additional cost savings through reductions in non-personnel related overhead spending. These cost expenditures include expenses at both the corporate and facility level. For the years 2009-2013, corporate overhead expenses were projected to increase for inflation, net of additional cost reduction activities in 2010. The Masonite Debtors forecasted that some additional spending in selling, general and administration would be required in later years when market conditions recover.

### *Reorganization and Other Restructuring Assumptions*

*Restructuring Charges*

The Cash Flow Statement assumes that Masonite will incur approximately $33 million of cash restructuring charges in 2009. These payments relating to the Chapter 11 Cases and CCAA Proceedings are comprised of professional fees, payment of administrative, priority and other secured claims, and management emergence bonuses. Professional fees were projected by examining the run-rate for professionals billing at hourly and fixed-rates for 2006 and estimating 2007 and 2008 run-rate billing levels, accounting for hold-backs, success fees, and projected post-exit work plans.

*Asset Sales*

The Projections assume additional net proceeds of $19 million will be raised via asset sales. Masonite continues to evaluate its asset portfolio and, therefore, any assumptions relating to the results of Masonite's efforts to sell assets remain subject to material change.

*Income Taxes*

Generally, projected income taxes in the Income Statement and the Cash Flow Statement include both state/provincial income taxes and federal taxes, as well as provisions for deferred taxes. For purposes of forecasting potential taxable income, the Projections assume that the Masonite Debtors' tax basis of assets and net operating losses are entirely used up as part of the Restructuring Transactions. However, a final assessment of Masonite's net operating losses and tax basis of assets may vary based on the structure of the Plan and events occurring after the Effective Date.

*Capital Expenditures and Major Maintenance*

Capital expenditures and major maintenance reflected in the Income Statement and the Cash Flow Statement are for upkeep and investment in current manufacturing facilities. For purposes of the Projections, Masonite's capital expenditures are assumed to include maintenance, investment capital expenditures and capital expenditures required for environmental compliance. For 2009, the Projections estimate of capital expenditures reflect budgeted amounts for capitalized mandatory major maintenance, environmental compliance projects and other essential capital projects. Capital expenditures for years 2010 through 2013 are projected in two categories: mandatory environmental expenditures for Maximum Achieveable Control Technology ("MACT") and all other capital expenditures. The amounts for MACT are forecast based on current cost estimates and the remainder is based on historical experience of management.

*Financing Activities*

Principal payments and proceeds from borrowings reflected in the Cash Flow Statement for 2009 reflect repayment of pre-existing indebtedness prior to the commencement of the Chapter 11 Cases and the scheduled mandatory payments on the New Term Loan following emergence. The cancellation of the facility under the Senior Secured Credit Agreement, and the Senior Subordinated Notes, and the exchange of portions of the facility under the Senior Secured Credit Agreement into the New Term Loan and the New PIK Loan are not shown on the cash flow statement as these transactions were effected without the exchange of cash.

### **Balance Sheet**

The Balance Sheet was developed from the December 31, 2008 balance sheet contained in Masonite's Annual Report on Form 20-F for the fiscal year ended December 31, 2008. Adjustments were made to the December 31, 2008 balance sheet for illustrative purposes only. The Balance Sheet does not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting. The Balance Sheet includes the

debt and other obligations of Masonite's non-debtor affiliates, because these obligations will continue to remain outstanding and will be paid in the ordinary course of each non-debtor affiliate's operations. Certain liabilities subject to compromise will be converted to equity as a result of the Reorganized Masonite Debtors' issuance of New Common Stock (based upon the New Masonite Total Enterprise Value) to satisfy Allowed Claims under the Plan. The projected opening cash balance includes certain cash items from the sale of claims and other working capital related items.

The Balance Sheet includes the debt and other obligations of Masonite's non-debtor affiliates because these obligations will continue to remain outstanding and will be paid in the ordinary course of each non-debtor affiliate's operations. Certain liabilities subject to compromise will be converted to equity as a result of the Reorganized Masonite Debtors' issuance of New Common Stock (based upon the New Masonite Total Enterprise Value) to satisfy Allowed Claims under the Plan. The projected opening cash balance includes certain cash items from the sale of claims and other working capital related items.

On the Effective Date, the Reorganized Masonite Debtors will enter into the New Term Loan. On the Effective Date, actual Cash may vary from Cash reflected in the Balance Sheet because of variances in the Projections and potential changes in the Masonite Debtors' need for Cash to consummate the Plan.

### Risk Factors

*Holders of Claims should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, prior to voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Masonite Debtors' businesses or the Plan and its implementation.*

#### Class 2 and Class 4 may vote to reject the Plan.

Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Class 2 and Class 4 if at least two-thirds in amount and more than one-half in number of the Allowed Claims that vote in such Class, vote to accept the Plan. There is no guarantee that Masonite will receive the necessary acceptances from Holders of Claims in either Class 2 or Class 4. If Class 2 or Class 4 vote to reject the Plan, Masonite may elect to amend the Plan with the reasonable consent of the Senior Secured Agent and counsel to the Informal Noteholder Committee, seek Confirmation regardless of the rejection or proceed with liquidation.

#### The conditions precedent to the Confirmation and Consummation of the Plan may not occur.

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation of the Plan and the Effective Date are each subject to a number of conditions precedent. If the conditions precedent to Confirmation are not met or waived, the Plan will not be confirmed; and if the conditions precedent to the Effective Date are not met or waived, the Effective Date will not take place. In the event that the Plan is not confirmed or is not consummated, Masonite may amend the Plan and seek confirmation of the amended Plan. However, if Masonite does not secure sufficient working capital to continue its operations or if the revised Plan is not confirmed, Masonite may be forced to go out of business and proceed with a liquidation of its assets. While the Liquidation Analysis indicates that some Holders of Senior Secured Claims would receive a partial recovery, it also demonstrates that Holders of Other Secured Claims, Priority Tax Claims, Priority Non-Tax Claims, Senior Subordinated Notes Claims, General Unsecured Claims and Equity Interests would receive no recovery in a hypothetical chapter 7 liquidation. For a more detailed description of the consequences of a liquidation scenario, see "Best Interests Test" beginning on page 35 and "Findings of Liquidation Analysis" beginning on page 36.

#### Masonite may not be able to achieve its projected financial results.

The financial projections set forth on Exhibit B to this Disclosure Statement represent Masonite's management's best estimate of Masonite's future financial performance based on currently known facts and

assumptions about Masonite's future operations as well as the U.S. and world economy in general and the industry segments in which Masonite operates in particular. Masonite's actual financial results may differ significantly from the projections. If Masonite does not achieve its projected financial results, the value of the New Common Stock may be negatively affected and Masonite may lack sufficient liquidity to continue operating as planned after the Effective Date.

**A liquid trading market for the New Common Stock is unlikely to develop.**

A liquid trading market for the New Common Stock is unlikely to develop. As of the Effective Date, the New Common Stock will not be listed for trading on any stock exchange or trading system. Consequently, the trading liquidity of the New Common Stock will be limited. The future liquidity of the trading market for the New Common Stock will depend, among other things, upon the number of Holders of New Common Stock, and whether the stock is listed for trading on an exchange.

**Certain Holders of Senior Secured Claims or Senior Subordinated Notes Claims will acquire a substantial amount of New Common Stock upon Consummation of the Plan.**

Upon Consummation of the Plan, certain Holders of Claims will receive distributions of the New Common Stock representing a substantial amount of the outstanding shares of the New Common Stock, and certain Holders of Senior Secured Claims or Senior Subordinated Notes Claims will be in a position to exercise substantial influence over the outcome of actions requiring stockholder approval, including, among other things, election of directors. This concentration of ownership could also facilitate or hinder a negotiated change of control of Masonite and, consequently, impact the value of the New Common Stock.

**If we are unable to compete successfully, we could lose customers and our sales could decline.**

We compete against international, national and regional manufacturers of doors. Some of our principal competitors may be less highly leveraged than we are and may have greater financial, marketing and distribution resources than we do. Accordingly, these competitors may be better able to withstand changes in conditions within the industry in which we operate and may have significantly greater operating and financial flexibility than we do. Also, certain of our competitors may have excess production capacity, which could lead to pressure to decrease prices in order to remain competitive. For these and other reasons, these competitors could take a greater share of sales and cause us to lose business from our customers, resulting in potential further facility closures and related writedowns and impairments. If our service, quality, lead times and warranties are impacted, or if we are unable to support our customers with marketing and merchandising materials, displays, pricing programs and product support, we could also lose business from our customers.

**Downward trends in repair, renovation and remodeling and new home construction or in general economic conditions could negatively impact our financial performance.**

Regional trends in repair, renovation and remodeling and new home construction directly impact our financial performance because demand for doors is influenced by the level of repair, renovation and remodeling activity in existing homes and new home construction activity. Accordingly, trends such as strength of the global economy, new housing construction, housing sales, job growth, interest rates, availability of financing and consumer confidence, among other trends, have a direct impact on our business in the countries in which our products are sold. The U.S. market has magnified the housing market crisis to disproportionate levels. As such, the housing market has created a negative spin on all construction and related product suppliers. As a matter of fact, while historically cyclical, during 2007 and 2008, the housing market suffered a major downturn in the United States and December 2008 annualized seasonally adjusted housing starts were 33.12% below the December 2007 rate and 49.68% below the December 2006 rate, as reported by the U.S. Census Bureau. In addition, the repair, renovation and remodeling has recently experienced weakening year-over-year sales in the United States. Our relatively narrow focus within the building products industry amplifies the risks inherent in such a market downturn. The impact of this weakness on our revenues, profits and profit margin will be determined by many factors, including industry capacity, industry pricing discipline, and our ability to implement the series of initiatives encompassed in our business plan.

**Concentrated client base, consolidation of our customers and lack of customer contracts.**

Our customers consist mainly of wholesalers and retail home centers. Our top 10 major customers together accounted for approximately 40% of our gross sales in fiscal year 2008, while our largest customer accounted for approximately 15.4% of our gross sales in fiscal year 2008. We expect that a small number of customers will continue to account for a substantial portion of our gross sales for the foreseeable future. In addition, we generally do not enter into contracts with our customers and they generally do not have an obligation to purchase products from us. The loss of, or a diminution in, our relationship with our largest customer or any other major customer could have a material adverse effect on us. If any of these customers fails to remain competitive in their respective markets or encounters financial or operational problems, our revenue and profitability may decline.

In addition, consolidation among businesses operating in different geographic regions has increased in recent years, resulting in more customers operating nationally and internationally. We believe that these trends will continue in the future. As a result, our customers will increase in size and purchasing power. As our customers grow, we will be challenged to continue to provide consistently high customer service levels for increasing sales volumes, while offering a broad mix of innovative products and on-time and complete deliveries. If we fail to provide high levels of service, broad product offerings, competitive prices and timely and complete deliveries, we could lose a substantial portion of our customer base and our profitability, margins and revenues could decrease.

**Our business is subject to some seasonality.**

Our business experiences seasonal business swings, which correspond primarily to the northern hemisphere seasons, particularly winter effects in the northeastern and midwestern United States and in most regions of Canada. In addition to expected seasonal weather changes, unusually prolonged periods of cold, rain, blizzards, hurricanes or other severe weather patterns could delay or halt renovation and construction activity. This seasonality requires that we manage our cash flows over the course of the year. If sales were to fall substantially below what we would normally expect during certain periods, our annual financial results would be adversely impacted and our ability to service our debt may also be adversely affected.

**A disruption in our operations could materially affect our operating results.**

We operate over 65 facilities worldwide. Many of our facilities are located in areas that are vulnerable to natural disasters, such as hurricanes and earthquakes, as well as terrorist attacks or other acts of violence or war. In the event these occurrences were to interrupt our operations for any extended period of time, it could delay shipment of merchandise to our customers, damage our reputation or otherwise have a material adverse effect on our financial condition and results of operations.

**We are subject to the credit risk of our customers.**

We provide credit to our customers in the normal course of business. We generally do not require collateral in extending such credit. Also, our credit insurance has expired and only a few letters of credit that we have obtained from a limited number of customers remain outstanding. Our increased exposure, coupled with material instances of default, could have an adverse effect on our business, financial condition, results of operations and cash flow. In addition, we may need to make credit decisions that could cause our business to decline or the collection of certain receivables could become impossible and we would need to write those off.

**Increased prices for raw materials or finished goods used in our products and/or interruptions in deliveries of raw materials or finished goods could adversely affect our profitability, margins and revenues.**

We require a regular supply of steel, fiberglass, wood, wood composites, door facings, cut stock, core material and other raw materials as well as petroleum-based products such as resins and foam. Our profitability is affected by the prices of the raw materials and finished goods used in the manufacture of our products. The commodities we use may undergo major price fluctuations and there is no certainty that we will be able to pass these costs through to our customers. We also purchase raw materials and manufactured items from suppliers located in non-U.S. dollar based economies, therefore, fluctuations in currency exchange rates may also affect us. In certain

instances, we depend upon single or limited source suppliers for the supply of raw materials. Our dependency upon regular deliveries from particular suppliers means that interruptions or stoppages in such deliveries could adversely affect our operations until arrangements with alternate suppliers could be made.

**Increases in labor costs, potential labor disputes and work stoppages at our facilities or the facilities of our suppliers could materially adversely affect our financial performance.**

Our financial performance is affected by the availability of qualified personnel and the cost of labor. We have approximately 8,500 employees and contract laborers. A significant number of our employees are unionized. Employees represented by these unions are subject to collective bargaining agreements. None of our North American collective bargaining agreements are subject to renewal in 2009, and our collective bargaining agreements in France, Mexico, United Kingdom and South Africa are subject to annual renewal. If we are unable to enter into new, satisfactory labor agreements with our unionized employees upon expiration of their collective bargaining agreements, we could experience a significant disruption of our operations, which could cause us to be unable to deliver products to customers on a timely basis. If our workers were to engage in a strike, a work stoppage or other slowdowns, we could experience disruptions of our operations. Such disruptions could result in a loss of business and an increase in our operating expenses, which could reduce our profit margins. In addition, our non-unionized labor force may become subject to labor union organizing efforts, which could cause us to incur additional labor costs and increase the related risks that we now face. Many of our direct and indirect suppliers and customers also have unionized workforces. Strikes, work stoppages or slowdowns experienced by these suppliers and customers could result in slowdowns or closures of facilities where components of our products are manufactured or delivered. Any interruption in the production or delivery of these components could reduce sales, increase costs and have a material adverse affect on us.

**If our leases terminate or are not renewed upon expiration, we could be required to make significant capital expenditures to relocate our facilities.**

A significant number of our manufacturing facilities and warehouses are leased. There can be no assurance that upon termination or expiration of these leases we will be able to renew them on acceptable terms or at all. If we are unable to renew such leases, we could be required to make significant capital expenditures to relocate our facilities.

**We are exposed to political, economic and other risks that arise from operating a multinational business.**

We have operations in the United States, Canada, Chile, Mexico, Europe and, to a lesser extent, other foreign jurisdictions. Further, certain of our businesses obtain raw materials and finished goods from foreign suppliers. Accordingly, our business is subject to political, economic and other risks that are inherent in operating in numerous countries.

**Environmental requirements may impose significant environmental compliance costs and liabilities on us.**

Our operations are subject to numerous local and foreign laws and regulations relating to pollution control and the protection of the environment. Despite our best efforts to comply with environmental requirements, we are at risk of being subject to civil, administrative or criminal enforcement actions, of being held liable, of being subject to an order or of incurring costs, fines or penalties for, among other things, releases of contaminants or hazardous or toxic substances occurring on or emanating from currently or formerly owned or operated properties or any associated offsite disposal location, or for contamination discovered at any of our properties from activities conducted by us or by previous occupants. Changes in environmental laws and regulations or in their enforcement or the discovery of previously unknown or unanticipated contamination or non-compliance with environmental laws or regulations relating to our properties or operations could result in significant environmental liabilities or costs which could adversely affect our business. In addition, we might incur increased operating and maintenance costs and capital expenditures and other costs to comply with increasingly stringent air emission, wastewater discharge or waste disposal management laws or other future requirements. Accordingly, we are unable to predict the ultimate costs of compliance with or liability under environmental laws, which may be larger than current projections.

**We depend on our ability to innovate and to protect our intellectual property.**

Our continued success depends on our ability to develop and introduce new or improved products, to improve our manufacturing and product service processes, and to protect our proprietary rights to the technologies used in our products. We rely on a combination of U.S., Canadian and, to a lesser extent, European patents, trademarks, copyrights and trade secrets, as well as licensing, nondisclosure, confidentiality and other contractual restrictions to protect our intellectual property rights. However, these measures and our patents and trademarks may not afford complete protection of our intellectual property rights and it is possible that third parties may copy and market products based upon our technologies, under our brand or trade names without authorization or outside the jurisdictions in which we are protected. This could impede our growth in existing regions and expansion into new regions, create confusion among consumers and result in a greater supply of similar products that could erode prices for our protected products.

In addition, although we are not aware that any of our products or intellectual property rights materially infringe upon the proprietary rights of third parties, third parties may accuse us of infringing or misappropriating their patents, trademarks, copyrights or trade secrets. Third parties may also challenge our trademark rights and branding practices in the future. We may be required to institute or defend litigation to defend ourselves from such accusations or to enforce our patent, trademark and copyright rights from unauthorized use by others, which, regardless of the outcome, could result in substantial costs and diversion of resources and could negatively affect our competitive position, sales, profitability and reputation.

**Our business will suffer if certain key officers or employees discontinue employment with us.**

The success of our business is materially dependent upon the skills, experience and efforts of certain of our key officers and employees. The loss of key personnel could have a material adverse effect on our business, operating results or financial condition. We may not succeed in attracting and retaining the personnel we need to generate sales and to expand our operations successfully, and, in such event, our business could be materially and adversely affected. The loss of the services of any key personnel, or our inability to hire new personnel with the requisite skills, could impair our ability to develop new products or enhance existing products, sell products to our customers or manage our business effectively.

**Confirmation of the Plan**

### *The Confirmation Hearing*

The Bankruptcy Court has scheduled the Confirmation Hearing for May 29, 2009 at 9:30 a.m., prevailing Eastern time, before the Honorable Peter J. Walsh, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Courtroom # 2, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.  Approval of the Canadian Court will also be sought.

### *Requirements For Confirmation of the Plan*

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Equity Interests, or if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of Holders of Claims and Equity Interests that are impaired under the Plan.

*Requirements of Section 1129(a) of the Bankruptcy Code*

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan comply with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policies.

- The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the Reorganized Masonite Debtors and the nature of any compensation for such insider.

- With respect to each holder within an impaired class of claims or equity interests —

  - each such holder (a) has accepted the plan or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

  - if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class due to its election to retain a lien, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the Estate's interest in the property that secures such claims.

- With respect to each class of claims or equity interests, such class (a) has accepted the plan or (b) is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

  - with respect to a claim of a kind specified in sections 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim, unless otherwise agreed;

  - with respect to a class of claim of the kind specified in sections 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(3)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

  - with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

- If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any "insider," as defined in section 101 of the Bankruptcy Code.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. §1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(i)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

*Best Interests of Creditors*

Notwithstanding acceptance of the Plan by each impaired class, to confirm the Plan, the Bankruptcy Court must determine that it is in the best interests of each holder of a claim or interest in any such impaired class that has not voted to accept the Plan. Accordingly, if an impaired class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired class a recovery on account of the member's claim or equity interest that has a value, as of the effective date of the Plan, at least equal to the value of the distribution that each such member would receive if the Masonite Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. For additional information, please see the section entitled "Liquidation Analysis" beginning on page 35.

*Acceptance*

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.

*Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Masonite Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Masonite Debtors have prepared the financial projections, as set forth on Exhibit B attached hereto. Based upon the financial projections, the Masonite Debtors believe that Masonite will be a viable operation following the Chapter 11 Cases and the CCAA Proceedings, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

*Requirements of Section 1129(b) of the Bankruptcy Code*

The Bankruptcy Code permits confirmation of a plan of reorganization even if it is not accepted by each impaired class so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class and (c) the plan of reorganization is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted such plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

*Secured Creditors*

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (i) that each of the holders of the secured claims included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, to the extent of the allowed amount of such claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such Holder's interest in the Estate's interest in such property; (ii) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

*Unsecured Creditors*

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that: (i) each Holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior claims or interests.

*Holders of Equity Interests*

A plan of reorganization is fair and equitable as to an impaired class of equity interests that rejects the plan if the plan provides that: (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such Holder is entitled, or (C) the value of the equity interest; or (ii) the Holder of any equity interest that is junior to the equity interests of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior interest.

The Masonite Debtors believe the Plan is fair and equitable as to Holders of Claims in Classes that vote to reject the Plan or that are deemed to reject the Plan because the Plan provides that their Allowed Claims or Equity Interests will be either Unimpaired, or they will receive their "absolute priority" entitlements under the Bankruptcy Code. The Masonite Debtors believe the Plan is fair and equitable as to Holders of General Unsecured Claims and Equity Interests because Holders of Claims and Equity Interests junior to General Unsecured Claims will not receive or retain any property under the Plan on account of such Claims or Equity Interests.

*"Unfair Discrimination"*

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or equity interests.

The Masonite Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests. The Masonite Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

*Valuation of Masonite*

In conjunction with formulating the Plan, the Masonite Debtors determined that it was necessary to estimate the post-Confirmation going concern value of Masonite. Accordingly, such valuation is set forth in the "Valuation Analysis" beginning on page 31.

## Effect of Confirmation of the Plan

### Preservation of Avoidance Actions

On and after the Effective Date, any and all Avoidance Actions shall be preserved and retained by the Reorganized Masonite Debtors, which shall have the exclusive right, as applicable, to enforce, settle, release, abandon, or prosecute any such Avoidance Actions. The Reorganized Masonite Debtors may offset any claim supporting an Avoidance Action against any payment or Distribution due to any Holder of a Claim under the Plan. In addition, if a Distribution is made in error, the Reorganized Masonite Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such Distribution.

### Retention of Jurisdiction by the Bankruptcy Court

After the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan (except as otherwise set forth in any related agreements, documents, instruments, or contracts executed or entered into in connection with the Plan in which case the governing law of such agreement shall control). In particular, the Bankruptcy Court will keep exclusive jurisdiction to:

- Determine any disputes regarding any claim or interest against Masonite.

- Resolve any matters related to any executory contract or unexpired lease to which Masonite is party.

- Ensure that distributions to holders of allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide, or resolve any contested or litigated matters, and any other matters, and grant or deny any applications involving Masonite that may be pending on the Effective Date;

- Adjudicate, decide, or resolve any and all matters related to any causes of action, including those based in whole or in part on events occurring before or after Masonite filed for bankruptcy;

- Enter and implement such orders as may be necessary or appropriate to consummate the Plan and all documents created in connection with the Plan or this Disclosure Statement;

- Enter an order or final decree concluding or closing the Chapter 11 Cases; and

- Adjudicate any and all disputes arising from or relating to distributions under the Plan.

This list of matters over which the Bankruptcy Court will retain exclusive jurisdiction following the Confirmation is not exhaustive. For a full list of the matters over which the Bankruptcy Court retains jurisdiction after the Confirmation Hearing, please see Article XI of the Plan annexed hereto as Exhibit A. In addition, the Canadian Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the CCAA Proceedings and the CBCA Plan.

*Settlement, Release, Injunction, and Related Provisions*

*Discharge of Claims and Termination of Equity Interests*

PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED MASONITE DEBTORS), EQUITY INTERESTS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR EQUITY INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND EQUITY INTERESTS IN, THE MASONITE DEBTORS OR ANY OF THEIR ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND EQUITY INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR EQUITY INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE MASONITE DEBTORS PRIOR TO THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), OR 502(I) OF THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM OR EQUITY INTEREST BASED UPON SUCH DEBT, RIGHT, OR EQUITY INTEREST IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR EQUITY INTEREST BASED UPON SUCH DEBT, RIGHT, OR EQUITY INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH A CLAIM OR EQUITY INTEREST HAS ACCEPTED THE PLAN. ANY DEFAULT BY THE MASONITE DEBTORS OR THEIR AFFILIATES WITH RESPECT TO ANY CLAIM OR EQUITY INTEREST THAT EXISTED IMMEDIATELY PRIOR TO OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED ON THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND EQUITY INTERESTS SUBJECT TO THE EFFECTIVE DATE OCCURRING.

*Releases*

*Release of Liens*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED MASONITE DEBTORS AND ITS SUCCESSORS AND ASSIGNS.

*Releases by the Masonite Debtors*

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE MASONITE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE OF THE PLAN, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE MASONITE DEBTORS, THE REORGANIZED MASONITE DEBTORS, AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE MASONITE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE MASONITE DEBTORS, THE REORGANIZED MASONITE DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE MASONITE DEBTORS, THE CHAPTER 11 CASES, THE CCAA PROCEEDINGS, OR PROCEEDINGS PURSUANT TO THE CBCA, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE MASONITE DEBTORS OR THE REORGANIZED MASONITE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY MASONITE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE CCAA PROCEEDINGS, OR PROCEEDINGS PURSUANT TO THE CBCA, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THE PLAN SUPPLEMENT AND THIS DISCLOSURE STATEMENT, THE CBCA PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.

*Releases by Holders of Claims and Equity Interests*

AS OF THE EFFECTIVE DATE OF THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ALL MASONITE SHAREHOLDERS) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED THE MASONITE DEBTORS, THE REORGANIZED MASONITE DEBTORS, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE MASONITE DEBTORS, THE MASONITE DEBTORS' RESTRUCTURING, THE CHAPTER 11 CASES, THE CCAA PROCEEDINGS, OR PROCEEDINGS PURSUANT TO THE CBCA, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE MASONITE DEBTORS OR THE REORGANIZED MASONITE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY MASONITE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE

CHAPTER 11 CASES, THE CCAA PROCEEDINGS, OR PROCEEDINGS PURSUANT TO THE CBCA, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN, THIS DISCLOSURE STATEMENT, THE RELATED PLAN SUPPLEMENT, THE CBCA PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE OF THE PLAN, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN. NOTWITHSTANDING ANYTHING IN THE PLAN, NO PERSON SHALL BE DISCHARGED, RELEASED, OR RELIEVED FROM ANY LIABILITY WITH RESPECT TO THE PENSION PLAN AS A RESULT OF THE CHAPTER 11 CASES OR THE PLAN. NOR SHALL THE PBGC, THE PENSION PLAN, OR ANY OTHER PERSON BE ENJOINED OR PRECLUDED FROM ENFORCING ANY LIABILITY WITH RESPECT TO THE PENSION PLAN AS A RESULT OF THE CHAPTER 11 CASES, THE PLAN'S PROVISIONS, OR THE PLAN'S CONFIRMATION.

*Consideration By Shareholder Released Parties In Exchange For Release Provisions*

THE SHAREHOLDER RELEASED PARTIES HAVE PROVIDED OR WILL PROVIDE THE FOLLOWING CONSIDERATION IN EXCHANGE FOR THE RELEASE PROVISIONS PROVIDED IN THE PLAN: EACH OF THE SHAREHOLDER RELEASED PARTIES PROVIDED VALUE TO THE MASONITE DEBTORS AND AIDED IN THE REORGANIZATION PROCESS. THERE ARE THREE KEY ELEMENTS SUPPORTING THE RELEASE PROVISIONS. <u>FIRST</u>, KKR HAS AGREED TO WAIVE A GENERAL UNSECURED CLAIM FOR PREPETITION MANAGEMENT FEES IN THE AMOUNT OF APPROXIMATELY $1.7 MILLION. IF SUCH GENERAL UNSECURED CLAIM WERE NOT WAIVED, THE MASONITE DEBTORS COULD BE REQUIRED TO PAY SUCH GENERAL UNSECURED CLAIM IN CASH IN FULL. <u>SECOND</u>, KKR MILLENNIUM FUND (OVERSEAS) L.P., A MASONITE SHAREHOLDER, HAS AGREED TO A NOTICE AND CONSULTATION PROCESS WITH THE MASONITE DEBTORS BEFORE TAKING ANY WORTHLESS STOCK DEDUCTION WITH RESPECT TO ITS STOCK HOLDINGS IN MASONITE HOLDING CORPORATION. THIS CONSIDERATION, WHICH KKR MILLENNIUM FUND (OVERSEAS) L.P. WAS OTHERWISE UNDER NO OBLIGATION TO PROVIDE, AVOIDED POTENTIALLY COSTLY AND DISTRACTING LITIGATION AND HAS PRESERVED THE MASONITE DEBTORS VALUABLE TAX ATTRIBUTES. <u>THIRD</u>, THE RELEASE PROVISIONS WERE A CRITICAL COMPONENT OF THE MASONITE DEBTORS BEING ABLE TO ACHIEVE A PRE-ARRANGED PLAN OR REORGANIZATION. ACCORDINGLY, THE MASONITE DEBTORS BELIEVE THAT THE RELEASE PROVISIONS OF THE PLAN ARE APPROPRIATE.

*Exculpation*

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, OBLIGATION, CAUSE OF ACTION, OR LIABILITY FOR ANY EXCULPATED CLAIM, EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE MASONITE DEBTORS AND THE REORGANIZED MASONITE DEBTORS (AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS) HAVE PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN, AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF

**SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.**

*Injunction*

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C OR ARTICLE VIII.D OF THE PLAN, DISCHARGED PURSUANT TO ARTICLE VIII.A OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE MASONITE DEBTORS, THE REORGANIZED MASONITE DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR EQUITY INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EQUITY INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.**

*Subordination Rights*

**ANY DISTRIBUTIONS UNDER THE PLAN TO HOLDERS OF SENIOR SUBORDINATED NOTES CLAIMS SHALL BE RECEIVED AND RETAINED FREE FROM ANY OBLIGATIONS TO HOLD OR TRANSFER THE SAME TO ANY OTHER CREDITOR, AND SHALL NOT BE SUBJECT TO LEVY, GARNISHMENT, ATTACHMENT, OR OTHER LEGAL PROCESS BY ANY HOLDER BY REASON OF CLAIMED CONTRACTUAL SUBORDINATION RIGHTS. THE SUBORDINATION RIGHTS SHALL BE WAIVED AND THE CONFIRMATION ORDER SHALL CONSTITUTE AN INJUNCTION ENJOINING ANY PERSON FROM ENFORCING OR ATTEMPTING TO ENFORCE ANY CONTRACTUAL, LEGAL OR EQUITABLE SUBORDINATION RIGHTS TO PROPERTY DISTRIBUTED UNDER THE PLAN TO HOLDERS OF SENIOR SUBORDINATED NOTES CLAIMS, IN EACH CASE OTHER THAN AS PROVIDED IN THE PLAN.**

### Important Securities Laws Disclosure

Under the Plan, (i) shares of New Common Stock will be distributed to Holders of Senior Secured Claims and Senior Subordinated Notes Claims, and (ii) New Warrants will be issued to Holders of Senior Subordinated Notes Claims (the New Common Stock and the New Warrants, collectively, the "Plan Securities").

New Masonite Holdings and Masonite will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the Plan Securities. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive the Plan Securities are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell New Common Stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, Holders of New Common Stock deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC.

The issuance of the Plan Securities and New Common Stock issuable upon the exercise of New Warrants in Canada will be exempt from the prospectus and registration requirements under Canadian securities legislation. As a consequence of these exemptions, certain protections, rights and remedies provided by Canadian securities legislation, including statutory rights of rescission or damages, will not be available in respect of the Plan Securities and New Common Stock issued upon the exercise of New Warrants. Masonite is not currently a "reporting issuer" in Canada as such term is defined under applicable Canadian securities legislation. In addition, there will be no public market for the Plan Securities (including New Common Stock issuable upon the exercise of New Warrants) in Canada. Such securities may only be re-sold by Canadian holders pursuant to an exemption from the prospectus and registration requirements under Canadian securities legislation or pursuant to discretionary regulatory relief. Canadian holders will be permitted to re-sell their Plan Securities and New Common Stock issued upon the exercise of New Warrants through an exchange, or a market, outside of Canada or to a person or company outside of Canada provided that at the time of issuance of the Plan Securities, residents of Canada do not own, directly or indirectly, more than 10% of the outstanding subject class of securities and do not represent more than 10% of the total number of owners, directly or indirectly, of the subject class of securities.

**Canadian holders of Plan Securities are advised to seek legal advice prior to any resale of the Plan Securities.**

### Nominee Voting Instructions

Only the Holders of Class 2 Senior Secured Claims and Class 4 Senior Subordinated Notes Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate ballots and returning them in the envelope provided. The failure of a Holder to deliver a duly executed ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan. Voting instructions are attached to each ballot.

With respect to the Class 4 Senior Subordinated Notes Claims, the nominees should deliver the ballot and other documents relating to the Plan, including this Disclosure Statement, to each beneficial owner of the eligible Senior Subordinated Notes Claims for which they serve as nominee ("Beneficial Owner").

A nominee has two options with respect to voting. Under the first option, the nominee will forward the solicitation package, including the ballot, procedures for participating in the rights offering and related subscription forms, to each Beneficial Owner for voting and include a return envelope provided by and addressed to the nominee so that the Beneficial Owner may return the completed Beneficial Owner ballot to the nominee. Upon receipt of the ballots, the nominee will summarize the individual votes of its respective Beneficial Owners on the appropriate master ballot and then return the master ballot to the voting agent before the voting deadline occurs at 5:00 p.m., prevailing Eastern time, on May 18, 2009.

Under the second option, if the nominee elects to "prevalidate" ballots:

- The nominee shall forward the solicitation package or copies thereof (including (a) the Disclosure Statement (together with the Plan annexed thereto as Exhibit A, and all other exhibits), (b) an individual ballot that has been prevalidated, as indicated in paragraph (b) below, and (c) a return envelope provided by and addressed to the voting agent) to the Beneficial Owner within five (5) business days of the receipt by such nominee of the solicitation package;

- To "prevalidate" a ballot, the nominee shall complete and execute the ballot and indicate on the ballot the name of the registered Holder, the amount of securities held by the nominee for the Beneficial Owner and the account number(s) for the account(s) in which such securities are held by the nominee; and

- The Beneficial Owner shall return the prevalidated ballot to the voting agent by the voting deadline at 5:00 p.m., prevailing Eastern time, on May 18, 2009.

If a master ballot is received after the voting deadline, the votes and elections on such master ballot will not be counted. The method of delivery of a master ballot to be sent to the voting agent is at the election and risk of each nominee. Except as otherwise provided in this Disclosure Statement, such delivery will be deemed made only when the executed master ballot is actually received by the voting agent. Instead of effecting delivery by mail, it is recommended, though not required, that such entities use an overnight or hand delivery service. In all cases, sufficient time should be allowed to assure timely delivery. No ballot should be sent to Masonite, or Masonite's financial or legal advisors, but only to the voting agent as set forth under "How do I vote for or against the Plan?" in the section entitled "Questions and Answers Regarding this Disclosure Statement and the Plan," which begins on page 3.

Nominees must provide appropriate information for each of the items on the master ballot, including, without limitation, identifying the votes to accept or reject the Plan.

By returning a master ballot, each nominee will be certifying to Masonite and the Bankruptcy Court, among other things, that:

- it has received a copy of the Disclosure Statement and other solicitation materials annexed to the Disclosure Statement, and it has delivered the same to the Beneficial Owners;

- it has received a completed and signed ballot from each Beneficial Owner whose vote is reflected on such master ballot;

- it is a bank, broker or other nominee (or agent thereof) that holds the securities being voted on behalf of the Beneficial Owners identified on such master ballot;

- it has properly disclosed (a) the number of such Beneficial Owners, (b) the amount of securities held by each such Beneficial Owner, (c) each Beneficial Owner's respective vote, if any, concerning the Plan and (d) the customer account, serial number and/or other identification number for each such Beneficial Owner;

- each such Beneficial Owner has certified to the nominee that such Beneficial Owner has not submitted any other ballots for such Claims held in other accounts or other names, or, if it has submitted another ballot held in other accounts or names, that the Beneficial Owner has certified to the nominee that such Beneficial Owner has cast the same vote for such claims, and the undersigned has identified such other accounts or owner and such other ballots;

- it has been authorized by each such Beneficial Owner to vote on the Plan; and

- it will maintain the original Beneficial Owner ballot returned by each Beneficial Owner (whether properly completed or defective) for one year after the voting deadline (or such other date as is set by subsequent Bankruptcy Court order) for disclosure to the Bankruptcy Court or the Masonite Debtors, if so ordered.

Each master ballot must be returned in sufficient time to allow it to be RECEIVED by the voting agent by no later than 5:00 p.m., prevailing Eastern time, on May 18, 2009.

## Certain U.S. Federal Income Tax
## Consequences of the Plan

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to Masonite Corporation and any of its subsidiaries that are Masonite Debtors (each, a "U.S. Debtor") and certain U.S. Holders (as defined below) of Claims against a U.S. Debtor. The following summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, rulings, and pronouncements of the U.S. Internal Revenue Service (the "IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Masonite Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. This discussion addresses only those U.S. Holders that hold Claims as capital assets within the meaning of Section 1221 of the Code. In addition, this summary does not address non-U.S., state, local, estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to a Masonite Debtor within the meaning of the Tax Code, persons that that are not U.S. Holders, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims, or who will hold the New Term Loan, the New PIK Loan, New Common Stock and/or New Warrants, as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark to market method of accounting, and U.S. Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that U.S. Holders of Claims

hold only Claims in a single Class. U.S. Holders of Claims in more than a single class should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim that is for United States federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

The United States federal income tax consequences to a partner in an entity or arrangement treated as a partnership for United States federal income tax purposes that holds a Claim generally will depend on the status of the partner and the activities of the partnership. Partners in a partnership holding a Claim should consult their own tax advisors.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular U.S. Holder of a Claim. Each U.S. Holder of a Claim should seek advice from its own independent tax advisors concerning the United States federal, state, local, foreign income and other tax consequences of the Plan to them in light of its particular circumstances.

This discussion assumes that the various debt and other arrangements to which any Masonite Debtor is a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### *Certain United States Federal Income Tax Consequences to the U.S. Debtors*

Masonite Corporation expects to report consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $170 million as of the Petition Date. As discussed below, the amount of Masonite Corporation's NOL carryforwards may be significantly reduced or eliminated upon implementation of the Plan. In addition, the U.S. Debtors' subsequent utilization of any losses and NOL carryforwards remaining and possibly certain other tax attributes may be restricted as a result of and upon the implementation of the Plan.

*Cancellation of Debt Income and Reduction of Tax Attributes*

As a result of the Plan, the U.S. Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt income ("CODI") upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of CODI, in general, is the

excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer (determined in the manner described below), the amount of cash paid and the fair market value of any other consideration given in exchange for such indebtedness at the time of the exchange. For purposes of determining CODI, an acquisition of debt of the U.S. Debtors by certain related persons will be treated as an acquisition by the U.S. Debtors.

A debtor is not, however, required to include any amount of CODI in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for the exclusion of CODI under the foregoing rule, Section 108 of the Tax Code requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of CODI which it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (a) NOLs, (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), (e) passive activity loss and credit carryovers and (f) foreign tax credits. A debtor with CODI may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the Tax Code, though it has not been determined whether the U.S. Debtors would make this election.

As a result of the Consummation of the Plan, and in particular the exchange of certain Claims for a portion of the New Term Loan, the New PIK Loan, New Common Stock and/or New Warrants, Masonite Corporation expects to realize substantial CODI. The extent of such CODI and resulting tax attribute reduction will depend significantly on the issue price of the New Term Loan and the New PIK Loan (determined in the manner described below) and the fair market value of the New Common Stock and New Warrants. The issue price of the New Term Loan and the New PIK Loan and the fair market value of the New Common Stock and the New Warrants cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction of tax attributes will be required, the exact amount of such reduction cannot be predicted with certainty. Indeed, it is currently anticipated that the amount of CODI will exceed the amount of the NOLs thereby eliminating the NOLs and also reducing the U.S. Debtors' tax basis in their assets.

Any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the CODI at issue. To the extent the debtor reduces its tax basis in the stock of another member of the consolidated group (which basis may not be reduced below zero), such other member is required to reduce its tax attributes by an equivalent amount.

*Limitation on NOL Carryforwards and Other Tax Attributes*

Following the implementation of the Plan, Masonite Corporation currently anticipates that Masonite Corporation will have no NOL carryforwards. However, any NOLs that do remain (should this prove incorrect), as well as any remaining tax credit carryforwards, built-in losses (to the extent recognized within the five-year period following the Effective Date or treated as recognized pursuant to the safe harbors provided by IRS Notice 2003-65), and, possibly, certain other tax attributes of the U.S. Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under Section 382 of the Tax Code as a result of an "ownership change" of the U.S. Debtors by reason of the transactions pursuant to the Plan. This discussion describes the limitation determined under Section 382 of the Tax Code in the case of an "ownership change" as the "Section 382 Limitation." The annual Section 382 Limitation on the use of Pre-Change Losses in any "post change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate (currently 5.49%) is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. The Section 382 Limitation may be increased to the extent that the U.S. Debtors recognize certain built-in gains in its assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation). A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5% or more of a corporation's stock at any time during the testing period and one or more "public groups" of shareholders that individually own less than 5% of the value of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that has consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group. Also under applicable Treasury Regulations, stock of a lower-tier corporation is generally treated as owned proportionately by the shareholders of a higher-tier corporation, and, accordingly, an ownership change of Masonite Holding Corporation will result in an ownership change of the U.S. Debtors.

The issuance under the Plan of the New Common Stock and New Warrants, along with the cancellation of existing Equity Interests of Masonite Holding Corporation through the Plan, is expected to cause an ownership change to occur with respect to Masonite Holding Corporation and, thus, the U.S. Debtors on the Effective Date. As a result, Section 382 of the Tax Code will apply to limit the U.S. Debtors' use of any remaining consolidated NOLs after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of CODI. Similarly, the ability of the U.S. Debtors' consolidated group to use any remaining capital loss carryforwards and tax credits will also be limited.

*Special Bankruptcy Exceptions*

Section 382(l)(5) of the Tax Code provides a special rule applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Rule"). If a corporation qualifies for the Section 382(l)(5) Rule, the annual Section 382 Limitation will not apply to the corporation's NOLs on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(l)(5) Rule does, however, require that the corporation's NOLs and credit carryovers be computed without taking into account the aggregate amount of all interest deductions during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change in respect of debt exchanged for the corporation's stock (such interest hereinafter called "Disqualified Interest"). The corporation will qualify under the Section 382(l)(5) Rule if the corporation's pre-bankruptcy shareholders and holders of certain debt (the "Qualifying Debt") own at least 50% of the stock of the corporation after the bankruptcy reorganization, and the corporation does not elect not to apply the Section 382(l)(5) Rule. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. For the purpose of determining whether a claim constitutes Qualifying Debt, special rules may in some cases apply to treat a subsequent transferee as the transferor creditor.

If the exchanges contemplated by the Plan qualify for tax treatment under the Section 382(l)(5) Rule and the U.S. Debtors do not elect out of the Section 382(l)(5) Rule, the U.S. Debtors' NOL carryover (if any) will be available for future use without any Section 382 Limitation (after reduction of the U.S. Debtors' NOLs by Disqualified Interest). However, under the Section 382(l)(5) Rule, if there is a second ownership change during the two-year period immediately following Consummation of the Plan, the Section 382 Limitation after the second ownership change shall be zero. The determination of the application of the Section 382(l)(5) Rule is highly fact specific and dependent on circumstances that are difficult to assess accurately; however, the U.S. Debtors do not believe they will qualify for the Section 382(l)(5) Rule.

If the exchanges do not qualify for tax treatment under the Section 382(l)(5) Rule or the U.S. Debtors elect not to apply the Section 382(l)(5) Rule, the U.S. Debtors' use of any remaining NOLs to offset taxable income earned after an ownership change will be subject to the annual Section 382 Limitation. Since the U.S. Debtors are in bankruptcy, however, Section 382(l)(6) of the Tax Code will apply. Section 382(l)(6) of the Tax Code provides that, in the case of an ownership change resulting from a bankruptcy proceeding of a debtor, the value of the debtor's stock for the purpose of computing the Section 382 Limitation will generally be calculated by reference to

the net equity value of debtor's stock taking into account the increase of the value of the corporation as a result of the surrender or cancellation of creditors' claims in the transaction (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes). Accordingly, under this rule the Section 382 Limitation would generally reflect the increase in the value of a debtor's stock resulting from the conversion of debt to equity in the proceeding. Although it is impossible to predict what the net equity value of the U.S. Debtors will be immediately after the exchanges contemplated by the Plan, the U.S. Debtors' use of any Pre-Change Losses is expected to be substantially limited after those exchanges.

While it is not certain, the U.S. Debtors do not expect to retain any NOL carryforward after the Consummation of the Plan. Should the Consummation of the Plan not result in the anticipated elimination of the U.S. Debtors' consolidated NOL, the special rules of Sections 382(l)(5) and 382(l)(6) of the Tax Code then could be applicable to the U.S. Debtors.

*Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular U. S. federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002 which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the Tax Code, immediately before the ownership change.

## Consequences to U.S. Holders of Allowed Claims

*Certain United States Federal Income Tax Consequences to the U.S. Holders of Priority Non-Tax Claims or General Unsecured Claims*

Pursuant to the Plan, a U.S. Holder of a Priority Non-Tax Claim or a General Unsecured Claim that is not due and payable on or before the Effective Date will receive payment in full in Cash. A U.S. Holder who receives Cash in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for federal income tax purposes in an amount equal to the difference between (1) the amount of Cash received in exchange for its Claim and (2) the U.S. Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "market discount" and "accrued interest" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the U.S. Holder.

*Certain United States Federal Income Tax Consequences to the U.S. Holders of Senior Secured Claims and Senior Subordinated Notes Claims*

Pursuant to the Plan, a U.S. Holder of a Senior Secured Claim will receive, at such U.S. Holder's option, a share of the New Term Loan, a share of the New PIK Loan and/or a portion of the New Common Stock, and a U.S. Holder of a Senior Subordinated Notes Claim will receive a portion of the New Common Stock and the New Warrants.

*U.S. Holders who Receive New Common Stock*

Subject to Section 367 of the Tax Code, if applicable as discussed below, the receipt by a U.S. Holder of a Senior Secured Claim or a Senior Subordinated Notes Claim of New Common Stock should be treated as a tax-free transaction under Section 351 of the Tax Code (except to the extent that the U.S. Holder also receives "boot", i.e. consideration other than New Common Stock in the exchange for its Allowed Claim). However, if New Masonite

Holdings is a non-United States corporation, Masonite Corporation expects that Section 367 of the Tax Code will apply to the exchange of Senior Secured Claims and Senior Subordinated Notes Claims for New Common Stock and boot, if any. Under Section 367, a U.S. Holder of an Allowed Senior Secured Claim or a Senior Subordinated Notes Claim generally should recognize gain, but not loss, on the exchange of its Allowed Claim for New Common Stock and boot, if any. Gain, if any, will be equal to the excess of (1) the sum of the fair market value of the New Common Stock and New Warrants received and the issue price of the New Term Loan and the New PIK Loan received (determined in the manner described below), as applicable, over (2) the U.S. Holder's tax basis in the Claims surrendered.

- If a U.S. Holder recognizes gain, such gain should be capital in nature (subject to the "market discount" and "accrued interest" rules described below) and should be long term capital gain if the Claims were held for more than one year by the U.S. Holder. A U.S. Holder's tax basis in the shares of New Common Stock will be equal to the fair market value of the New Common Stock and the U.S. Holder's holding period in the shares of New Common Stock should begin on the day following the Effective Date.

- If a U.S. Holder realizes a loss, such loss will not be recognized. The U.S. Holder's tax basis in the shares of New Common Stock will be equal to the adjusted tax basis of the Allowed Claim less the issue price of the New Term Loan or New PIK Loan received or the fair market value of the New Warrants received, as applicable. The U.S. Holder's holding period in the shares of New Common Stock will include the holding period of the Claim surrendered.

- A U.S. Holder's tax basis in the New Term Loan or New PIK Loan received on the Effective Date should equal the issue price of the New Term Loan or New PIK Loan, as applicable, and a U.S. Holder's tax basis in the New Warrants should equal the fair market value of the New Warrants. A U.S. Holder's holding period for the New Term Loan, New PIK Loan, or New Warrants received on the Effective Date should begin on the day following the Effective Date.

*Dividends on New Common Stock*

Subject to the discussion below under "Passive Foreign Investment Company Considerations," if you are a U.S. Holder, for U.S. federal income tax purposes, the gross amount of any distribution (other than certain distributions, if any, of shares distributed to all shareholders of New Masonite Holdings) made to you with respect to New Common Stock, including the amount of any Canadian taxes withheld from the distribution, will constitute dividends to the extent of New Masonite Holdings' current and accumulated earnings and profits (as determined under U.S. federal income tax principles). Subject to the discussion below under "Passive Foreign Investment Company Considerations," non-corporate U.S. Holders generally will be taxed on such distributions at the lower rates applicable to long-term capital gains (i.e., gains from the sale of capital assets held for more than one year) with respect to taxable years beginning on or before December 31, 2010. Subject to the discussion below under "Passive Foreign Investment Company Considerations," if distributions with respect to New Common Stock exceed New Masonite Holdings' current and accumulated earnings and profits as determined under U.S. federal income tax principles, the excess would be treated first as a tax-free return of capital to the extent of your adjusted tax basis in the New Common Stock. Any amount in excess of the amount of the dividend and the return of capital would be treated as capital gain.

If you are a U.S. Holder, dividends paid in Canadian dollars, including the amount of any Canadian taxes withheld from the dividends, will be included in your gross income in an amount equal to the U.S. dollar value of the Canadian dollars calculated by reference to the spot exchange rate in effect on the day the dividends are includible in income. If dividends paid in Canadian dollars are converted into U.S. dollars on the day they are includible in income, you generally should not be required to recognize foreign currency gain or loss with respect to the conversion, if you are a U.S. Holder. However, any gains or losses resulting from the conversion of Canadian dollars between the time of the receipt of dividends paid in Canadian dollars and the time the Canadian dollars are converted into U.S. dollars will be treated as ordinary income or loss to you, as the case may be, if you are a U.S. Holder. The amount of any distribution of property other than cash will be the fair market value of the property on the date of distribution.

If you are a U.S. Holder, you will have a basis in any Canadian dollars received as a refund of Canadian withholding taxes equal to a U.S. dollar amount calculated by reference to the exchange rate in effect on the date of receipt of the dividend on which the tax was withheld.

If you are a U.S. Holder, dividends received by you with respect to New Common Stock will be treated as foreign source income, which may be relevant in calculating your foreign tax credit limitation. Subject to certain conditions and limitations, Canadian tax withheld on dividends may be deducted from your taxable income or credited against your U.S. federal income tax liability. However, to the extent that you are a U.S. Holder and would be entitled to a refund of Canadian withholding taxes pursuant to the U.S.—Canada tax treaty, you may not be eligible for a U.S. foreign tax credit with respect to the amount of such withholding taxes which may be refunded, even if you fail to claim such refund. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For this purpose, dividends distributed by New Masonite Holdings generally will constitute passive income. The rules relating to the determination of the U.S. foreign tax credit are complex, and, if you are a U.S. Holder, you should consult your tax advisor to determine whether and to what extent you would be entitled to this credit.

*Passive Foreign Investment Company Considerations*

A non-U.S. corporation will be classified as a "passive foreign investment company," or a "PFIC," for U.S. federal income tax purposes in any taxable year in which, after applying certain look-through rules, either

- at least 75 percent of its gross income is "passive income"; or

- at least 50 percent, on average, of the gross value of its assets is attributable to assets that produce "passive income" or are held for the production of passive income.

Passive income for this purpose generally includes dividends, interest, certain royalties, certain rents and gains from commodities and securities transactions.

Based on certain estimates of its gross income and gross assets and the nature of its business, Masonite believes that New Masonite Holdings will not be classified as a PFIC for the taxable year ending December 31, 2009. New Masonite Holdings' status in future years will depend on its assets and activities in those years. Masonite has no reason to believe that the assets or activities of New Masonite Holdings will change in a manner that would cause it to be classified as a PFIC. If New Masonite Holdings were a PFIC, and you are a U.S. Holder, you generally would be subject to imputed interest charges and other disadvantageous tax treatment with respect to any gain from the sale or exchange of, and certain distributions with respect to, your New Common Stock, including the denial of the taxation of certain dividends at the lower rates applicable to long-term capital gains (as discussed above in "Dividends on New Common Stock").

If New Masonite Holdings were a PFIC, you may be able to make a variety of elections which might alleviate certain of the tax consequences referred to above. However, it is expected that the conditions necessary for making such elections will not be present in the case of New Common Stock. You should consult your own tax advisor regarding the tax consequences that would arise if New Masonite Holdings were treated as a PFIC.

*U.S. Holders who do not receive New Common Stock*

If a U.S. Holder does not receive New Common Stock, the receipt by a U.S. Holder of a Senior Secured Claim of a share of the New Term Loan or New PIK Loan should result in the recognition of gain or loss equal to the difference between (1) the issue price of the share of the New Term Loan or New PIK Loan received (determined in the manner described below) and (2) the U.S. Holder's tax basis in the Claims surrendered by the U.S. Holder. Such gain or loss should be capital in nature (subject to the "market discount" and "accrued interest" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the U.S. Holder. A U.S. Holder's tax basis in the New Term Loan or New PIK Loan received on the Effective Date should equal the issue price of the New Term Loan or New PIK Loan, as applicable. A U.S. Holder's holding

period for the New Term Loan or New PIK Loan received on the Effective Date should begin on the day following the Effective Date.

*Issue Price of a Debt Instrument*

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the debt instruments issued to a U.S. Holder, or the debt instruments surrendered by a U.S. Holder, under the Plan are traded on an "established securities market" at any time during the sixty (60) day period ending thirty (30) days after the Effective Date. In general, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying foreign securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or, where the debt instrument is not so traded, that is issued for property so traded) would be the fair market value of such debt instrument (or, where the debt instrument is not so traded, such other property so traded) on the issue date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for property so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable IRS federal rate).

*Accrued Interest*

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued interest, such amount should be taxable to the U.S. Holder as interest income. Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the U.S. Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the U.S. Holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

*Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a U.S. Holder of a Claim who exchanges the Claim for a portion of the New Term Loan, New PIK Loan, New Common Stock and/or New Warrants on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "accrued market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (1) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (2) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

*Limitation on Use of Capital Losses*

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a

portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

*Consequences to U.S. Holders of Other Secured Claims, Intercompany Interests and/or Intercompany Claims*

Pursuant to the Plan, each Other Secured Claim, Intercompany Interest and Intercompany Claim shall be reinstated. If an Other Secured Claim, Intercompany Interest or Intercompany Claim is reinstated, the U.S. Holder of such Claim should not recognize gain or loss except to the extent collateral securing such Claim is changed, and the change in collateral constitutes a "significant modification" of the Other Secured Claim, Intercompany Interest or Intercompany Claim, as applicable, within the meaning of Regulations promulgated under Section 1001 of the Tax Code.

*Consequences to U.S. Holders of Section 510(b) Claims*

Pursuant to the Plan, each Section 510(b) Claim shall be cancelled without any distribution. A U.S. Holder may be entitled in the year of cancellation (or in an earlier year) to a bad debt deduction in some amount under section 166(a) of the Tax Code to the extent of such U.S. Holder's tax basis in the Section 510(b) Claim. The rules governing the timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Section 510(b) Claims therefore are urged to consult their tax advisors with respect to their ability to take such a deduction.

*Information Reporting and Back-up Withholding*

Payments of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

### ***Consequences to non-U.S. holders of New Masonite Holdings being organized in the United States***

The following is a summary of material U.S. federal income tax consequences of the ownership and disposition of the New Term Loan, New PIK Loan, New Common Stock and New Warrants to a non-U.S. holder if New Masonite Holdings is organized in the United States. For purposes of this summary, a "non-U.S. holder" means a beneficial owner of New Term Loan, New PIK Loan, New Common Stock or New Warrants that is, for U.S. federal income tax purposes:

- a nonresident alien individual;

- a foreign corporation; or

- a foreign estate or foreign trust.

In the case of a holder that is classified as a partnership for U.S. federal income tax purposes that holds New Common Stock, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding New Common Stock, then you should consult your own tax advisors.

This summary does not address all aspects of U.S. federal income taxes that may be relevant to non-U.S. holders in light of their personal circumstances, and does not deal with federal taxes other than the federal income tax or with foreign, state, local or other tax considerations. Special rules, not discussed here, may apply to certain non-U.S. holders, including:

- U.S. expatriates;

- controlled foreign corporations;

- passive foreign investment companies; and

- corporations that accumulate earnings to avoid U.S. federal income tax.

Such non-U.S. holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.

This summary applies only to a non-U.S. holder that holds New Term Loan, New PIK Loan, New Common Stock or New Warrants as a capital asset (within the meaning of Section 1221 of the Internal Revenue Code), and assumes that no item of income or gain in respect of the common stock at any time will be effectively connected with a U.S. trade or business conducted by the non-U.S. holder.

*Interest on the New Term Loan and New PIK Loan*

Generally any interest paid to a non-U.S. Holder of the New Term Loan or New PIK Loan will not be subject to U.S. federal income tax if the interest qualifies as "portfolio interest." Interest on the New Term Loan and New PIK Loan generally will qualify as portfolio interest if:

- the non-U.S. Holder does not actually or constructively own 10% or more of the total voting power of all the New Masonite Holdings voting stock;

- such holder is not a "controlled foreign corporation" with respect to which New Masonite Holdings is a "related person" within the meaning of the Code;

- either the beneficial owner, under penalties of perjury, certifies that the beneficial owner is not a United States person and such certificate provides the beneficial owner's name and address, or a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the New Term Loan or New PIK Loan certifies, under penalties of perjury, that such a statement has been received from the beneficial owner by it or by a financial institution between it and the beneficial owner; and

- the non-U.S. Holder is not a bank receiving interest on the extension of credit made pursuant to a loan agreement made in the ordinary course of its trade or business.

The gross amount of payments to a non-U.S. Holder of interest that does not qualify for the portfolio interest exemption will be subject to U.S. withholding tax at the rate of 30%, unless a U.S. income tax treaty applies to reduce or eliminate such withholding tax. To claim the benefit of a tax treaty a non-U.S. Holder must provide a properly executed Internal Revenue Service ("IRS") Form W-8BEN (or such successor form as the IRS designates), prior to the payment of interest. The non-U.S. Holder must provide the form to the Masonite Debtors or their paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Masonite Debtors or their paying agent a statement that it has received the form and furnish a copy thereof; provided, that a foreign financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated. A non-U.S. Holder who is claiming the benefits of a treaty may be required in certain instances to obtain a U.S. taxpayer identification number and to provide certain documentary evidence issued by foreign governmental authorities to prove residence in the foreign country.

*Dividends*

Dividends paid to a non-U.S. holder (to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes) generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

If you wish to claim the benefit of an applicable treaty rate and to avoid backup withholding tax, as discussed below, for dividends, then you must (a) provide the withholding agent with a properly completed Internal Revenue Service Form W-8BEN (or other applicable form), and certify under penalties of perjury that you are not a U.S. person and are eligible for treaty benefits or (b) if our common stock is held through certain foreign intermediaries, satisfy the relevant certification requirements of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain non-U.S. holders other than corporations or individuals.

If you are eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty, then you may obtain a refund of any excess amounts withheld by filing timely an appropriate claim for refund with the Internal Revenue Service.

*Gain on Disposition of New Term Loan, New PIK Loan, New Common Stock and New Warrants*

A non-U.S. holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of New Term Loan, New PIK Loan, New Common Stock or New Warrants, unless:

- if the non-U.S. holder is an individual, that person is present in the U.S. for 183 days or more in the taxable year of the sale or other taxable disposition, and that person has a "tax home" in the U.S.; or

- in the case of a disposition of New Common Stock or New Warrants, New Masonite Holdings is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

New Masonite Holdings does not anticipate becoming (if organized in the United States), a "U.S. real property holding corporation" for U.S. federal income tax purposes.

*Information Reporting and Backup Withholding Tax*

New Masonite Holdings will be required to report annually to the Internal Revenue Service and to you the amount of interest and dividends paid to you and the amount of tax, if any, withheld with respect to such interest and dividends. The Internal Revenue Service may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which you are resident.

In addition, you may be subject to information reporting requirements and backup withholding tax with respect to interest and dividends paid on, and the proceeds of disposition of, New Term Loan, New PIK Loan, New Common Stock and New Warrants, unless, generally, you certify under penalties of perjury (usually on Internal Revenue Service Form W-8BEN) that you are not a U.S. person or you otherwise establish an exemption.

Any amounts withheld under the backup withholding tax rules may be allowed as a refund or a credit against your U.S. federal income tax liability, provided the required information is timely furnished by you to the Internal Revenue Service.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation. All Holders of Claims should consult with their tax advisors as to the particular tax consequences to them of the transaction contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws and of any change in applicable tax laws.**

# Certain Canadian Federal Income Tax Considerations

The following is a summary of the principal Canadian federal income tax consequences of the Plan to Holders who, at all relevant times for purposes of the Income Tax Act (Canada) (the "Canadian Tax Act"), deal at arm's length with, and are not affiliated with, Masonite International Corporation, Masonite International Inc., Masonite Holding Corporation, New Masonite Holdings and their successors and who hold their Equity Interests in Masonite Holding Corporation or the "Former Equity Interest"), Senior Secured Claims and Senior Subordinated Notes (each, an "Existing Note") as capital property and will hold their New Term Loan, New PIK Loan, New Common Stock and New Warrants, as the case may be, as capital property. The New Term Loan, New PIK Loan, New Common Stock and New Warrants will generally be considered to be capital property for this purpose to a Holder unless either the Holder holds (or will hold) such securities in the course of carrying on a business, or the Holder has acquired (or will acquire) such securities in a transaction or transactions considered to be an adventure in the nature of trade.

This summary is not applicable to (i) a Holder that is a "financial institution" for purposes of the "mark-to-market" rules, (ii) a Holder an interest in which is a "tax shelter investment", (iii) a Holder to whom the "functional currency" reporting rules apply, (iv) a Non-Resident Holder (as defined below) where, at any time during the 60-month period immediately preceding a disposition of Former Equity Interests, New Common Stock or New Warrants, as applicable, the Holder, persons with whom the Holder does not deal at arm's length, or the Holder together with all such persons, owned 25% or more of the issued shares of any class or series of the capital stock of Masonite Holding Corporation or New Masonite Holdings, as the case may be, and (v) a Canadian Holder (as defined below) for whom Masonite Holding Corporation or New Masonite Holdings, as the case may be, is a "foreign affiliate", all as defined under the Canadian Tax Act. Such Holders should consult with their own tax advisors.

This summary is based upon the current provisions of the Canadian Tax Act, the regulations promulgated thereunder (the "Canadian Regulations") and the current published administrative policies and assessing policies of the Canada Revenue Agency (the "CRA"). The summary also takes into account all specific proposals to amend the Canadian Tax Act and the Canadian Regulations that have been publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof (the "Tax Proposals"), and assumes that all such Tax Proposals will be enacted in the form proposed. No assurance can be given that the Tax Proposals will be enacted in the form proposed or at all. This summary does not otherwise take into account or anticipate any changes in law, whether by way of legislative, judicial or administrative action or interpretation, nor does it address any provincial, territorial or foreign tax considerations. No advance income tax ruling has been requested from CRA, no legal opinion has been requested from counsel concerning any tax consequences of the Plan to Masonite International Corporation or the Holders, and no tax opinion is given by this disclosure statement.

**This summary is of a general nature only, is not exhaustive of all Canadian federal income tax consequences and is not intended to be, nor should it be construed as, legal or tax advice to any particular Holder. Holders are urged to consult their own tax advisors concerning the tax consequences to them of the Plan.**

### Foreign Currency

In general, for purposes of the Canadian Tax Act, all amounts relevant in computing a Holder's liability under the Canadian Tax Act must be computed in Canadian currency. Any amount denominated in U.S. dollars (including cost, proceeds of disposition, dividends and payment of interest) must be converted to Canadian dollars using the rate of exchange quoted by the Bank of Canada at noon for the applicable day or such other rate of exchange as is acceptable to the CRA. The amount of interest and any capital gain or capital loss of a Holder may be affected by fluctuations in Canadian dollar exchange rates.

### Residents of Canada

The following discussion applies to Holders who, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention, and at all relevant times, are residents of Canada ("Canadian Holders").

Certain Canadian Holders whose Existing Notes and New Term Loan, New PIK Loan and New Common Stock might not otherwise qualify as capital property may, in certain circumstances, treat such Existing Notes and New Term Loan, New PIK Loan and New Common Stock (provided New Masonite Holdings is a resident of Canada for purposes of the Canadian Tax Act) as capital property by making an irrevocable election pursuant to subsection 39(4) of the Canadian Tax Act.

*Exchange of the Existing Notes*

A Canadian Holder will be considered to have disposed of Existing Notes upon their exchange for a portion of the New Term Loan, a portion of the New PIK Loan, New Common Stock and New Warrants, as the case may be, on the Effective Date. A Canadian Holder that is a corporation, partnership, unit trust or any trust of which a corporation or partnership is a beneficiary will generally be required to include in income the amount of interest accrued or deemed to accrue on the Existing Notes up to and including the Effective Date or that became receivable or was received on or before the Effective Date, to the extent that such amounts have not otherwise been included in the Canadian Holder's income for the year or a preceding taxation year. Any other Canadian Holder, including an individual, will be required to include in income for a taxation year any interest on the Existing Notes received or receivable by such Canadian Holder in the year (depending upon the method regularly followed by the Canadian Holder in computing income) except to the extent that such amount was otherwise included in its income for the year or a preceding taxation year. Where a Canadian Holder is required to include in income an amount on account of unpaid interest on the Existing Notes that accrues in respect of the period between September 16, 2008 and the Effective Date, the Canadian Holder should be entitled to a deduction in computing income of an equivalent amount.

A Canadian Holder's proceeds of disposition of the Existing Notes upon the exchange of the Existing Notes for a portion of the New Term Loan, a portion of the New PIK Loan, New Common Stock and New Warrants, as the case may be, will be an amount equal to the aggregate of the fair market value at the time of the exchange of the portion of the New Term Loan, portion of the New PIK Loan, New Common Stock and New Warrants, as the case may be, received in exchange for the Existing Notes. A Canadian Holder will be considered to have acquired a portion of the New Term Loan, a portion of the New PIK Loan, New Common Stock, and, if applicable, New Warrants, at a cost equal to their fair market value at the time of the exchange. The cost to the Canadian Holder of each New Common Stock or New Warrant, as the case may be, so acquired must then be averaged with the adjusted cost base of all other New Common Stock or New Warrants, as the case may be, held by the Holder as capital property at that time for purposes of subsequently computing the adjusted cost base of each New Common Stock or New Warrant, as the case may be, held by the Holder. If the aggregate fair market value of the portion of the New Term Loan, portion of the New PIK Loan, New Common Stock and New Warrant, as the case may be, received upon the exchange of the Existing Notes exceeds the fair market value of the Existing Notes, a portion of the New Term Loan, New PIK Loan, New Common Stock and New Warrants may not be considered to be received as proceeds of disposition for the Existing Notes and Canadian Holders may be required to include an amount in income for Canadian tax purposes. Canadian Holders should consult their own tax advisors.

In general, a Canadian Holder will realize a capital gain (or capital loss) on the exchange of the Existing Notes equal to the amount by which the proceeds of disposition exceed (or are exceeded by) the adjusted cost base to the Canadian Holder of such Existing Notes, plus any reasonable costs of disposition. In respect of a Canadian Holder holding Existing Notes, the Canadian Holder's loss, if any, on the exchange of these Existing Notes is limited to that proportion of the amount that would otherwise be the Canadian Holder's loss from the exchange of these Existing Notes, that the total fair market value of the New Common Stock and the New Warrants, as the case may be, received as part of the consideration for these Existing Notes is of the total fair market value of the New Term Loan, New PIK Loan, New Common Stock and New Warrants received on such exchange. Any excess of the amount that would otherwise be the Canadian Holder's loss over the allowable portion of such loss will be added in computing the adjusted cost base of the New Term Loan and New PIK Loan to the Canadian Holder in proportion to the principal amounts of the Holder's New Term Loan and New PIK Loan. The tax treatment of any capital gain (or capital loss) realized is described below under the heading "Taxation of Capital Gains and Capital Losses".

*Taxation of Interest on the New Term Loan and New PIK Loan*

A Canadian Holder that is a corporation, partnership, unit trust or any trust of which a corporation or a partnership is a beneficiary will generally be required to include in income for a taxation year the amount of interest accrued or deemed to accrue on the New Term Loan and New PIK Loan to the end of the taxation year or that became receivable or was received by it before the end of the year, to the extent such amounts have not otherwise been included in such Canadian Holder's income for the year or a preceding taxation year.

Any other Canadian Holder, including an individual, will be required to include in income for a taxation year any interest on the New Term Loan or New PIK Loan received or receivable by such Canadian Holder in the year (depending upon the method regularly followed by the Canadian Holder in computing income) except to the extent that such amount was otherwise included in its income for the year or a preceding taxation year.

In addition, to the extent that the face amount of Holder's New Term Loan or New PIK Loan, as the case may be, exceeds the amount of the consideration given therefor, the difference will give rise to a discount (the "Discount") and a Canadian Holder may be required to include an additional amount in computing its income, either in a taxation year in which such amount accrues or in a taxation year in which the Discount is received or receivable by the Canadian Holder. Canadian Holders are urged to consult their tax advisors as to the Canadian tax treatment of the Discount.

If New Masonite Holdings is a non-resident of Canada, any non-resident withholding tax on such interest may give rise to a Canadian Holder's entitlement to claim a foreign tax credit or deduction in respect of such tax where applicable under the Canadian Tax Act.

*Sale, Redemption or Repayment of the New Term Loan or New PIK Loan*

On a disposition or a deemed disposition of a New Term Loan or New PIK Loan, a Canadian Holder will generally be required to include in income the amount of interest accrued or deemed to accrue to the date of disposition or that became receivable or is received on or before the date of disposition, to the extent that such amounts have not otherwise been included in the Canadian Holder's income for the year or a preceding taxation year.

In general, a disposition or a deemed disposition of the New Term Loan or New PIK Loan will give rise to a capital gain (or a capital loss) to the extent that the proceeds of disposition, net of any amount included in the Canadian Holder's income as interest and any reasonable costs of disposition, exceed (or are exceeded by) the adjusted cost base to the Canadian Holder of the New Term Loan or New PIK Loan, as applicable. Any such capital gain (or capital loss) will be subject to the treatment described below under the heading "Taxation of Capital Gains and Capital Losses".

*Dividends on New Common Stock*

Provided that New Masonite Holdings is a resident of Canada for purposes of the Canadian Tax Act and any applicable income tax treaty or convention, any dividends received or deemed to be received on New Common Stock by a Canadian Holder that is an individual (including a trust) will be included in the individual's income and will be subject to the gross-up and dividend tax credit rules in the Canadian Tax Act. New Masonite Holdings intends to designate all dividends that it pays as "eligible dividends" that are entitled to the enhanced gross-up and dividend tax credit. Dividends received or deemed to be received on New Common Stock by a Canadian Holder that is a corporation will be included in computing the corporation's income and such Canadian Holder generally will be entitled to deduct the amount of such dividends in computing taxable income. A Canadian Holder that is a "private corporation" or a "subject corporation" (as such terms are defined in the Canadian Tax Act), may be liable under Part IV of the Canadian Tax Act to pay a refundable tax of 33 1/3% on dividends received or deemed to be received on New Common Stock to the extent such dividends are deductible in computing the Canadian Holder's taxable income.

If New Masonite Holdings is a non-resident of Canada, a Canadian Holder will be required to include in computing its income for a taxation year the amount of any dividends received on New Common Stock. Dividends received on New Common Stock by a Canadian Holder who is an individual will not be subject to the gross-up and dividend tax credit rules in the Canadian Tax Act normally applicable to taxable dividends received from taxable Canadian corporations. A Canadian Holder that is a corporation will include such dividends in computing income and will not be entitled to deduct the amount of such dividends in computing its taxable income. A Canadian Holder that is throughout the year a "Canadian-controlled private corporation" (as defined in the Canadian Tax Act) may be liable to pay an additional refundable tax of 6⅔% on such dividends. Any non-resident withholding tax on such dividends may give rise to a Canadian Holder's entitlement to claim a foreign tax credit or deduction in respect of such tax where applicable under the Canadian Tax Act.

*Disposition of New Common Stock*

A Canadian Holder will realize a capital gain (or capital loss) on a disposition or deemed disposition of New Common Stock equal to the amount by which the proceeds of disposition exceed (or are exceeded by) the adjusted cost base to the Canadian Holder of such New Common Stock, plus any reasonable costs of disposition. The tax treatment of any such capital gain (or capital loss) is described below under the heading "Taxation of Capital Gains and Capital Losses".

*Exercise or Disposition of New Warrants*

No gain or loss will be realized by a Canadian Holder upon the exercise of a New Warrant. The cost to the Canadian Holder of each New Common Stock acquired upon the exercise of a New Warrant will be equal to the aggregate of the holder's adjusted cost base of the New Warrant immediately before the exercise thereof and the exercise price paid. The cost to the holder of each New Common Stock acquired upon the exercise of a New Warrant must then be averaged with the adjusted cost base of all other New Common Stock held by the Canadian Holder as capital property at the time of the exercise of the New Warrant for purposes of subsequently computing the adjusted cost base of each New Common Stock held by the Canadian Holder.

A Canadian Holder will realize a capital gain (or loss) on the disposition or deemed disposition of a New Warrant (other than by exercise) equal to the amount by which the proceeds of disposition exceed (or are exceeded by) the adjusted cost base to the Canadian Holder of such New Warrant, plus any reasonable costs of disposition. The tax treatment of any capital gain (or capital loss) is described below under the heading "Taxation of Capital Gains and Capital Losses".

*Disposition of Former Equity Interest*

A Canadian Holder of Former Equity Interests will not receive any amount under the Plan in respect of its Former Equity Interests and, accordingly, will realize a capital loss equal to the adjusted cost base of the Former Equity Interests immediately before the disposition. Such capital loss may be reduced by the amount of dividends previously received in respect of the Former Equity Interests (or in respect of shares for which the Former Equity Interests were substituted) to the extent and under the circumstances set out in the Canadian Tax Act. The consequences under the Canadian Tax Act to a Non-Resident Holder of Former Equity Interests, including the possible notification and reporting requirements under the Canadian Tax Act and Canadian Regulations, are complex and depend upon certain facts relevant to a particular Non-Resident Holder. Accordingly, Non-Resident Holders of Former Equity Interests should consult their own tax advisors regarding the Canadian tax consequences to them under the Plan.

*Alternative Minimum Tax*

Individuals (other than certain trusts) may be subject to an alternative minimum tax under the Canadian Tax Act upon realizing net capital gains or receiving dividends.

*Taxation of Capital Gains and Capital Losses*

In general, one-half of any capital gain (a "Taxable Capital Gain") realized by a Canadian Holder in a taxation year will be included in the Canadian Holder's income in the year and one-half of the amount of any capital loss realized by a Canadian Holder in a taxation year may be deducted from net Taxable Capital Gains realized by the Canadian Holder in the year and any of the three preceding taxation years or in any subsequent year, to the extent and under the circumstances described in the Canadian Tax Act.

*Additional Refundable Tax*

A Canadian Holder that is a "Canadian-controlled private corporation" (as defined in the Canadian Tax Act) may be liable to pay an additional refundable tax of 6 2/3% on certain investment income, including amounts in respect of interest, dividends on the New Common Stock and Taxable Capital Gains.

*Proposals Regarding Foreign Investment Entities*

If New Masonite Holdings is a non-resident of Canada, the proposed amendments in respect of the taxation of certain interests held by Canadian residents in certain non-resident entities, applicable for taxation years commencing after 2006 (the "FIE Proposals"), may apply notwithstanding that they have yet to be passed into law. However, the January 27, 2009 Federal Budget announced that the Government of Canada will review the existing FIE Proposals in light of submissions that it has received before proceeding with measures in the area.

Under the FIE Proposals, where a Canadian resident holds an interest such as a share or rights to acquire shares (such as the New Common Stock and New Warrants), other than an "exempt interest", in a corporation that is a "foreign investment entity" (a "FIE") at the corporation's taxation year-end (as each of such terms is defined in the FIE Proposals), the Canadian resident generally will be required to include in computing income for the Canadian resident's taxation year that includes such year-end an amount in respect of such interest computed in one of three ways: (a) an imputed return calculated as a prescribed percentage of the holder's "designated cost" of such interest; (b) in certain circumstances, the annual accrued increase or decrease in the fair market value of the holder's interest; or (c) in certain other limited circumstances, a proportionate share of the FIE's income or loss for the year calculated using Canadian tax rules as specified in the FIE Proposals.

New Masonite Holdings will not, however, be a FIE at the end of a taxation year provided that either: (i) at such time, the "carrying value" of all of its "investment property" is not greater than one-half of the "carrying value" of all of its property; or (ii) throughout the relevant taxation year, its principal undertaking will have been the carrying on of a business that is not an "investment business". No assurances can be given that New Masonite Holdings will not be a FIE at the end of any of its taxation years or at any other times.

Even if New Masonite Holdings were a FIE for purposes of the FIE Proposals at the end of a taxation year, if the New Common Stock or New Warrants qualified as "exempt interests" for a particular Canadian Holder at that time, the FIE Proposals would not apply in respect of such Canadian Holder's New Common Stock or New Warrants, respectively. Generally, under the FIE Proposals, the New Common Stock or New Warrants would be an "exempt interest" to a particular Canadian Holder at the end of a particular taxation year if: (a) it was reasonable to conclude that the Canadian Holder had no "tax avoidance motive" in respect of the New Common Stock or New Warrants respectively, at that time; and (b) throughout such period the New Common Stock or New Warrants, respectively, were an "arm's length interest" of the Canadian Holder.

Canadian Holders should consult their own tax advisors regarding the FIE Proposals generally in respect of the New Common Stock or New Warrants, including the determination of whether or not they have a "tax avoidance motive" and whether or not the New Common Stock or New Warrants may at any time constitute an "exempt interest" to a Canadian Holder.

If New Masonite Holdings were a FIE, the FIE Proposals include complex provisions to relieve against double taxation of dividends received and amounts included in income under the FIE Proposals. Canadian Holders should consult their own tax advisors in this regard.

*Eligibility for Investment*

The New Common Stock, if listed on a "designated stock exchange" (which includes the TSX and the NYSE), will be qualified investments under the Canadian Tax Act and the Canadian Regulations for trusts governed by registered retirement savings plans, registered retirement income funds, registered education savings plans, registered disability savings plans, deferred profit sharing plans and tax-free savings accounts within the meaning of the Canadian Tax Act (collectively, the "Registered Plans"). The New Warrants will be qualified investments under the Canadian Tax Act and the Canadian Regulations for the Registered Plans (i) if the New Warrants are listed on a designated stock exchange; or (ii) if the New Common Stock are qualified investments and New Masonite Holdings is not an annuitant, a beneficiary, an employer or a subscriber under, or a holder of, the governing Registered Plan and New Masonite Holdings deals at arm's length with each person who is an annuitant, a beneficiary, an employer or a subscriber under, or a holder of, the governing Registered Plan. The New Term Loan and New PIK Loan, as the case may be, will be qualified investments under the Canadian Tax Act and the Canadian Regulations for Registered Plans (other than a deferred profit sharing plan for which any employer is the issuer or is an employer with whom the issuer does not deal at arms' length (within the meaning of the Canadian Tax Act) at a particular time provided that (i) the New Term Loan and New PIK Loan, as the case may be, have, at the particular time, or had at the time of their acquisition by the Registered Plan, an investment grade credit rating with a "prescribed credit rating agency" for purposes of the Canadian Tax Act and the Canadian Regulations; or (ii) the issuer is a Canadian corporation and, is, at the particular time, controlled directly or indirectly by New Masonite Holdings and the shares of New Masonite Holdings are, at the particular time, listed on a designated stock exchange in Canada.

Notwithstanding the foregoing, if the New Common Stock, the New Warrants, the New Term Loan or the New PIK Loan are "prohibited investments" for the purposes of the tax-free savings accounts, a Canadian Holder will be subject to a penalty tax as set out in the Canadian Tax Act.

Canadian Holders should consult their own tax advisors regarding the application of these rules under the Canadian Tax Act and the Canadian Regulations in their particular circumstances.

### **Non-Residents of Canada**

The following discussion applies to a Holder who, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention, and at all relevant times, is not resident in Canada and does not use or hold the Existing Notes and will not use or hold its portion of the New Term Loan, the New PIK Loan, New Common Stock or New Warrants, as the case may be, in carrying on a business in Canada (a "Non-Resident Holder"). In addition, this discussion does not apply to an insurer who carries on an insurance business in Canada and elsewhere or an authorized foreign bank that carries on a Canadian banking business.

*Exchange of the Existing Notes*

Upon the exchange of the Existing Notes for New Term Loan, New PIK Loan, New Common Stock or New Warrants, as the case may be, by a Non-Resident Holder pursuant to the Plan, no taxes will be payable under the Canadian Tax Act by such a Non-Resident Holder. A Non-Resident Holder will be considered for Canadian tax purposes to have acquired any New Term Loan, New PIK Loan, New Common Stock and New Warrants at a cost equal to their fair market value at the time of the exchange. The cost to the holder of each New Common Stock and New Warrant, as the case may be, acquired in exchange for the Existing Notes must then be averaged with the adjusted cost base of all other New Common Stock and New Warrants, as the case may be, held by the Non-Resident Holder as capital property at that time for purposes of subsequently computing the adjusted cost base of each New Common Stock and New Warrant, as the case may be, held by the Non-Resident Holder.

*Holding and Disposing of the New Term Loan, New PIK Loan, New Common Stock and New Warrants*

If New Masonite Holdings is a non-resident of Canada, a Non-Resident Holder generally will not realize any Canadian federal income tax consequences as a result of holding or disposing of the New Term Loan, New PIK Loan, New Common Stock and New Warrants (assuming that such securities are not, and are not deemed to be,

"taxable Canadian property"). The Canadian federal income tax consequences to a Non-Resident Holder are set out below where New Masonite Holdings is a resident of Canada for purposes of the Canadian Tax Act.

### *Holding and Repayment of the New Term Loan and New PIK Loan*

Under the Canadian Tax Act, the payment or deemed payment of interest in respect of the New Term Loan and New PIK Loan to a Non-Resident Holder will be exempt from Canadian non-resident withholding tax. No other taxes on income (including Taxable Capital Gains) will be payable by a Non-Resident Holder under the Canadian Tax Act in respect of the acquisition, holding or repayment of the New Term Loan and New PIK Loan.

### *Dividends on New Common Stock*

Dividends paid or credited and deemed to be paid or credited on New Common Stock to Non-Resident Holders will be subject to non-resident withholding tax under the Canadian Tax Act at a rate of 25%, subject to reduction under the provisions of an applicable income tax treaty or convention.

### *Disposition of New Common Stock*

A disposition by a Non-Resident Holder of New Common Stock will not be subject to Canadian tax unless such New Common Stock constitutes "taxable Canadian property" (as defined in the Canadian Tax Act) to the Non-Resident Holder at the time of the disposition and relief from taxation is not available under an applicable income tax treaty or convention.

Unless the New Common Stock is listed on a "designated stock exchange" (which includes the TSX and the NYSE) at the time of such disposition, generally such New Common Stock will constitute taxable Canadian property to a Non-Resident Holder at the time of its disposition. If the New Common Stock is not listed on a designated stock exchange, the notification and withholding provisions of section 116 of the Canadian Tax Act will apply to Non-Resident Holders.

### *Exercise or Disposition of New Warrants*

No gain or loss will be realized by a Non-Resident Holder upon the exercise of a New Warrant. The cost to the Non-Resident Holder of each New Common Stock acquired upon the exercise of a New Warrant will be equal to the aggregate of the holder's adjusted cost base of the New Warrant immediately before the exercise thereof and the exercise price paid. The cost to the holder of each New Common Stock acquired upon the exercise of a New Warrant must then be averaged with the adjusted cost base of all other New Common Stock held by the Non-Resident Holder as capital property at the time of the exercise of the New Warrant for purposes of subsequently computing the adjusted cost base of each New Common Stock held by the Non-Resident Holder.

A Non-Resident Holder will not be subject to Canadian tax in respect of the disposition or deemed disposition of a New Warrant unless such New Warrant constitutes taxable Canadian property to the Non-Resident Holder at the time of the disposition and relief from taxation is not available under an applicable income tax treaty or convention. Provided the New Common Stock is listed on a "designated stock exchange" (which includes the TSX and the NYSE) at the time of such disposition, generally such New Warrants will not constitute taxable Canadian property to a Non-Resident Holder.

### **Consequences to Masonite**

The settlement or extinguishment of Masonite International Corporation's commercial debt obligations (as defined in the Canadian Tax Act) for an amount that may be less than the full amount owed by Masonite International Corporation (the "Forgiven Amount") may result in the application of the Canadian debt forgiveness rules. Under these rules, the Forgiven Amount will reduce certain tax attributes of Masonite International Corporation in the order prescribed by the Canadian Tax Act and, could, in certain circumstances require an amount to be included in Masonite International Corporation's income.

Following the Restructuring Transactions, Masonite International Corporation believes that its tax attributes will exceed the Forgiven Amount, and accordingly, that it will not be required to include any amount in income as a result of the settlement or extinguishment.  However, if the Forgiven Amount exceeds the tax attributes, material adverse tax consequences to Masonite International Corporation would occur.

## Recommendation of Masonite

In the opinion of Masonite, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Masonite's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, Masonite recommends that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated: April 16, 2009

Respectfully submitted,

MASONITE CORPORATION
(for itself and on behalf of each of the Masonite Debtors)

By:
Name: Anthony D. DiLucente
Title: Executive Vice President and Chief Financial Officer

Prepared by:

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4800 (telephone)

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware
(302) 651-7700 (telephone)

ATTORNEYS FOR THE MASONITE DEBTORS